## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

COLUMBIA HOUSING/PNC
INSTITUTIONAL FUND IV LIMITED
PARTNERSHIP, COLUMBIA HOUSING
SLP CORPORATION, OCWEN 2000-LLC,
PNC BANK, and COLUMBIA
HOUSING/PNC FUND IV, INC.,

CIVIL ACTION NO. 06-371

          Plaintiffs,

v.

OCWEN FEDERAL BANK FSB,
OCWEN INVESTMENT CORPORATION,
and OCWEN LOAN SERVICING, LLC

          Defendants.

## DEFENDANTS' MOTION TO DISMISS
## PURSUANT TO FED. R. CIV. P. 12(b)(1)

**SAUL EWING LLP**

Domenic E. Pacitti (No. 3989)
Michael F. Bonkowski (No. 2219)
Kimberly L. Gattuso (No. 3733)
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899
(302) 421-6800
(302) 421-6813
dpacitti@saul.com

Counsel for Defendants
OCWEN FEDERAL BANK FSB, OCWEN
INVESTMENT CORPORATION, and
OCWEN LOAN SERVICING, LLC

OF COUNSEL:

Joshua C. Krumholz (not yet admitted)
Elizabeth M. Mitchell (not yet admitted)
Benjamin M. Mcgovern (not yet admitted)
HOLLAND & KNIGHT LLP
10 St. James Avenue
Boston, MA 02116
(617) 523-2700 (telephone)
(617) 523-6850 (facsimile)
joshua.krumholz@hklaw.com

DATED:      June 30, 2006

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...........................................................................................................1

NATURE AND STAGE OF PROCEEDINGS .....................................................................1

SUMMARY OF ARGUMENT ..........................................................................................2

FACTUAL BACKGROUND..............................................................................................2

      The Parties and the Operative Agreements................................................................2

      The De-Thrifting and Dissolution of Ocwen FSB....................................................4

      OLS Has Acted As The Managing Member Of Ocwen 2000 Since July 2005.........5

      The Plaintiffs' Claim of Controversy .......................................................................6

ARGUMENT...................................................................................................................8

    I.     THE STANDARD OF REVIEW ON A MOTION TO DISMISS
           UNDER RULE 12(b)(1)...............................................................................8

    II.    THIS COURT LACKS SUBJECT-MATTER JURISDICTION
           BECAUSE THERE IS NOT COMPLETE DIVERSITY BETWEEN
           THE PARTIES...............................................................................................9

    III.   NO ACTUAL CASE OR CONTROVERSY EXISTS WITH REGARD
           TO THE PAYMENTS UNDER THE PSA...................................................11

CONCLUSION..............................................................................................................14

## TABLE OF AUTHORITIES

### CASES

Arrowhead Indus. Water, Inc. v. Ecolochem, Inc., 846 F.2d 731 (Fed. Cir. 1988)...........13

BP Chems. Ltd. v. Union Carbide Corp., 4 F.3d 975 (Fed. Cir. 1993) .............................12

Bell Atlantic Corp. v. MFS Communications Co., 901 F. Supp. 835 (D. Del. 1995) ...............................................................................................................................11

Breitigan v. New Castle County, 350 F. Supp. 2d 571 (D. Del. 2004)..............................12

Dow Chem. Co. v. Exxon Chem. Patents, Inc., 1996 WL. 571541 (D. Del. 1996) ..........12

Employers Ins. of Wausau v. Crown Cork & Seal Co., Inc., 905 F.2d 42 (3d Cir. 1990) .................................................................................................................................9

GMAC Commercial Credit LLC v. Dillard Dept. Stores, Inc., 357 F.3d 827 (8th Cir. 2004).......................................................................................................................10

Grupo Dataflux v. Atlas Global Group, LLP, 541 U.S. 567 (2004)..................................11

Indianapolis v. Chase Nat'l Bank, 314 U.S. 63 (1941) ........................................................9

Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee, 456 U.S. 694 (1982)................................................................................................................................9

Ketterson v. Wolf, 2001 WL. 940909 (D. Del. 2001) .........................................................9

Medtronic Vascular, Inc. v. Boston Scientific Corp., 348 F. Supp. 2d 316 (D. Del. 2004) ......................................................................................................................8, 10

MDIP, Inc. v. Rapoport, 2005 WL. 1242157 (D. Del. 2005).........................................9, 10

Mortensen v. First Fed. Sav. and Loan Ass'n, 549 F.2d 884 (3d Cir. 1977) .......................8

NutraSweet Co. v. Ajinomoto Co., 423 F. Supp. 2d 450 (D. Del. 2006) ..........................12

Polak v. Kobayashi, 2005 WL. 2008306 (D. Del. 2005)......................................................9

Shamrock Holdings of California, Inc. v. Arenson, 421 F. Supp. 2d 800 (D. Del. 2006) ...............................................................................................................................12

Smith v. DCA Food Indus., Inc., 269 F. Supp. 863 (D.C. Md. 1967) ...............................11

Vermeer Mfg. Co. v. Deere & Co., 379 F. Supp. 2d 645 (D. Del. 2005)...........................12

Wisconsin Dep't of Corrections v. Schacht, 524 U.S. 381 (1998).............................6, 9, 10

## RULES AND STATUTES

Fed. R. Civ. P. 12(b)(1)..................................................................................................3, 8

Fed. R. Civ P. 67...............................................................................................................1

28 U.S.C. § 1332(a) ..........................................................................................................9

28 U.S.C. § 2201, et seq, The Declaratory Judgment Act .................................................11

28 U.S.C.A. § 2201(a) (West 1994)..................................................................................11

## INTRODUCTION

In bringing this action, the plaintiffs, Columbia Housing/PNC Institutional Fund IV

Limited Partnership ("PNC Fund IV"), Columbia Housing SLP Corporation ("Columbia SLP"),

Ocwen 2000-LLC ("Ocwen 2000"), PNC Bank ("PNC") and PNC Fund IV, Inc. ("Fund IV,

Inc.") (collectively, the "Plaintiffs"), purport to bring into federal court a purely internal dispute

regarding the status of the members of a limited liability company. Not surprisingly, no subject-

matter diversity lies because diversity of citizenship between the parties is not complete.

Specifically, diversity of a limited liability company is based upon the residence of its members.

Where, as pled here, the company itself is adverse to its own members, diversity can never be

complete. For that reason, the entire action must be dismissed.

In addition, the Plaintiffs seek a declaration from this Court that they may avoid

payments under a purchase and sale agreement based solely upon purely hypothetical

circumstances that have not arisen and, very likely, will never arise. For that reason, no actual

case or controversy exists regarding that agreement or those payments. As such, even if

diversity existed, that portion of the declaratory judgment action must be dismissed.

## NATURE AND STAGE OF PROCEEDINGS

On June 5, 2006, Plaintiffs filed their complaint seeking declaratory relief regarding the

effect of the dissolution of Ocwen FSB on the parties' respective rights and obligations pursuant

to the Purchase and Sale Agreement ("PSA"), the Eighth Amendment to the Purchase and Sale

Agreement Including Capital Contribution Agreement (the "Eighth Amendment") and the

Amended and Restated Operating Agreement of Ocwen 2000-LLC (the "Ocwen 2000 Operating

Agreement") and/or the Tax Indemnity Agreement (the "Tax Indemnity"). On that same day,

Plaintiffs filed a three-paragraph Motion for Leave to Deposit Funds into the Court Registry (the

"Motion"), pursuant to Federal Rule of Civil Procedure 67 ("Rule 67").

On June 22, 2006, Defendants filed their Opposition to Plaintiffs' Motion for Leave to Deposit Funds into the Court Registry (Docket No. 7) ("Opposition"). On that same date and unbeknownst to Defendants, the Court entered its Order granting Plaintiffs' Motion.

On June 30, 2006, Defendants filed a Motion for Reconsideration/Reargument of the Court's June 22, 2006 Order. Additionally, on June 30, 2006, Defendants filed this Motion to Dismiss.

## SUMMARY OF ARGUMENT

1.     The Court lacks subject-matter jurisdiction because there is not complete diversity between the parties.

2.     No actual case or controversy exists with regard to the payments under the PSA.

## FACTUAL BACKGROUND

### The Parties and the Operative Agreements

The Complaint focuses upon two distinct agreements: (1) the Amended and Restated Operating Agreement of Ocwen 2000-LLC (the "Operating Agreement"); and (2) the Purchase and Sale Agreement, with amendments (the "PSA"). *See* Complaint ("Compl."), ¶¶ 15-17. Parties to the Operating Agreement are:

- PNC Fund IV. *See* Compl., ¶ 15. PNC Fund IV is a Massachusetts limited partnership. *See id.*, ¶ 1. Its partners are PNC, a national banking association located in Pennsylvania, and Fund IV, Inc., a Massachusetts corporation with a principal place of business in Pennsylvania. *See id.*, ¶¶ 4, 5, 9.

- Ocwen Federal Bank FSB ("Ocwen FSB"). *See id.*, ¶ 15. Ocwen FSB is a dissolved federal savings bank previously located in Florida. *See id.*, ¶ 6.

Parties to the PSA are:

2

- PNC Fund IV. *See id.*, ¶ 16.

- Ocwen FSB. *See id.*

- Ocwen Investment Corp. ("Ocwen Investment"). *See id.* Ocwen Investment is a New Jersey corporation with its principal place of business in Florida. *See id.*, ¶ 7.

- Ocwen 2000. *See id.*, ¶ 16. Ocwen 2000 is a Delaware limited liability company. *See id.*, ¶ 3. PNC Fund IV is a member of that LLC. *See id.*, ¶ 10. As discussed below, Ocwen FSB was the managing member of Ocwen 2000 before it was dissolved and replaced by Ocwen Loan Servicing LLC ("OLS"), a Delaware limited liability company. *See id.*, ¶¶ 8, 15. OLS's sole member is Ocwen Financial Corporation ("Ocwen Financial"). *See* Affidavit of David Ho in Support of Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) ("Ho Aff."), ¶ 2 filed contemporaneously herewith. Ocwen Financial is a Florida corporation. *See id.*

The Operating Agreement governs the operations of Ocwen 2000. *See* Operating Agreement, attached to Affidavit of Michael Mosher filed in Support of Defendants' Opposition to Plaintiffs' Motion For Leave to Deposit Funds into the Court Registry (Docket No. 8) ("Mosher Aff.") at Tab 4. Ocwen 2000 was created to own and manage a number of limited partnership interests (the "Interests") in a series of limited partnerships, each of which owns a separate affordable housing property. *See id.*, pp. 1-2, 4.

The PSA concerns the acquisition of those Interests. *See* PSA, pp. 8, 11-15, attached to Mosher Aff. at Tab 1. The PSA creates a payment stream from PNC Fund IV to the sellers (the "Sellers") of those Interests. *See id* and Eighth Amendment to PSA attached to Mosher Aff. at Tab 2, §1.1. Pursuant to the PSA, PNC Fund IV took an interest in Ocwen 2000 for the purpose of controlling the ultimate disposition of the Interests. *See* PSA, p. 8. In exchange, the PSA

3

obligated PNC Fund IV (or a designee) to make payments to Ocwen 2000 (the "Payments"). *See* PSA and Eighth Amendment to PSA, §1.1, attached to Mosher Aff. at Tabs 2 and 3, respectively; Compl., ¶ 30. Ocwen 2000 in turn paid that money to Ocwen FSB as the agent of the Sellers of the Interests. *See* Compl., ¶ 31. PNC Fund IV has never claimed that it did not receive the partnership interests or the allocation of benefits to which it was entitled, or that the Payments were not owed for any reason. *See generally* Compl.; Mosher Aff., ¶¶ 6, 24.

## The De-Thrifting and Dissolution of Ocwen FSB

The Plaintiffs' claims revolve around the dissolution and de-thrifting of Ocwen FSB, and the assumption by OLS of Ocwen FSB's rights and responsibilities. *See* Compl., ¶¶ 19-36. Prior to July 1, 2005, Ocwen FSB operated as a federal savings bank organized under the Home Owner's Loan Act. *See* Mosher Aff., ¶ 12. In November 2004, Ocwen FSB filed an Application for Voluntary Dissolution with the Office of Thrift Supervision ("OTS"). *See id.*

On June 13, 2005, OTS approved the plan of voluntary dissolution subject to certain conditions. *See id.*, ¶ 13. One condition was that Ocwen FSB's parent, Ocwen Financial, guarantee Ocwen FSB's obligations and enter into cash collateral and cash trust agreements with Ocwen FSB, all on terms acceptable to OTS. *See id.*

On June 28, 2005, following OTS approval, Ocwen Financial entered into an Assignment and Assumption Agreement ("Assignment Agreement") with, among others, Ocwen FSB and OLS. *See id.*, ¶ 14. A true and accurate copy of that agreement is attached to the Mosher Aff. at Tab 5. Under the Assignment Agreement, Ocwen FSB assigned all of its assets, liabilities and remaining business to OLS. *See* Mosher Aff., ¶ 14.

On that same date, and again with OTS approval, Ocwen Financial entered into a Guaranty with OLS for all obligations it had assumed from Ocwen FSB. *See id.*, ¶ 15. A true and accurate copy of that Guaranty is attached to the Mosher Aff. at Tab 6. As Ocwen FSB's

4

parent, Ocwen Financial's guaranty of OLS's obligations gave PNC and its related entities more security than they had when the obligation ran to Ocwen FSB alone. *See* Mosher Aff., ¶ 16. Ocwen Financial has greater financial resources than Ocwen FSB had by itself. *See id.*

Effective June 30, 2005, with the permission of OTS and after a long regulatory process, Ocwen FSB terminated its status as a federal savings bank.

## OLS Has Acted As The Managing Member Of Ocwen 2000 Since July 2005

As early as April 12, 2005, more than two months before the de-thrifting, Ocwen Financial formally notified PNC and its related entities of the de-thrifting process of Ocwen FSB. *See id.*, ¶ 17 and email dated April 12, 2005, attached to Mosher Aff. at Tab 7. Thereafter, Ocwen and PNC and/or its related entities engaged in multiple communications discussing the de-thrifting and dissolution process prior to its occurrence. *See* Mosher Aff., ¶¶ 18-20 and emails attached to Mosher Aff. at Tabs 8 and 9. Those communications continued after the de-thrifting and dissolution occurred. *See* Mosher Aff., ¶¶ 21-22 and emails attached to Mosher Aff. at Tabs 10 and 11. During that entire time, neither PNC nor its affiliates complained about nor asserted any rights regarding the process. *See* Mosher Aff., ¶ 23.

Since July 2005, OLS has acted as the Managing Member in all respects in conformance with the Assignment Agreement. Prior to the filing of this lawsuit, no PNC-related entity complained of OLS's conduct, nor did they assert that OLS was not the Managing Member. In fact, even when, in January 2006, a PNC-entity asserted that it was the Managing Member of two other Ocwen companies, it still did not assert that OLS was not the true Managing Member of Ocwen 2000.[1]

---

[1]    The Plaintiffs' claim with regard to those other companies is the subject of three other lawsuits in Massachusetts and Florida.

5

For the eleven months from OLS's first assuming its Managing Member role to the time this lawsuit was filed, neither Fund IV, Inc. nor any PNC-related entity asserted that it was the true Managing Member of Ocwen 2000. *See* Ho Aff., ¶ 4. None of the Plaintiffs have taken any action to limit or restrict OLS's management control, nor have they claimed to have done so. *See id.* Similarly, none of the Plaintiffs have taken any action or made any statement that would designate Fund IV, Inc. as the Managing Member of Ocwen 2000. *See id.*, ¶ 5. Likewise, no PNC-entity has asserted management control over Ocwen 2000. *See id.*

Notably, after the de-thrifting and dissolution of Ocwen FSB occurred, and after PNC and its related entities were put on notice of that event, PNC Fund IV nevertheless made a substantial Payment under the PSA. *See* Mosher Aff., ¶ 24. Specifically, on August 26, 2005, Ocwen provided PNC with an invoice for a Payment under the PSA. *See id.* and invoice attached to Mosher Aff. to Tab 12. On August 29, 2005, pursuant to its obligations under the PSA, PNC Fund IV paid OLS the amount of $5,216,379.35. *See* Mosher Aff., ¶ 24 and wire transfer receipt attached to Mosher Aff. at Tab 13.

Thus, with full knowledge of the de-thrifting and dissolution of Ocwen FSB, PNC Fund IV already has made a substantial Payment. As such, while the Plaintiffs now ask this Court to declare that OLS should no longer be the Managing Member, OLS has acted in that capacity, with the Plaintiffs' knowledge and without complaint, through the present.

## The Plaintiffs' Claim of Controversy

With respect to the Operating Agreement, the Plaintiffs allege that Ocwen FSB's dissolution resulted in an "Event of Withdrawal." *See* Compl., ¶¶ 19-24. The Plaintiffs ask the Court to declare that, as a result, OLS is not the Managing Member and should be replaced by Fund IV, Inc. *See* Compl., prayers a-b.

6

With respect to the PSA, no true controversy can be claimed. The Plaintiffs assert that Ocwen FSB's dissolution negates PNC Fund IV's obligations to make the Payments. *See* Compl., ¶ 35. According to the PSA, however, the Payments "shall be absolute and unconditional except as set forth in this Agreement." *See* Eighth Amendment to PSA, § 1.1. Accordingly, one must look within the PSA for any qualification to that obligation.

In the Complaint, the Plaintiffs rely upon Section 3.3, which governs PNC Fund IV's rights of offset. It provides that PNC Fund IV may offset its Payment obligations by: (1) the amount of any Indemnity Payment that Ocwen FSB has failed to pay; or (2) any costs incurred by PNC Fund IV as a result of the FDIC's placing Ocwen FSB into receivership or conservatorship. *See* Eighth Amendment to PSA, § 3.3 and Compl., ¶ 32.

The Plaintiffs do not claim, however, that either of these events has occurred. *See generally* Compl. They do not claim that an Indemnity Payment is owed or is even imminent. *See id.*, ¶¶ 33-36. They do not claim that Ocwen FSB has been delinquent. *See id.* Similarly, they do not claim that they have suffered any costs as a result of a receivership or conservatorship, or indeed that either event has actually happened. *See id.*[2] As such, they do not claim that any condition presently exists or is imminent that would give PNC Fund IV the right to withhold future payments.

Instead, the Plaintiffs point to a hypothetical, nonexistent risk, based upon the dissolution of Ocwen FSB. Specifically, the Plaintiffs theorize that Ocwen FSB's dissolution might prevent it from being able to satisfy heretofore unknown indemnity obligations. *See* Compl., ¶ 35. They allege that the dissolution "constitutes a breach and/or anticipatory breach" of some as yet

---

[2]     The Plaintiffs also claim that the dissolution of Ocwen FSB is the equivalent of a receivership or conservatorship. *See* Compl., ¶ 36. That statement is inaccurate. *See* Mosher Aff., ¶¶ 12-14. Regardless, the Plaintiffs do not claim that they have incurred any costs associated with the dissolution, as required in Section 3.3 of the Eighth Amendment, so the relevance of this allegation is unclear.

7

unformed obligation. *See id.* Accordingly, as discussed herein, no case or controversy exists over which this Court may exercise jurisdiction.

## ARGUMENT

## I.    THE STANDARD OF REVIEW ON A MOTION TO DISMISS UNDER RULE 12(b)(1)

The defendants seek to dismiss the Complaint for lack of subject-matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1). A motion to dismiss under Rule 12(b)(1) challenges the jurisdiction of a court to address the merits of a plaintiff's complaint. *See* Fed. R. Civ. P. 12(b)(1). The motion may present either a facial or factual challenge to subject matter jurisdiction. *See Mortensen v. First Fed. Sav. and Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). A factual challenge to subject matter jurisdiction, which is presented by this motion, exists where there is an attack on "the existence of subject matter jurisdiction in fact, quite apart from any pleadings." *Id.*

When a Court considers a factual challenge to jurisdiction, it does not presume the truth of the plaintiff's allegations, and the existence of disputed material facts does not preclude the Court from evaluating for itself the merits of jurisdictional claims. *See id.*; *Medtronic Vascular, Inc. v. Boston Scientific Corp.,* 348 F. Supp. 2d 316, 321 (D. Del. 2004) (stating that under a factual attack, the Court may "consider affidavits, depositions, and testimony to resolve factual issues bearing on jurisdiction."). Moreover, the plaintiff has the burden of proof that jurisdiction does in fact exist. *See Mortensen*, 549 F.2d at 891.

The instant motion presents a factual challenge because the defendants dispute the existence of the jurisdictional facts alleged in the Complaint. Thus, the Court is not required to presume the truth of the Plaintiffs' allegations. Under that standard, the Plaintiffs cannot meet their burden of proving that jurisdiction exists.

8

## II.    THIS COURT LACKS SUBJECT-MATTER JURISDICTION BECAUSE THERE IS NOT COMPLETE DIVERSITY BETWEEN THE PARTIES

The Complaint rests subject-matter jurisdiction upon diversity of citizenship pursuant to

28 U.S.C. § 1332(a). *See* Compl., ¶ 12.[3]  Section 1332 requires that the matter be between

"citizens of different States." *See* 28 U.S.C. § 1332(a)(1).

To satisfy the statute, however, diversity must be *complete.*  In other words, each

plaintiff's residence must be different than each of the defendant's place of residence. *See*

*Wisconsin Dep't of Corrections v. Schacht,* 524 U.S. 381, 389 (1998), *citing to Insurance*

*Corp. of Ireland v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702 (1982) ("The presence of

the nondiverse party automatically destroys original jurisdiction: No party need assert the defect.

No party can waive the defect or consent to jurisdiction"); *Employers Ins. of Wausau v. Crown*

*Cork & Seal Co., Inc.,* 905 F.2d 42, 45 (3d Cir. 1990), *quoting from Indianapolis v. Chase Nat'l*

*Bank,* 314 U.S. 63, 69 (1941) ("In order to sustain jurisdiction based on the diversity of the parties,

there must exist an 'actual, substantial controversy between citizens of different states, all of

whom on one side of the controversy are citizens of different states from all parties on the other

side.'")

In this instance, the Complaint fails because there is not complete diversity. One of the

named plaintiffs is Ocwen 2000. As a limited liability company, residency for purposes of

diversity is based upon the residence of its members. *See MDIP, Inc. v. Rapoport,* 2005 WL

1242157, at *4 (D. Del. 2005), a copy of which is appended hereto at Exhibit A; *Polak v.*

---

[3]      The Complaint also notes that jurisdiction is based upon a choice of forum provision in the Operating Agreement, which provides for jurisdiction in either state or federal court in Delaware. *See* Compl., ¶ 13. Thus, to the extent this matter lacks complete diversity, the Plaintiffs may re-file in Delaware Chancery Court. *See* 6 Del. C. § 18-110 (investing Chancery Court with power to determine "the right of any person to become or continue to be a manager of a limited liability company, and, in case the right to serve as a manager is claimed by more than 1 person, may determine the person or persons entitled to serve as managers.").

9

*Kobayashi,* 2005 WL 2008306, at *2 (D. Del. 2005) (holding that a Delaware limited liability company "assumes the citizenship of its members"), a copy of which is appended hereto at Exhibit B; *Ketterson v. Wolf,* 2001 WL 940909, at *3 (D. Del. 2001) ("After a review of the available case law, the Court concludes that a limited liability company is a citizen of the states of which its individual members are citizens"), a copy of which is appended hereto at Exhibit C.[4]

At the time the dispute arose and the lawsuit was filed, OLS was and is the Managing Member of Ocwen 2000, having succeeded Ocwen FSB. *See* Compl., ¶ 8 and Ho Aff., ¶ 3. OLS also is, however, a defendant. *See* Compl., ¶¶ 6 and 8. With OLS as a member of the plaintiff, Ocwen 2000, and also named as a defendant, by definition there cannot be complete diversity. *See Wisconsin Dep't of Corrections,* 524 U.S. at 388-89 ("A case falls within the federal district court's "original" diversity "jurisdiction" only if diversity of citizenship among the parties is complete, *i.e.,* only if there is no plaintiff and no defendant who are citizens of the same state.")

The Plaintiffs allege, without any specificity or detail, that "Fund IV, Inc. was designated as and became Managing Member of Ocwen 2000, and remains the Managing Member of Ocwen 2000." *See id.,* ¶ 24. That statement, however, is incorrect and should be disregarded by the Court. *See Medtronic Vascular, Inc.,* 348 F. Supp. 2d at 321 (holding that under a factual 12(b)(1) challenge to a court's jurisdiction, "the court is not confined to allegations in the ... complaint, but can consider affidavits, depositions, and testimony to resolve factual issues

---

[4]     For diversity jurisdiction purposes, it is irrelevant that a limited liability company may be organized under the laws of a particular state. *See GMAC Commercial Credit LLC v. Dillard Dept. Stores, Inc.,* 357 F.3d 827, 828-29 (8th Cir. 2004) (holding that, although limited liability companies and corporations have similar attributes, different "citizenship" rules apply to each: "Generally, a district court's diversity jurisdiction in a suit by or against [an unincorporated] entity depends on the citizenship of all the members ... The only exception to this rule is a corporation's citizenship, which is (1) the state of incorporation, and (2) the state where the corporation's principal place of business is located ... The corporation exception coincides with the common law's tradition of treating only incorporated groups as legal persons and accounting for all other groups as partnerships ... The Supreme Court has repeatedly resisted extending the corporation exception to other entities .... ") (internal citations omitted). *See also MDIP, Inc.,* 2005 WL 1242157, at *4 (recognizing the "bright-line rule" that the citizenship of an artificial entity depends upon the citizenship of its members, unless that entity is a corporation).

bearing on jurisdiction ... In such a situation, no presumptive truthfulness attaches to plaintiffs allegations ....") (internal citations omitted). None of the Plaintiffs took any action or made any statement that designated Fund IV, Inc. as the Managing Member of Ocwen 2000. *See* Ho Aff., ¶ 5. Indeed, prior to filing this lawsuit, at no time has any PNC-related entity asserted that Fund IV, Inc. was the Managing Member, nor did any PNC-related entity ever assert management control over Ocwen 2000. *See id.* ¶¶ 4-5. In all respects, OLS has managed the company for the eleven months since Ocwen FSB's dissolution and assignment, and no PNC-entity has even attempted to restrict or limit OLS's management control during this time. *See id.,* ¶¶ 3-4.

As such, OLS remains the Managing Member until and unless a court of competent jurisdiction determines that it is not. *See* Operating Agreement, Article 5 (outlining rights, powers and duties of Managing Member), attached to Mosher Aff. at Tab 4. Determination of diversity must be made based upon the status of the parties at the time the case was filed, and not based upon the Plaintiffs' requested relief. *See Grupo Dataflux v. Atlas Global Group, LLP*, 541 U.S. 567, 570 (2004) ("It has long been the case that "the jurisdiction of the Court depends upon the state of things at the time of the action brought.") (internal citation omitted). Therefore, at the time the Complaint was filed, the parties were not and are not completely diverse and no jurisdiction lies.

## III.    NO ACTUAL CASE OR CONTROVERSY EXISTS WITH REGARD TO THE PAYMENTS UNDER THE PSA

The Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.* does not grant jurisdiction to federal courts. Rather, it merely makes available an additional remedy in cases over which federal courts have jurisdiction by diversity or by federal question. *See Bell Atlantic Corp. v. MFS Communications Co.,* 901 F. Supp. 835, 840 (D. Del. 1995). Accordingly, if the Court determines that diversity jurisdiction exists, the further jurisdictional question arises as to

11

whether this lawsuit presents a case of actual controversy within the meaning of the Declaratory

Judgment Act.[5] *See Smith v. DCA Food Indus., Inc.*, 269 F. Supp. 863, 868 (D.C. Md. 1967).

"To state a claim for a declaratory judgment, a plaintiff must demonstrate the existence of an

actual controversy in which the parties have adverse legal interests, and which is of sufficient

immediacy to warrant a declaration of rights." *Shamrock Holdings of California, Inc. v.*

*Arenson*, 421 F. Supp. 2d 800, 805 (D. Del. 2006) (internal citations omitted).  This Court has

explained that:

> The purpose of the Declaratory Judgment Act is to enable a person who is
> reasonably at legal risk because of an unresolved dispute, to obtain judicial
> resolution of that dispute without having to await the commencement of
> legal action by the other side.  It accommodates the practical situation
> wherein the interests of one side to the dispute may be served by delay in
> taking legal action.  However, the controversy must be actual, not
> hypothetical or of uncertain prospective occurrence.  The requirement of
> actual controversy encompasses concepts such as ripeness, standing, and
> the prohibition against advisory judicial rulings – all raised in this case.

*NutraSweet Co. v. Ajinomoto Co.*, 423 F. Supp. 2d 450, 454-55 (D. Del. 2006), *quoting BP*

*Chems. Ltd. v. Union Carbide Corp.*, 4 F.3d 975, 977 (Fed. Cir. 1993); *Vermeer Mfg. Co. v.*

*Deere & Co.*, 379 F. Supp. 2d 645, 648 (D. Del. 2005) (same).

If no actual controversy is presented, the court must then dismiss for want of jurisdiction.

*See Breitigan v. New Castle County*, 350 F. Supp. 2d 571, 582 (D. Del. 2004) (dismissing

---

[5] The Declaratory Judgment Act provides in pertinent part:

> (a) In a case of actual controversy within its jurisdiction, expect with respect to Federal taxes
> other than actions brought under section 7428 of the Internal Revenue Code of 1986, a proceeding
> under section 505 or 1146 of title 11, or in any civil action involving an antidumping or
> countervailing duty proceeding regarding a class or kind of merchandise of a free trade area
> country (as defined in section 516A(f)(10) of the Tariff Action of 1930), is determined by the
> administering authority, any court of the United States, upon the filing of an appropriate pleading,
> may declare the rights and other legal relations of any interested party seeking such declaration,
> whether or not further relief is or could be sought.  Any such declaration shall have the force and
> effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C.A. § 2201(a) (West 1994).

declaratory judgment action for lack of subject matter jurisdiction where plaintiff failed to show that a controversy currently existed and appeared to be seeking no more than an adviosry opinion, which Article III courts have no power to issue). Moreover, even where an actual controversy exists, the Declaratory Judgment Act does not confer a right to a declaratory judgment upon litigants. *See Dow Chem. Co. v. Exxon Chem. Patents, Inc.*, 1996 WL 571541, at * 2 (D. Del. 1996), a copy of which is appended at Exhibit D, *citing Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 733 n.6 (Fed. Cir. 1988). Rather, it is an enabling act conferring discretion on the courts to entertain such claims. *See id.*

Based upon the Plaintiffs' allegations, they have asserted nothing more than a theoretical risk based upon hypothetical scenarios that have not yet (and likely will never) come to fruition. No event under the PSA has occurred that would trigger any right of offset regarding the Payments. Further, in the unlikely circumstance that some event occurs at some hypothetical date in the future, PNC Fund IV simply may offset that amount from a future Payment. That is the purpose of the offset provision. Plain and simple, there is no controversy or threat of one about which the Plaintiffs can complain, and this matter should be dismissed for want of subject-matter jurisdiction.

In addition, as the Plaintiffs have known since at least December 2005, Ocwen FSB's, and now OLS's, obligations under the PSA and related documents are fully guaranteed by Ocwen Financial. *See* Mosher Aff., ¶¶ 25-26. In fact, information regarding the Guaranty was placed on Ocwen's website. *See id.*, ¶ 27 and website attached to Mosher Aff. at Tab 18. Ocwen Financial provides greater financial protection than even Ocwen FSB provided, such that the Plaintiffs are, if anything, in a better financial position than before the de-thrifting of Ocwen FSB. *See* Mosher Aff., ¶ 16. As such, under any scenario, there is no circumstance where the

13

Plaintiffs will be harmed in any way, and there is no scenario where PNC Fund IV will not have to make Payments in conformance with the PSA.  For that additional reason, the Court should at least exercise its discretion and decline to adjudicate a dispute that is simply of no consequence to the parties involved.

### CONCLUSION

The defendants respectfully request that this Court dismiss the Plaintiffs' Complaint based upon a lack of subject-matter jurisdiction.

SAUL EWING LLP

Domenic E. Pacitti (No. 3989)
Michael F. Bonkowski (No. 2219)
Kimberly L. Gattuso (No. 3733)
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE  19899
(302) 421-6800
(302) 421-6813
dpacitti@saul.com

Counsel for Defendants
OCWEN FEDERAL BANK FSB, OCWEN
INVESTMENT CORPORATION, and
OCWEN LOAN SERVICING, LLC

OF COUNSEL:

Joshua C. Krumholz (not yet admitted)
Elizabeth M. Mitchell (not yet admitted)
Benjamin M. Mcgovern (not yet admitted)
HOLLAND & KNIGHT LLP
10 St. James Avenue
Boston, MA 02116
(617) 523-2700 (telephone)
(617) 523-6850 (facsimile)
joshua.krumholz@hklaw.com

DATED:    June 30, 2006

14

# EXHIBIT A

Westlaw.

Slip Copy
Slip Copy, 2005 WL 1242157 (D.Del.)
**(Cite as: Slip Copy)**

Page 1

# H

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
THE LITIGATION TRUST OF MDIP, INC.
(formerly known as Mosler, Inc.) and Its Affiliates as
Assignee of Certain Claims Pursuant to the Second
Amended Joint Plan of Liquidation of MDIP, Inc.
and Its Affiliates, Plaintiffs,
v.
Michael RAPOPORT, et al., Defendants.
**No. Civ.A. 03-779GMS.**

May 25, 2005.

Michael F. Bonkowski, Mark Minuti, Saul Ewing
LLP, Wilmington, DE, for Plaintiffs.
Paul J. Lockwood, Eric M. Davis, Skadden, Arps,
Slate, Meagher & Flom, Wilmington, DE, for
Defendants.

*MEMORANDUM*

SLEET, J.

## I. INTRODUCTION

**\*1** Presently before the court are six motions: a
motion to dismiss Counts I and II of the Amended
Complaint for lack of subject matter jurisdiction
(D.I.67), a motion for partial summary judgment as to
Counts I and II (D.I.84), a motion to strike the
plaintiff's summary judgment affidavits (D.I.114), a
motion to strike the plaintiff's jury demand (D.I.127),
a motion *in limine* requesting the court to exclude
evidence and testimony not disclosed in plaintiff's
responses to contention interrogatories (D.I.124), and
a motion *in limine* requesting the court to preclude
evidence of events that took place prior to August 6,
1998 (D.I.125). For the following reasons, the court
will grant the motion to dismiss Counts I and II, and
deny the remaining motions as moot insofar as they
pertain to Counts I or II.

## II. STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil
Procedure 12(b)(1) may present either a facial or
factual challenge to subject matter jurisdiction.

*Mortensen v. First Fed. Sav. and Loan Ass'n,* 549
F.2d 884, 891 (3d Cir.1977). The present motion
presents a facial challenge to the complaint because
the jurisdictional facts are not in dispute. Such a
motion requires the court to consider the allegations
of the Amended Complaint as true and to make all
reasonable inferences in the plaintiff's favor. *See id.*

## III. BACKGROUND

The following facts are alleged in the Amended
Complaint, which the court assumes to be true for the
purpose of deciding this motion. Mosler, Inc.
("Mosler"), a Delaware corporation, traces its roots
back to 1867, when the Mosler-Bahmann Safe
Company was founded by Gustav Mosler. (D.I. 28 ¶
17.) From 1967 to 1990, Mosler went through a
series of buyouts that ultimately resulted in 59% of
Mosler's stock being held by Kelso & Co., Inc.
("Kelso") and a few of Mosler's senior managers.
(Id.¶ ¶ 21-23.) This permitted Kelso to "install"
defendants William Marquard, Thomas Wall, and
Robert Young (collectively, "the Kelso Directors")
on Mosler's Board of Directors. (Id.¶ 2.) During its
first few years under this ownership structure, Mosler
flourished-its sales increased every year from 1992 to
1995. (Id.¶ 26.)

Then, in February 1995, Mosler's Chairman and CEO
sent a memo to the Kelso Directors requesting their
"concurrence to" the hiring of Michel Rapoport as
the next CEO, "which [is] consistent with our
succession planning." (Id.¶ 27.) However,
succession planning had not been discussed at either
of the two board meetings prior to February 1995,
and the memo contained minimal information
regarding Rapoport himself. (Id.¶ ¶ 28-30.) Although
no alternative candidates were considered, the
inexperienced and unqualified Rapoport was hired as
Mosler's CEO. (Id.¶ ¶ 31-33.) Mosler subsequently
entered a period of decline, precipitated by
"numerous reckless and misinformed decisions" and
mismanagement by Rapoport and the Kelso
Directors. (Id.¶ 35.)

**\*2** For example, in October 1998, Mosler acquired a
security equipment business known as LeFebure.
(Id.¶ 36.) However, during the acquisition process,
Rapoport failed to hire outside consultants to assist
with due diligence and valuation. Instead, he relied

Slip Copy
Slip Copy, 2005 WL 1242157 (D.Del.)
(Cite as: Slip Copy)

upon numbers provided by LeFebure's parent company, De La Rue,[FN1] and by Mosler's internal personnel. (Id. ¶ 39.) Furthermore, the Kelso Directors did not inform themselves as to the adequacy of Rapoport's due diligence and valuation. (Id.¶ 41.) Then, at a special meeting of Mosler's Board in September 1998, the LeFebure acquisition was approved. This occurred in spite of the fact that no tangible information concerning the acquisition was provided to the Kelso Directors; the minutes of the special meeting merely reflect "extensive discussion" about the acquisition. (Id.¶ 40.) As it turned out, De La Rue overstated LeFebure's financial condition and, as a result, Mosler "grossly overpaid" for LeFebure. (Id.¶ 42.)

> FN1. The precise details of the relationship between LeFebure and De La Rue are not set forth in the complaint, but those details are unimportant here.

The subsequent integration of LeFebure's business did not go well either. Without any objection from the Kelso Directors, Rapoport fired many key LeFebure employees who were essential to the integration process. (Id.¶ 43-44.) Consequently, "many of the former LeFebure accounts were understaffed and poorly serviced, and Mosler had significant difficulty synchronizing LeFebure's business practices with its own, further minimizing the benefits that Mosler recognized from the LeFebure Acquisition." (Id.¶ 43.) Rapoport and the Kelso Directors also failed to heed specific warnings, given to them before the acquisition, pertaining to "systems issues that would arise from the need to integrate LeFebure's systems with Mosler's," resulting in a "serious deterioration of Mosler's liquidity." (Id.¶ 45.)

Then in 1999, Mosler attempted to update the software it used to process orders, collect accounts receivable, etc. (Id.¶ 46.) Rapoport and the Kelso Directors were advised by Mosler's in-house IT employees, among others, that outside specialists would be required for a project of this type. (Id.¶ 47.) Nevertheless, Rapoport did not hire outside specialists, and without objection from the Kelso Directors, endeavored to complete the project using only Mosler's in-house IT employees. (Id.¶ 48.) But because these employees were not qualified to make the updates, the project became "a disaster." Thereafter, Mosler was unable to "timely and accurately invoice customers and collect receivables, accurately track its inventory and timely provide

needed parts to its customers, and generate the reliable financials required to access its operating credit facilities." (Id.¶ 50.) As a result, Mosler's financial condition further deteriorated. (Id.¶ 51.)

During this time, Rapoport and the Kelso Directors also failed to institute standard business controls. For example, they did not "address sustained and systemic flaws in Mosler's inventory management system," resulting in untimely deliveries to customers, and hence, damage to Mosler's goodwill. (Id.¶ 53.) Mosler's accounts receivable were also rapidly increasing, but neither Rapoport nor the Kelso Directors instituted standard internal control procedures to ensure timely invoicing. (Id.¶ 54.) Moreover, the problems with the accounts receivable were not discussed at either the February or May 1999 Board meetings. (Id.¶ ¶ 56-57.) Mosler's contemporaneous SEC statements further reflect the financial troubles the company was experiencing. Between 1995 and 1999, Mosler reported an increase in uncollected accounts receivable from $46 million to nearly $100 million. (Id.¶ 55.) Between 1998 and 1999, Mosler saw its net income go from the black to the red, and between 1998 and 2000, its earnings [FN2] declined while its net sales increased.

> FN2. The earnings referred to here are the earnings before interest, taxation, depreciation, and amortization, commonly known as EBITDA.

\*3 The deterioration of Mosler did not go unnoticed. On two occasions, in 1999 and 2000, Mosler's outside auditor advised the Board of "reportable conditions" and "material weaknesses" regarding the company's internal controls. However, neither Rapoport nor the Kelso Directors took any corrective action. (Id.¶ ¶ 65-73.) Furthermore, in addition to experiencing "unreasonably high turnover of certain officers and key employees" (id.¶ 59), Mosler also suffered from internal unrest. On at least ten occasions between the end of 1997 and the beginning of 2001, certain Kelso Directors were told by senior Mosler employees that the company had "serious business problems" and that Rapoport was mismanaging the company. (Id.¶ 60.) Yet, the Kelso Directors failed to investigate these complaints and defended Rapoport after he took retaliatory action against two of the senior employees. (Id.¶ ¶ 60-61.)

By the end of 2000, Mosler began to default on loans and on interest payments due on its bonds. (Id.¶ 77.) Although Mosler pursued potential buyers, it

ultimately filed a voluntary petition under Chapter 11 in the United States Bankruptcy Court for the District of Delaware. (Id.¶ ¶ 78-79.) Mosler, since renamed MDIP, Inc. ("MDIP"), sold its assets at auction for nearly \$28 million, but the proceeds were insufficient to pay all of its creditors. (Id.¶ ¶ 79-80.) Therefore, pursuant to the approved Chapter 11 plan, the MDIP Litigation Trust, Inc. (the "Trust") was created for the benefit of the unpaid creditors to pursue certain claims. (Id.¶ ¶ 1, 5.) More specifically, the Trust "is required to prosecute all causes of action assigned to the Trust by Mosler ... for the benefit of holders of Allowed Class 3 and Allowed Class 4 Claims." (Id.¶ 7.) "Moreover, under the Plan, each holder of such a Claim is a Litigation Trust Beneficiary, each of whom has received a beneficial interest in the Litigation Trust Assets in accordance with the Plan." (Id.)

Pursuant to this directive, the Trust, in its own name, brought the present action against the Kelso Directors, Rapoport, and Kelso. Count I, based on the allegations outlined above, seeks to recover damages from the Kelso Directors for breach of the fiduciary duties of due care, good faith, and loyalty. (Id.¶ ¶ 81-84.) Count II, also based on the allegations outlined above, seeks to recover damages from Rapoport under the same theory. (Id.¶ ¶ 85-88.) Counts III and IV are avoidance and recovery of constructively fraudulent transfer claims against Kelso, under 11 U.S.C. § 548(a)(1)(B) and 11 U.S.C. § 544(b), respectively. (Id.¶ ¶ 89-101.) However, the parties have since stipulated to the dismissal of Count III, and to a reduction in the damages sought in Count IV from \$800,000 to \$450,000. (D.I.99.)

## IV. DISCUSSION

The defendants argue that Counts I and II, which are state law claims, should be dismissed for lack of subject matter jurisdiction because (1) there is incomplete diversity, and (2) the exercise of supplemental jurisdiction would be inappropriate. Each of these arguments is addressed below.

### A. Diversity of Citizenship

*4 The diversity jurisdiction statute provides, in relevant part:

The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of \$75,000, exclusive of interest and costs, and is between ... citizens of

different States[.]

28 U.S.C. § 1332(a)(1) (2004). Since *Strawbridge v. Curtiss,* 3 Cranch 267, 2 L.Ed. 435 (1806), the Supreme Court has "interpreted the diversity statute to require 'complete diversity' of citizenship." *C.T. Carden v. Arkoma Assoc.,* 494 U.S. 185, 187, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990). That means the citizenship of every plaintiff must be diverse from the citizenship of every defendant, unless an independent basis for original jurisdiction exists between the non-diverse parties. *See Romero v. Int'l Terminal Operating Co.,* 358 U.S. 354, 381, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959). For an artificial entity, unless that entity is a corporation, its citizenship "depends on the citizenship of ... 'each of its members .' " *Id.* at 195-96 (citations omitted). In *C.T. Carden,* the Supreme Court established that this is a bright-line rule only to be modified by Congress, even where strong policy considerations would favor an exception. *See C.T. Carden,* 494 U.S. at 196-97.[FN3] However, no such statutory modification exists in this case. [FN4]

> FN3. Where an artificial entity is the named party whose citizenship is in question, the court may not look to the citizenship of unnamed parties. *C.T. Carden,* 494 U.S. at 187 n. 1. Thus, in the case of a litigation trust, even if application of the "real party to the controversy" test, *see generally Navarro Sav. Ass'n v. Lee,* 446 U.S. 458, 100 S.Ct. 1779, 64 L.Ed.2d 425 (1980), would dictate that the citizenship of the trustees should be determinative for the purpose of diversity, the court may not consider their citizenship unless they are named parties, *C.T. Carden,* 494 U.S. at 187 n. 1.

> FN4. The Trust argues that *C.T. Carden* is distinguishable because that case involved a partnership rather than a litigation trust. However, as the defendants point out, the Court's broad language leads to the inescapable conclusion that litigation trusts are subject to its holding as well:
> Thus, the course we take today does not so much disregard the policy of accommodating our diversity jurisdiction to the changing realities of commercial organization, as it honors the more important policy of leaving that to the people's elected representatives. Such accommodation is not only performed more

legitimately by Congress than by courts, but it is performed more intelligently by legislation than by interpretation of the statutory word "citizen." The 50 States have created, and will continue to create, a wide assortment of artificial entities possessing different powers and characteristics, and composed of various classes of members with varying degrees of interest and control. Which of them is entitled to be considered a "citizen" for diversity purposes, and which of their members' citizenship is to be consulted, are questions more readily resolved by legislative prescription than by legal reasoning, and questions whose complexity is particularly unwelcome at the threshold stage of determining whether a court has jurisdiction. We have long since decided that, having established special treatment for corporations, we will leave the rest to Congress; we adhere to that decision. *C.T. Carden,* 494 U.S. at 197. Thus, even if the court were inclined to agree with the Trust's policy arguments as to why the citizenship of the Trust itself should control, the Supreme Court has shut down that line of inquiry and left it up to Congress.

Consequently, the court must determine the citizenship of the Trust by looking to the citizenship of its "members," i.e., its beneficiaries.[FN5] *In re A.H. Robins Co., Inc.,* 197 B.R. 575, 579 (Bankr.E.D. Va. June 30, 1995). [FN6] As such, the citizenship of each creditor-beneficiary must be diverse from the citizenship of each of the Kelso Directors.[FN7] *Id.* Based on the court's review of the submitted list of creditors, numerous Class 3 and Class 4 creditors are citizens of the same states as the Kelso Directors. (See D.I. 144 Ex. B.) [FN8] Therefore, as the case is currently captioned, the court does not have diversity jurisdiction over Counts I and II. Moreover, even if the trustees were named plaintiffs and were the "real parties to the controversy," diversity of citizenship would still be lacking because both trustee Julie Dien Ledoux and defendant Wall are residents of New York. (D.I. 28 ¶ 11; D.I. 70 Ex. 1.)

> FN5. The court's conclusion that it must look to the citizenship of the Trust's beneficiaries may rely on the assumption that the Trust has the capacity to sue in its own name. *See Allegis Group, Inc. Contractors Health Plan Trust v. Conn. Gen. Life Ins. Co.,* No. 04-16, 2004 WL

1289862, at *4 n. 3 (D.Md. June 10, 2004). However, since diversity is lacking regardless of whether the citizenship of the beneficiaries or the citizenship of the trustees controls, the court need not address the question of whether there exists a legal basis for making such an assumption, or whether such an assumption is necessary in the first place.

FN6. The Trust argues that *A.H. Robins,* in which the court looked to the citizenship of the defendant-trust's beneficiaries, is distinguishable because that case involved a products liability claimants trust rather than a litigation trust. (D.I. 145 at 3.) Once again, since diversity is lacking regardless of whether the citizenship of the beneficiaries or the citizenship of the trustees controls, the court need not address the Trust's argument.

FN7. The citizenship of Kelso itself is irrelevant because there is an independent basis for original jurisdiction as to Count IV, namely federal question jurisdiction under 28 U.S.C. § 1331 (1993). *Romero,* 358 U.S. at 381.

FN8. Technically speaking, the court's reliance upon "matters outside the pleadings" converts this motion to dismiss into a motion for summary judgment. Fed.R.Civ.P. 12(c). However, if the material facts are not in dispute, then the result is the same regardless of the label attached to the motion. The Trust points out that "there has been no discovery in this action directed specifically to the issue of the citizenship of the beneficiaries," but fails to actually contest the list of creditor-beneficiaries submitted by the defendants. (D.I. 145 at 4.) Since the Trust is presumably in the best position to know the citizenship of its own beneficiaries, and since it does not contest the submitted list, the court has no reason to believe that the material facts are in dispute. Therefore, given the Trust's concession that, based on the list of creditors, "there would not be complete diversity if the citizenship of all beneficiaries were taken into account" (id.), the court is justified in its finding.

The Trust disagrees with this analysis. Instead, it argues, the Trust's status as a litigation trust arising from a bankruptcy proceeding qualifies it for a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"special rule" that " '[i]t is the citizenship of the bankrupt rather than the citizenship of the trustee in bankruptcy that is determinative for diversity jurisdiction." ' *Carlton v. BAWW, Inc.,* 751 F.2d 781, 787 (5th Cir.1985) (quoting 13B C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure: Jurisdiction 2d § 3606). However, the "special rule" extracted from Wright & Miller is based on a 1906 Supreme Court interpretation of a statute that was repealed in 1978. *See Bush v. Elliot,* 202 U.S. 477, 26 S.Ct. 668, 50 L.Ed. 1114 (1906); 11 U.S.C. § 46 (repealed 1978). The court is cognizant of the fact that, in spite of § 46 being repealed nearly twenty seven years ago, the "special rule" appears to have some continued viability in certain jurisdictions. *See, e.g., Carlton,* 751 F.2d at 787; *Pupo v. Chadwick's of Boston, Inc.,* No. 03-564, 2004 WL 2480399 (S.D.N.Y. Nov.4, 2004); *Official Plan Comm. of Omniplex Comm. Group, LLC, v. Lucent Tech., Inc.,* 344 F.Supp.2d 1194 (E.D.Mo. July 9, 2004). *But see Samson v. Allis-Chalmers Prod. Liab. Trust,* No. 90-0139, 1990 WL 87394 (E.D.Pa. June 21, 1990). Nevertheless, it is clear that "the reasoning underlying this rule rests on a shaky foundation," *Lucent,* 344 F.Supp.2d at 1196, so the court is reluctant to apply it. Bearing that in mind, the Trust admits it is not in fact a bankruptcy trustee that would have been subject to the now-repealed § 46 in the first place. (D.I. 78 at 11.) In essence, the Trust is asking the court not only to apply a repealed statute, but also to apply the repealed statute *by analogy.* But if applying a repealed statute is dubious (which it is), then applying a repealed statute by analogy is simply beyond the pale. Furthermore, even if § 46 had not been repealed, the fact that the Trust's *"sole* purpose is to liquidate and distribute MDIP's assets for the benefit of unsecured creditors" (D.I. 78 at 11) may not have been a sufficient reason to apply the "special rule" by analogy anyway. *Cf. In re Resorts Int'l, Inc.,* 372 F.3d 154, 169 (3d Cir.2004) ("Though the Litigation Trust's assets, the proceeds from the litigation claims, were once assets of the estate, that alone does not create a close nexus to the bankruptcy plan or proceeding sufficient to confer bankruptcy jurisdiction."). Therefore, the court will decline the Trust's invitation to apply the "special rule" in this case.

**\*5** Thus, diversity jurisdiction is lacking and the court must dismiss Counts I and II unless the exercise of supplemental jurisdiction is appropriate.

B. Supplemental Jurisdiction

The supplemental jurisdiction statute provides, in relevant part:

(a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution....

...

(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction[.]

28 U.S.C. § 1367 (1993).

In this case, the court need not determine whether the state law claims "are so related to" the federal law claim "that they form part of the same case or controversy" because it is abundantly clear that the state law claims "substantially predominate[ ] over" the federal law claim. In the fifteen-page section of the Amended Complaint captioned "Allegations Relevant To All Claims," nary a word can be found that relates to the allegedly fraudulent transfers from Mosler to Kelso. (See D.I. 28 ¶ ¶ 17-80.) In fact, it is not until the twenty-fourth page of the Amended Complaint's twenty-six pages that these transfers are vaguely described in Counts III and IV. (Id.¶ ¶ 89-101.) Moreover, after the dismissal of Count III, the damages sought in Count IV was reduced from $800,000 to $450,000 (D.I.99), whereas the damage sought in Counts I and II is in the neighborhood of $200,000,000 (D.I. 78 at 2). Clearly, both in terms of the facts alleged and the damages sought, the state law claims substantially predominate over the federal law claims. Thus, the exercise of supplemental jurisdiction in this case would truly permit the tail to wag the dog, and that is something the court will not permit.

## V. CONCLUSION

Because the court does not have original jurisdiction over Counts I and II, and because the court declines to exercise supplemental jurisdiction, subject matter jurisdiction is lacking and the motion to dismiss must be granted.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*ORDER*

IT IS HEREBY ORDERED THAT:

1. The defendants' motion to dismiss (D.I.67) be GRANTED;

2. Counts I and II of the Amended Complaint (D.I.28) be DISMISSED;

3. The defendants' motion for summary judgment (D.I.84) be DENIED as moot;

4. The defendants' motion to strike the plaintiff's summary judgment affidavits (D.I.114) be DENIED as moot;

5. The defendants' motion to strike the plaintiff's jury demand (D.I.127) be DENIED as moot;

6. The defendants' motion *in limine* requesting the court to exclude evidence and testimony not disclosed in plaintiff's responses to contention interrogatories (D.I.124) be DENIED as moot insofar as it pertains to Counts I or II; and

*6 7. The defendants' motion *in limine* requesting the court to preclude evidence of events that took place prior to August 6, 1998 (D.I.125) be DENIED as moot.

D.Del.,2005.
In re Litigation Trust of MDIP, Inc.
Slip Copy, 2005 WL 1242157 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:03CV00779 (Docket) (Aug. 05, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

# Westlaw.

Slip Copy
Slip Copy, 2005 WL 2008306 (D.Del.)
**(Cite as: Slip Copy)**

Page 1

# C

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
Werner L. POLAK, Plaintiff,
v.
John M. KOBAYASHI, Defendant,
andPOKOBO, L.L.C., Nominal Defendant.
**No. Civ.A. 05-330 JJF.**

Aug. 22, 2005.

Susan W. Waesco, Martin P. Tully, David A. Harris,
and Samuel T. Hirzel II, of Morris, Nichols, Arsht &
Tunnell, Wilmington, Delaware. for Plaintiff.
Kevin F. Brady, and Christos T. Adamopoulos, of
Connolly Bove Lodge & Hutz LLP, Wilmington,
Delaware. John P. Akolt III, and John C. Akolt, of
Law Offices of Akolt & Akolt, LLC, Denver,
Colorado. for Defendant, of counsel.

## *MEMORANDUM OPINION*

FARNAN, J.
**\*1** Pending before the Court is the Motion To
Remand (D.I.8) filed by Plaintiff Werner L. Polak.
For the reasons discussed, the motion will be denied.

## BACKGROUND

On March 21, 1997, Mr. Polak and Defendant John
M. Kobayashi filed a certificate of formation with the
Delaware Secretary of State, forming Pokobo LLC
("Pokobo"). The operation and management of
Pokobo is governed by the Limited Liability
Company Agreement of Pokobo, LLC ("the LLC
Agreement"), dated March 1, 1997, which defines the
parties' obligations to Pokobo and to each other.
Pursuant to Section 5.01 of the LLC Agreement,
management of Pokobo is vested jointly in Mr. Polok
and Mr. Kobayashi.

On February 23, 2005, Mr. Polak filed a Petition for
Dissolution in the Court of Chancery in Delaware
against Defendants Mr. Kobayashi and Pokobo. In
his Petition, Mr. Polak seeks judicial dissolution of
Pokobo pursuant to 6 Delaware Code § § 18-801 and
18-802 and an accounting of each member's capital
account and Pokobo's expenses. Mr. Polak also seeks

a judicial declaration that real property currently
titled solely in Mr. Kobayashi's name belongs to
Pokobo and is being held in constructive trust for
Pokobo, and that title should be transferred to
Pokobo. The Petition also asserts a derivative claim
on behalf of Pokobo for breach of fiduciary duty and
claims for breach of contract and unjust enrichment.
(D.I. 1, Appendix A.) All of Mr. Polak's claims arise
under state law; no federal law claims are asserted.

On May 25, 2005, Mr. Kobayashi filed a Notice of
Removal removing the case to this Court pursuant to
28 U.S.C. § § 1441 and 1446 (D.I.1). On June 2,
2005, Mr. Kobayashi filed a Motion To Transfer
(D.I.4), requesting transfer to the United States
District Court for the District of Hawaii. On June 15,
2005, Mr. Polak filed the instant Motion To Remand
(D.I.8), seeking remand to the Delaware Court of
Chancery.

## LEGAL STANDARD

The exercise of removal jurisdiction is governed by
28 U.S.C. § 1441(a) (2004). The statute is strictly
construed, requiring remand to state court if any
doubt exists over whether removal was proper.
*Shamrock Oil & Gaz Corp. v. Sheets,* 313 U.S. 100,
104 (1941). A court will remand a removed case "if
at any time before final judgment it appears that the
district court lacks subject matter jurisdiction." 28
U.S.C. § 1447(c) (2004). The party seeking removal
bears the burden to establish federal jurisdiction.
*Steel Valley Auth. v. Union Switch & Signal Div. Am.
Standard, Inc.,* 809 F.2d 1006 (3d Cir.1987); *Zoren v.
Genesis Engery, L.P.,* 195 F.Supp.2d 598, 602
(D.Del.2002). In determining whether remand based
on improper removal is appropriate, the court "must
focus on the plaintiff's complaint at the time the
petition for removal was filed," and assume all
factual allegations therein are true. *Id.*

## PARTIES' CONTENTIONS

By his Motion, Mr. Polak contends that this case
must be remanded for lack of subject matter
jurisdiction because complete diversity of citizenship
does not exist among the parties. Specifically, Mr.
Polak contends that Pokobo's citizenship must be
considered for purposes of determining whether

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

diversity jurisdiction exists. Mr. Polak further contends that, even if subject matter jurisdiction exists, the Court should decline to exercise its jurisdiction on abstention grounds. In response, Mr. Kobayashi contends that, because Mr. Polak's claims are direct and not derivative, Pokobo's citizenship is not a factor in determining diversity jurisdiction. The parties do not dispute that the amount in controversy for federal subject matter jurisdiction based on diversity of citizenship is satisfied.

## DISCUSSION

I. Whether Complete Diversity Of Citizenship Exists

**\*2** Mr. Polak's Petition For Dissolution indicates that Mr. Polak is a citizen of the state of New York and Mr. Kobayashi is a citizen of the state of Colorado. (D.I. 1, Appendix A at 2.) Because a Delaware limited liability company, assumes the citizenship of its members, the Court concludes that Pokobo is a citizen of both New York and Colorado. *See Ketterson v. Wolf*, 2001 WL 940909 (D.Del., August 14, 2001); *Carden v. Arkoma Assocs.*, 494 U.S. 185, 187-192 (1990); *Handelsman v. Bedford Vill. Assocs. Ltd. P'ship*, 213 F.3d 48, 51-52 (2d Cir.2000).

Pokobo is named as a Nominal Defendant in the Petition For Dissolution. A nominal party is generally a party without a real interest in the litigation. *See Bumberger v. Insurance Co. of North Am.*, 952 F.2d 764, 767 (3d Cir.1991). "[A] federal court must disregard nominal and formal parties and rest jurisdiction only upon the citizenship of real parties to the controversy." *Navarro Sav. Ass'n v. Lee*, 446 U.S. 458 (1980). However, in determining whether removal is proper, a court may realign the parties according to their substantive interests in the litigation. *See Employers Ins. of Wausau v. Crown Cork & Seal Co., Inc.*, 942 F.2d 862 (3d Cir.1991). In the Third Circuit, when determining whether diversity of citizenship exists, "a court must first identify the primary issue in controversy and then determine whether there is a real dispute by opposing parties over that issue." *Id.* at 864.

To identify the primary issue, the Court first looks to the pleadings submitted by the parties. *Id.* at 866. The Court also has a duty to look beyond the pleadings to determine the actual interests of the parties. *Development Finance Corp. v. Alpha Housing & Health Care, Inc.*, 54 F.3d 156 (3d Cir.1995). Mr. Polak's Petition For Dissolution contains five counts:

judicial dissolution, breach of contract, breach of fiduciary duty, declaratory judgment, and unjust enrichment. Mr. Polak contends that the primary issue is whether Mr. Kobayashi breached his fiduciary duty to Pokobo. (D.I. 9 at 9.) Mr. Kobayashi contends that this lawsuit hinges on Mr. Polak's breach of contract claim. (D.I. 13 at 11.)

After reviewing the Petition For Dissolution (D.I. 1, Appendix A), the Court concludes that the primary issue in this lawsuit is whether Pokobo should be dissolved pursuant to 6 Delaware Code § § 18-801 and 18-802. Although in his Petition Mr. Polak also asks the Court to determine whether a 17-acre parcel of property titled solely in Mr. Kobayashi's name rightfully belongs to Pokobo, the Court concludes that the issue of ownership of the 17-acre parcel is central only to Mr. Polak's secondary claims: 1) whether Mr. Kobayashi breached Section 5.01 of the LLC Agreement; 2) whether Mr. Kobayashi breached his fiduciary duty to Pokobo, and 3) whether Mr. Kobayashi was unjustly enriched by his conduct with regard to the 17-acre parcel. On the face of the Petition, it appears that Mr. Polak is requesting dissolution of Pokobo regardless of the Court's holding with regard to the ownership of the 17-acre parcel.

**\*3** Having determined that dissolution of the corporation is the primary issue in this lawsuit, the Court must next determine whether there is a "real dispute by opposing parties" over that issue. In other words, the Court will determine whether Pokobo is a real party to the dissolution controversy.

Mr. Polak contends that Pokobo is a real party to the dispute because Mr. Polak's claims are derivative rather than direct. Pursuant to Delaware law, the issue of whether a stockholder's claims are derivative or direct turns solely on who suffered the alleged harm and who would receive the benefit of any recovery or other remedy. *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del.Supr.2004).

The Court finds that Mr. Polak, not Pokobo, would benefit from the dissolution of the corporation. Further, this action arises out of a strictly internal conflict between Pokobo's members, both of whom will be before the Court. Because Mr. Polak has failed to establish that Pokobo itself has any interest distinct from the interests of Mr. Polak and Mr. Kobayashi, the Court concludes that Pokobo is not a real party to the dissolution issue and should remain a nominal defendant. Accordingly, the Court concludes

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 3

that, in these circumstances, complete diversity of citizenship exists among the parties and the Court has subject matter jurisdiction to hear this lawsuit.

## II. Whether The Court Should Abstain From Hearing The Controversy

Mr. Polak contends that, pursuant to the *Burford* abstention doctrine, the federal interest in retaining jurisdiction in these circumstances is outweighed by the state interest in resolving the dispute between the parties. In response, Mr. Kobayashi contends that the present lawsuit does not present "difficult questions of state law bearing on problems of substantial public import" and, thus, Burford abstention is inappropriate.

*"Burford* abstention applies when a federal court is asked to enjoin a state administrative order that will injure the plaintiff (such as an order granting an oil drilling permit to a competitor or denying the plaintiff permission to discontinue an unprofitable line of business)." *Keeley v. Loomis Fargo & Co.,* 183 F.3d 257, 273 n. 13 (3d Cir.1999). A federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies:

(1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar"; or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."

*New Orleans Pub. Serv., Inc. v. Council of New Orleans,* 491 U.S. 350, 361 (1989) (citation omitted); *see also Keeley,* 183 F.3d at 257. Cases implicating *Burford* abstention generally involve state orders against an individual party that a plaintiff seeks to enjoin in federal court. This lawsuit presents a dispute between two members of a limited liability corporation. Thus, there are no "proceedings or orders of state administrative agencies" at issue here. Further, some of Mr. Polak's claims are for damages, not equitable relief. For these reasons, the Court concludes that abstention pursuant to *Burford* is not appropriate in the circumstances of this case.

## CONCLUSION

*4 For the reasons discussed, the Motion To Remand

(D.I.8) filed by Plaintiff Werner L. Polak will be denied.

An appropriate Order will be entered.

### *ORDER*

At Wilmington, this *22* day of August 2005, for the reasons set forth in the Memorandum Opinion issued this date,

NOW THEREFORE, IT IS HEREBY ORDERED that the Motion To Remand (D.I.8) filed by Plaintiff Werner L. Polak is *DENIED.*

D.Del.,2005.
Polak v. Kobayashi
Slip Copy, 2005 WL 2008306 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 2868131 (Trial Motion, Memorandum and Affidavit) Defendant's Response to Plaintiff's Motion for Reargument or Reconsideration (Sep. 20, 2005) Original Image of this Document (PDF)

• 2005 WL 2385561 (Trial Motion, Memorandum and Affidavit) Plaintiff's Reply Brief in Support of His Motion to Remand (Jul. 11, 2005) Original Image of this Document (PDF)

• 2005 WL 1529887 (Trial Pleading) Answer And Affirmative Defenses of the Defendant John M. Kobayashi (Jun. 2, 2005) Original Image of this Document (PDF)

• 2005 WL 1529889 (Trial Motion, Memorandum and Affidavit) Defendant's Opening Brief in Support Of His Motion to Transfer Venue Under 28 U.S.C. | 1404 (A) (Jun. 2, 2005) Original Image of this Document with Appendix (PDF)

• 1:05cv00330 (Docket) (May. 25, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# **EXHIBIT C**

# Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 940909 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

## C

Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
Quentin KETTERSON, et al., Plaintiffs,
v.
Douglas H. WOLF, et al., Defendants.
**No. Civ.A. 99-689-JJF.**

Aug. 14, 2001.

Charlene Davis, and Richard L. Abbott, of the Bayard Firm, Wilmington, Delaware, Z. Lance Samay, Morristown, New Jersey, for Plaintiffs, of counsel.

R. Franklin Balotti, and Catherine G. Dearlove, of Richards, Layton & Finger, P.A., Wilmington, Delaware, Richard J. Idell, of Idell, Berman & Seitel, San Francisco, California, for Defendant Douglas H. Wolf, of counsel.

R. Franklin Balotti, and Catherine G. Dearlove, of Richards, Layton & Finger, P.A., Wilmington, Delaware, Richard B. Cooper, and Erik W. Kvam, of Cooper, Brown & Behrle, P.C., New York, New York, for Defendant Richard G. Buckingham, of counsel.

Andre G. Bouchard, and Joel Friedlander, of Bouchard Margules & Friedlander, Wilmington, Delaware, Robert L. Fila, Columbia, Maryland, for Defendant W. Lawrence Patrick, of counsel.

### *MEMORANDUM OPINION*

FARNAN, J.

*1 Presently before the Court is Defendants Douglas H. Wolf's and Richard G. Buckingham's Motion to Dismiss for Lack of Diversity Jurisdiction (D.I.75), and Defendant W. Lawrence Patrick's Motion to Dismiss (D.I.79), pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. For the reasons discussed below, the Court will grant the motions.

### BACKGROUND

The Amended Complaint filed in this action alleges the following facts. Plaintiff Quentin Ketterson ("Mr.Ketterson") is an investment banker based in New Jersey who is engaged in the business of facilitating transactions in the broadcast and computer software industries. Mr. Ketterson created

Plaintiff Triangle Broadcasting Company, L.L.C. ("Triangle")(collectively "Plaintiffs"), which is a Delaware limited liability company, in the fall of 1995 "for the express purpose of specializing in acquiring control of, or in any way facilitating the sale of, the stock of broadcasting companies, which own groups of TV and/or radio stations." Defendant Douglas H. Wolf ("Mr.Wolf"), from San Francisco, California, and Defendant Richard G. Buckingham ("Mr.Buckingham"), from New York, are both attorneys and businessmen who specialize in "facilitating tax-driven business transactions." Defendant W. Lawrence Patrick ("Mr.Patrick") is a Maryland attorney who owns Patrick Communications Corporation, a radio and television station brokerage firm (the individual defendants are collectively "Defendants").

Mr. Ketterson and Mr. Patrick, who were introduced by a mutual friend in early 1995, agreed to become equal partners in a business of "soliciting broadcast station sellers, buyers and brokers." In July of 1995, as a result of their initial work on this venture, Mr. Ketterson and Mr. Patrick were introduced to Mr. Buckingham, who at the time was affiliated with Mr. Wolf in an unincorporated association. Mr. Ketterson and Mr. Patrick were impressed with some of Mr. Buckingham's business proposals and sought to work with him in the future. In anticipation of working with Mr. Buckingham and Mr. Wolf, on or about August 1, 1995, Mr. Ketterson and Mr. Patrick executed a letter agreement establishing a partnership in which they would equally share any compensation earned as a part of their dealings with Mr. Buckingham and Mr. Wolf. At the end of October 1995, after several weeks of frequent communications among all four individuals, Mr. Ketterson and Mr. Patrick agreed with Mr. Buckingham and Mr. Wolf to formalize their business relationship by executing an agreement to create Triangle, a Delaware limited liability company, in which each individual would have a 25% interest. According to the terms of the agreement, Triangle's existence was effectuated on November 20, 1995. The purpose of Triangle was to "pursue and facilitate broadcast station sales transactions."

During the ensuing months, Mr. Ketterson and Mr. Patrick began working on Triangle's behalf, when, in February of 1996, they learned that Mr. Buckingham

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and Mr. Wolf had recently completed a \$165 million broadcast station stock sale separate from Triangle's business operations. Mr. Ketterson and Mr. Patrick continued to learn of other independent business activities in which Mr. Buckingham and Mr. Wolf had been engaging, and the controversy among the four escalated in July of 1996 when Mr. Wolf expressed reluctance "to honor his contractual commitment to share equally Triangle's earnings with [Mr. Ketterson and Mr. Patrick]."

**\*2** Despite their concerns about Mr. Buckingham and Mr. Wolf, Mr. Ketterson and Mr. Patrick continued to work in securing transactions for Triangle, and they regularly sent Mr. Buckingham and Mr. Wolf update letters to detail their progress. In response to one of these letters, in August of 1996, Mr. Buckingham and Mr. Wolf informed Mr. Ketterson and Mr. Patrick of their desire to "redefine" their relationship. Rather than resisting and possibly irreparably damaging their relationship with Mr. Buckingham and Mr. Wolf, Mr. Ketterson and Mr. Patrick drafted a modification of their agreement reducing their respective share of Triangle's profits.

In October 1996, Mr. Ketterson received a copy of a letter authored by Mr. Patrick that indicated that Mr. Ketterson had been completely excluded from a number of completed and pending Triangle transactions. On November 11, 1996, Mr. Ketterson received a letter from Mr. Buckingham and Mr. Wolf in which the two "purported to 'withdraw' from Triangle retroactively to August 1996." Mr. Ketterson quickly objected in writing to "the impropriety of the action of [Mr. Buckingham and Mr. Wolf in totally usurping Triangle's business and circumventing the LLC Agreement." In December 1996, Mr. Buckingham and Mr. Wolf informed Mr. Patrick that he could maintain his financial relationship with them, and could be indemnified by them, only if Mr. Patrick agreed to (1) withdraw from Triangle, (2) accept \$140,000 as his share of earnings for all of his contributions to Triangle to that date, (3) exclude Mr. Ketterson from any future broadcast station transaction, and (4) deprive Mr. Ketterson of any monies owed to him and of any legal rights that he may have possessed. Mr. Patrick eventually sent a letter to Mr. Ketterson on December 24, 1996, that expressed his desire to formally end his business relationship with Mr. Ketterson and stating that he would continue doing business with Mr. Buckingham and Mr. Wolf. On May 27, 1997, Mr. Ketterson authored a letter to Mr. Buckingham and Mr. Wolf which demanded an accounting of all of Triangle's profits, but Mr. Ketterson received no response. His

follow-up phone calls in late 1997 and early 1998 also went unanswered.

On November 10, 1998, Plaintiffs (Mr. Ketterson and Triangle) filed an action in the United States District Court for the District of New Jersey. (D.I. 88 at 1). Plaintiffs' Amended Complaint asserts claims for (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) breach of fiduciary duties, (4) conversion, (5) oppressive conduct, (6) fraud and conspiracy to defraud, (7) unjust enrichment, and (8) tortious interference with business opportunities, and it also demands an accounting of all of Triangle's profits. On October 14, 1999, the New Jersey court transferred the action to this Court because of improper venue. (D.I. 88 at 2). Defendants filed the instant motions on March 10, 2000, seeking dismissal of Plaintiffs' Amended Complaint due to lack of subject matter jurisdiction. (D.I. 88 at 2).

## DISCUSSION

**\*3** In order for the Court to have subject matter jurisdiction of an action containing only state law claims, there must be "complete diversity [of citizenship] between all plaintiffs and all defendants ." *Development Fin. Corp. v. Alpha Hous. & Health Care, Inc.,* 54 F.3d 156, 158 (3d Cir.1995). The burden to establish jurisdiction is on the plaintiff. *Kokkonen v. Guardian Life Ins. Co of Am.,* 511 U.S. 375, 377 (1994). Thus, in this case, if Plaintiffs fail to establish that the citizenship of every Defendant is different than the citizenship of every Plaintiff, the Court lacks jurisdiction and it must grant Defendants' motions.

### A. Citizenship of a Delaware Limited Liability Company

In order to resolve Defendants' motions, the Court must resolve the issue of a Delaware limited liability company's citizenship for diversity of jurisdiction purposes. After a review of the available case law, the Court concludes that a limited liability company is a citizen of the states of which its individual members are citizens. *See Carden v. Arkoma Assocs.,* 494 U.S. 185, 187-192 (1990)(holding that only corporations, and not other business entities such as limited partnerships, are considered citizens of the state which created it); *Handelsman v. Bedford Vill. Assocs. Ltd. P'ship,* 213 F.3d 48, 51-52 (2d

Cir.2000)(holding that limited liability companies have the citizenship of all of its members).

Since Plaintiff Triangle is a Delaware limited liability company and Defendants were all indisputably members of Triangle, the only way for there to be complete diversity in the instant case is if each Defendant effectively withdrew from Triangle, and that after such withdrawal, each Defendant was a citizen of a different state than each Plaintiff. However, as explained below, the Court concludes that Plaintiffs have failed to adequately allege such facts.

### B. Defendants' Motions Raise Facial Challenges to the Court's Jurisdiction

Two types of Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction may be brought by a defendant. One is a facial challenge to the Court's jurisdiction. *Gould Elecs. Inc. v. United States,* 220 F.3d 169, 176 (3d Cir.2000). When asserting a facial challenge, a defendant contends that the complaint alleges facts that, even if true, would not be sufficient to establish the court's jurisdiction. *Id.* In deciding a facial challenge, a Court "must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *Id.* However, a defendant can also assert a factual challenge to the court's subject matter jurisdiction, which contends that the allegations in the complaint establishing jurisdiction are not sufficiently supported by the facts. *Id.* When considering a factual challenge, a court can consider evidence outside of the pleadings. *Id.*

In the instant case, Defendants' motions present facial challenges to the Court's jurisdiction. In their motions, Defendants contend that Plaintiffs refuse to allege in their Amended Complaint that Defendants effectively withdrew from Triangle. (D.I. 96 at 7)(noting that the Amended Complaint repeatedly refers to Defendants' "purported" withdrawal). Thus, the Court concludes that it can only review and consider the Amended Complaint and its attached documents when resolving Defendants' motions.

**\*4** After reviewing Plaintiffs' Amended Complaint, it is clear that Plaintiffs do not allege that Defendants effectively withdrew from Triangle. Thus, Plaintiffs have failed to satisfy their burden of pleading the basis for the Court's jurisdiction, and Defendants' motions to dismiss must be granted.

### C. Plaintiffs Do Not Even Contend that the Amended Complaint Sufficiently Pleads the Basis of the Court's Jurisdiction

Plaintiffs contend that the Court should not construe Defendants' challenge as a facial challenge because there is a dispute of material fact as to whether or not Defendants effectively withdrew from Triangle. In particular, Plaintiffs cite to a complaint and its attached documents that Defendants filed in the Delaware Court of Chancery ("Chancery Court") seeking a declaratory judgment that Defendants had effectively withdrawn from Triangle in 1996.[FN1] (D.I. 88 at 2, 11-12). Because Defendants' present motions raise facial challenges to the Court's jurisdiction, the Court concludes that whether or not Defendants actually withdrew is irrelevant. What is relevant is whether Plaintiffs have pleaded facts that establish that Defendants withdrew. Plaintiffs have not, and therefore, their contentions in opposition to Defendants' motions are unsupported.[FN2]

> FN1. The Chancery Court action has been stayed pending resolution of the instant action. (D.I. 88 at 2).

> FN2. It appears that Plaintiffs have made certain tactical decisions when drafting their pleadings, but the Court is limited by the facts pleaded when deciding Defendants' motions. *Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.,* 177 F.3d 210, 222 n. 13 (3d Cir.1999)(stating that, even if the parties do not dispute that diversity of citizenship exists, the complaint still must allege facts establishing diversity, or dismissal is warranted).

Plaintiffs contend that the Chancery Court complaint can be considered by the Court in resolving the instant motions, despite the Court's conclusion that Defendants' motions raise facial challenges, because the complaint is a public record. (D.I. 88 at 11)(citing *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196-97 (3d Cir.1993)). However, the cases that have allowed consideration of public records involved Rule 12(b)(6) motions to dismiss, and the Court concludes that to allow consideration of public records on a Rule 12(b)(1) facial challenge would be to disregard the facial challenge/factual challenge distinction. *See Gould,* 220 F.3d at 176 n. 6 (extending *Pension Benefit* to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

allow consideration of documents attached to a complaint when deciding a Rule 12(b)(1) facial attack, but not discussing whether or not it would also allow consideration of public records); *Bell Atl.-Pa., Inc. v. Pennsylvania Pub. Util. Comm'n,* 107 F.Supp.2d 653, 658-59 (E.D.Pa.2000)(discussing how Courts can consider public records when analyzing Rule 12(b)(6) motions to dismiss, but recognizing that Rule 12(b)(1) motions to dismiss are analyzed under a different standard than Rule 12(b)(6) motions, and further, that can courts can consider documents outside the pleadings when analyzing Rule 12(b)(1) motions only if the motion presents a factual challenge).[FN3]

> FN3. One court has held that public records can be considered by a court in deciding a Rule 12(b)(1) facial challenge. *Hunter v. United States,* 2000 WL 1880257, at *3 (M.D.Pa. Dec. 15, 2000). The court noted that, when discussing what materials may be considered by a court in determining a Rule 12(b)(1) facial challenge, the *Gould* court cited *Pension Benefit,* which involved a Rule 12(b)(6) motion. *Id.* Since the *Pension Benefit* court allowed consideration of public records, the court in *Hunter* reasoned that *Gould* implicitly allows for the consideration of public records when deciding a Rule 12(b)(1) facial attack. *Id.* The court reasoned that this conclusion "comports with the fact that both a Rule 12(b)(6) motion and a Rule 12(b)(1) facial attack argue that the propriety of dismissal is apparent from the face of the complaint." *Id.* The Court concludes that the reasoning in *Hunter* is not helpful for two reasons. First, the Court believes *Hunter* inaccurately characterizes the *Gould* court's citation of *Pension Benefit. Gould* merely cited *Pension Benefit* for the proposition that the Third Circuit could "think of no principled reason why a court, in resolving a 12(b)(1) facial attack should not also consider documents *attached to the complaint." Gould,* 220 F.3d at 176 n. 6 (emphasis added). *Gould* did not hold that public records can be considered in resolving a Rule 12(b)(1) facial challenge. Second, even if *Gould* had intended to suggest that public records could be considered in resolving a Rule 12(b)(1) facial attack, the Court concludes that the instant circumstances present a "principled reason" why they should not be considered.

Plaintiffs hope to avoid dismissal on jurisdictional grounds by relying on public records, but Plaintiffs also do not want to be "bound" by the allegations in the public records for other issues, such as damages. It would be unfair to Defendants to allow Plaintiffs to rely on public records for purposes of jurisdiction, yet avoid having to plead the same facts in their Complaint because they may adversely affect other issues in the case.

Plaintiffs also contend that the Court should deny Defendants' motions because (1) it would be an abuse of discretion to rule on the jurisdictional issue without affording them an opportunity to conduct jurisdictional discovery, and (2) the decision resolving the jurisdictional issue should be postponed until trial because the jurisdictional issue is so intertwined with the merits of the case. (D.I. 88 at 13-16). As to Plaintiffs' first contention, because the Court concludes that Plaintiffs' Amended Complaint is facially deficient, the deficiency could not be cured by discovery. As to Plaintiffs' second contention, the Court concludes that it would be inappropriate to accept jurisdiction and consider the case on its merits where the challenge to the Court's jurisdiction is facial in nature. *See Society Hill Towers Owners, Ass'n v. Rendell,* 210 F.3d 168, 175 (3d Cir.2000)(noting that the Supreme Court "has recently cautioned against the practice of assuming jurisdiction and reaching the merits of a dispute," because issuing a decision based on such "hypothetical jurisdiction" is essentially an advisory opinion)(quoting *Steel Co. v. Citizens for Better Env't,* 523 U.S. 83, 93 (1998)).

**\*5** In sum, the Court concludes that Plaintiffs fail to meet their burden to affirmatively plead facts necessary to establish the basis of the Court's jurisdiction. Thus, the Court concludes that Defendants' motions should be granted.

## CONCLUSION

For the reasons discussed, the Court will grant Defendants' motions to dismiss for lack of subject matter jurisdiction.

An appropriate Order will be entered.

## *ORDER*

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 940909 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 5

At Wilmington this 14 day of August, 2001, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that:
1. Defendants Douglas H. Wolf's and Richard G. Buckingham's Motion to Dismiss for Lack of Diversity Jurisdiction (D.I.75) is *GRANTED.*
2. Defendant W. Lawrence Patrick's Motion to Dismiss (D.I.79) is *GRANTED.*
3. Motion of Defendants Wolf and Buckingham to Compel Discovery (D.I.73) is *DENIED AS MOOT.*

D.Del.,2001.
Ketterson v. Wolf
Not Reported in F.Supp.2d, 2001 WL 940909 (D.Del.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D

# Westlaw.

Not Reported in F.Supp.                                                    Page 1
Not Reported in F.Supp., 1996 WL 571541 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

# H

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
DOW CHEMICAL COMPANY Plaintiff,
v.
EXXON CHEMICAL PATENTS, INC., and Exxon
Corporation, Defendants.
**Civ. A. No. 94-572-SLR.**

Sept. 20, 1996.

Donald F. Parsons, Esquire, and Lisa B. Baeurle,
Esquire, of Morris, Nichols, Arsht & Tunnell,
Wilmington, Delaware, attorneys for plaintiff. Of
counsel: Harry J. Roper, Esquire, Raymond N.
Nimrod, Esquire, Aaron A. Barlow, Esquire, of
Roper & Quigg, Chicago, Illinois.

William J. Wade, Esquire, and Frederick L. Cottrell,
III, Esquire, of Riehards, Layton & Finger,
Wilmington, Delaware, attorneys for defendants. Of
Counsel: Richard C. Levin, Esquire, Scott R. Jacobs,
Esquire, Lisa S. Gallerano, Esquire, and John L.
Hendricks, Esquire, of Akin, Gump, Strauss, Hauer
& Feld, L.L.P., Dallas, Texas; Eric C. Woglom,
Esquire, Glenn A. Ousterhout, Esquire, Denise L.
Loring, Esquire, of Fish & Neave, New York, New
York.

MEMORANDUM OPINION
SUE L. ROBINSON, District Judge.

## I. INTRODUCTION

\*1 The Dow Chemical Company ("Dow"), filed this
action against Exxon Chemical Patents, Inc.
("ECPI") and Exxon Corporation ("Exxon") on
October 25, 1994. In Count I of its second amended
complaint, plaintiff seeks a declaration that the
manufacture, sale, or use of wire and cable devices
which utilize Dow ENGAGE polymers do not
infringe United States Patent No. 5,246,783 (the "
'783 patent") held by defendants, and that this patent
is invalid by virtue of its obviousness and defendants'
inequitable conduct before the Patent & Trademark
Office ("PTO"). (D.I. 142) In Count II, plaintiff
seeks declaratory, injunctive, and monetary relief
against Exxon for unfair competition. (D.I. 142).
Defendants filed a counterclaim for patent
infringement and several related state law claims.

(D.I. 157)

On August 5, 1996, defendants filed a Statement of
Nonliability which, according to defendants, gives
plaintiff an "unconditional covenant not to sue Dow
for infringement of the '783 patent." (D.I. 171 at 2)
Defendants have moved to dismiss on the basis of the
nonliability covenant. (D.I. 170) The motion has
been thoroughly briefed, and oral argument was held
on September 5, 1996. For the reasons that follow,
the court will grant defendants' motion with respect
to Count I of the complaint and deny the motion with
respect to Count II.

## II. BACKGROUND

The patent at issue in this litigation covers certain
wire and cable devices manufactured using a
particular insulating polymer.    The '783 patent,
entitled "Electrical Devices Comprising Polymeric
Insulating or Semiconducting Members," was issued
to ECPI on September 21, 1993. (D.I. 9, Ex. 1)
Exxon manufactures the polymer used in the patented
devices under the trade names VISTALON and
EXACT.   Roughly contemporaneously to the
issuance of this patent, Dow introduced its first line
of "ITP [FN1]" polymer products under the trademark
name of AFFINITY. By February of 1994, Dow had
introduced a second line of ITP products, the
ENGAGE products, with two polymers (ENGAGE
CL 8001 and ENGAGE CL 8002) specifically for
cable wire use. (D.I. 26 at ¶ ¶ 9-7) By June, Dow
also developed a third ENGAGE product, ENGAGE
CL 8003, which is also designed for wire and cable
use.

> FN1. ITP products are those which are
> produced using INSIGHT technology. (D.I.
> 26 at ¶ 3)

After several contacts between Exxon and Dow, and
between Exxon and Dow's customers, Dow filed the
present suit.   Defendants moved to dismiss,
contending that the court lacked subject matter
jurisdiction due to the absence of an actual case or
controversy. (D.I. 8, 66) This court denied the
motion, finding that Dow had taken concrete steps
toward the production and sale of a potentially
infringing product, and that Exxon had, through its

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

contacts with Dow and its customers, created a reasonable apprehension of suit on the part of Dow. (D.I. 76)

Since the resolution of that motion, plaintiff has increased its sales of the ENGAGE polymer, continued its development of new products using ENGAGE, and developed a new line of polymers for use in wire and cable devices, the Nordel IP polymers. (D.I. 204 at 4-7) Like products made with the ENGAGE polymer, Nordel IP products would potentially infringe defendants' patent.

\*2 Defendants have represented to the court that the license fees from plaintiff on the total amount of ENGAGE polymer used thus far to make infringing products would amount to slightly less than $63,000. Rather than engage in further costly litigation, they have proffered a Statement of Nonliability. The statement has undergone a number of revisions. In its most current form, it reads:

Exxon Chemical Patents, Inc. and Exxon Corporation (collectively "Exxon") hereby unconditionally covenant, promise, and agree on behalf of themselves and their successors-in-interest not to sue The Dow Chemical Company ("Dow") or any wire and cable compounder or manufacturer which Dow indemnifies against infringement of U.S. Patent No. 5,246,783, for infringement of any claim of U.S. Patent No. 5,246,783 based upon (1) any past, current or future polymer composition containing an ENGAGE and/or Nordel IP product, alone or blended with other materials, or (2) any past, current or future wire and cable device that incorporates any polymer composition containing an ENGAGE and/or Nordel IP product, alone or blended with other materials. For purposes of this Statement of Nonliability, ENGAGE is defined as any copolymer of ethylene and octene that is made using INSITE technology, whether sold under the tradename ENGAGE or under some other trade name, and Nordel IP is defined as any terpolymer of thylene, propylene, and ethylidene norbornene that is made using INSITE technology, whether sold under the tradename Nordel IP or under some other trade name.

(D.I. 271 at Ex. C-1) Based on this statement, defendants have moved to dismiss both counts of plaintiff's complaint.

### III. DISCUSSION

#### A. Count I

Jurisdiction by this court over plaintiff's patent claim can only arise from the Declaratory Judgment Act (the "Act"). 28 U.S.C. § § 2201 and 2202. "The existence of an actual controversy is an absolute predicate for declaratory judgment jurisdiction. When there is no actual controversy the court has no jurisdiction to decide the case. When there is an actual controversy and thus jurisdiction, the exercise of that jurisdiction is discretionary." *Spectronics Corp. v. H.B. Fuller Co.,* 940 F.2d 631, 633-634 (Fed.Cir.), *cert. denied,* 502 U.S. 1013 (1991) (citations omitted). No absolute right to a declaratory judgment exists. *Serco Servs. Co. L.P. v. Kelley Co., Inc.,* 34 U.S.P.Q.2d 1217 (Fed.Cir.1995); *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.,* 846 F.2d 731, 733 n. 6 (Fed.Cir.1988). When a defendant files a motion to challenge the court's jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1), the plaintiff has the burden of proof and must establish an actual case or controversy on the totality of the circumstances. *Spectronics,* 940 F.2d at 634 (citing *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 272 (1941)). When a factual dispute exists, it is plaintiff's burden to establish jurisdiction by the preponderance of the evidence. *West Interactive Corp. v. First Data Resources, Inc.,* 972 F.2d 1295, 1297 (Fed.Cir.1992). The Federal Circuit has set forth the following two-prong standard for determining whether "a case of actual controversy" exists in actions seeking a declaratory judgment of patent non-infringement or invalidity:

\*3 First, the accused infringer must have actually produced or prepared to produce an allegedly infringing product. *Jervis B. Webb Co. v. Southern Sys., Inc.,* 742 F.2d 1388, 1398-99, 222 U.S.P.Q. (BNA) 943, 949 (Fed.Cir.1984). The first prong "looks to the accused infringer's conduct and ensures that the controversy is sufficiently real and substantial." *Lang v. Pacific Marine and Supply Co.,* 895 F.2d 761, 764, 13 U.S.P.Q.2d (BNA) 1820, 1822 (Fed.Cir.1990).... Second, the patent holder's conduct must create an objectively reasonable apprehension on the part of the accused infringer that the patent holder will initiate suit if the allegedly infringing activity continues.

*Spectronics,* 940 F.2d at 634 (citations omitted). Thus, the first prong of the test reviews plaintiff's conduct and the second that of defendant. *Arrowhead,* 846 F.2d at 736; *B.P. Chemicals,* 4 F.3d at 978. These actions are reviewed objectively. *Mobil Oil Corp. v. Advanced Envtl. Recycling Technologies, Inc.,* 26 U.S.P.Q.2d 1238, 1239 (D.Del.1992).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-00371-GMS    Document 11-5    Filed 06/30/2006    Page 4 of 6

Not Reported in F.Supp.                                                                                    Page 3
Not Reported in F.Supp., 1996 WL 571541 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

The Federal Circuit has held that when an infringement claim is dismissed, counterclaims of noninfringement or invalidity become moot unless the party seeking declaratory judgment establishes the existence of an ongoing controversy. *Vieau v. Japax, Inc.,* 823 F.2d 1510, 1517-20 (Fed.Cir.1987). In a 1987 speech, Chief Judge Markey of the Federal Circuit offered a helpful insight into the policy underlying this and similar decisions:

Courts have no roving commission to destroy every invalid patent. Assuming the patent would have been proven invalid, a trial required for its destruction, after a finding of no infringement and thus in the absence of a case or controversy, is not justified, by considerations of public policy or otherwise.

H. Markey, *On Simplifying Patent Trials,* 116 F.R.D. 369, 377 n. 15, *cited in* Robert L. Harmon, *Patents and the Federal Circuit* § 14.3(g) (2d ed. 1991).

Defendants contend that their covenant not to sue moots plaintiff's Count I in its entirety. Plaintiff does not dispute the legal premise of this argument, but contends that Count I will be mooted only if defendants agree to a slight change in the wording of the Statement of Nonliability. Specifically, plaintiff wants the covenant to apply to any party indemnified by plaintiff, not just those engaged in wire and cable manufacture. (D.I. 272) In their brief, defendants assert that, in their interpretation, the covenant already applies to any party indemnified by plaintiff. (D.I. 271 at 2 n. 5)

Taking defendants at their word, the court concludes that the Statement of Nonliability is sufficient to protect plaintiff against any reasonable apprehension of suit for any products it currently manufactures or has taken concrete steps to manufacture in the future. Plaintiff has not demonstrated an ongoing controversy. Plaintiff's claims of noninfringement and invalidity, therefore, are not justiciable. Accordingly, Count I of the complaint will be dismissed.

### B. Count II

**\*4** Plaintiff points out that the remaining count of its claim is directed at Exxon only, not ECPI. Because there is complete diversity between the parties, plaintiff argues, its state law claims should survive the dismissal of Count I. Exxon, on the other hand, argues that the claims raised in Count II implicate the validity of the patent itself. Therefore, it contends, ECPI, as the patent owner, must be joined as a party pursuant to Fed.R.Civ.P. 19. Because ECPI is a Delaware corporation, joinder would destroy diversity and require the dismissal of Count II.

Rule 19(a) provides:

A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may [ ] as a practical matter impair or impede the person's ability to protect that interest....

Fed.R.Civ.P. 19(a). If, as in this case, joinder would defeat the court's subject matter jurisdiction, the court must make an additional determination:If a person described in subdivision (a)(1)-(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable.

Fed.R.Civ.P. 19(b). The rule lists several factors for the court to consider in making a determination on indispensability, including potential prejudice to the existing parties, whether such prejudice can be eliminated or mitigated by other measures, whether an adequate judgment can be rendered in the person's absence, and whether an adequate remedy will be available if the action is dismissed. Fed.R.Civ.P. 19(b).

In the case of patent owners, it is well-established that a mere licensee, even an exclusive licensee, may not sue for infringement without joinder of the patent owner. *Minco, Inc. v. Combustion Engineering, Inc.,* No. 96-1005, 96-1033, 1996 WL 511532 (Fed.Cir. Sept. 10, 1996); *Abbott Laboratories v. Diamedix Corp.,* 47 F.3d 1128 (Fed.Cir.1995). As the Federal Circuit explained in *Minco:*

A conveyance of interests in a patent typically constitutes either an assignment or a mere license. An assignment of patent rights operates to transfer title to the patent, while a license leaves title in the patent owner. Thus, an assignee holds title to a patent and may sue for infringement without further permission or clearance. A licensee, however, cannot sue without joinder of the patent owner. To

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 571541 (D.Del.)
(Cite as: Not Reported in F.Supp.)

Page 4

create an assignment, a contract must transfer: (1) the entire exclusive patent right, (2) an undivided interest in the patent rights, or (3) the entire exclusive right within any geographical region of the United States. An agreement that does not transfer one of these three interests is merely a license.

**\*5** *Minco, Inc. v. Combustion Engineering, Inc.* at **\*6**. These cases, however, do not stand for the proposition that a patent owner who retains any rights in the patent must be joined in any case affecting the validity of that patent.

In *Vaupel Textilmaschinen v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870 (Fed.Cir.1991), the Federal Circuit addressed the question of whether a patent owner was an indispensable party to an infringement suit brought by an exclusive licensee. In that case, the patent owner retained a veto right on sublicenses, the right to obtain patents on the invention in other countries, the right to receive infringement damages, the right to be notified of infringement suits, and a reversionary interest in the patent in the event of the licensee's bankruptcy. Construing the license agreement as a constructive assignment, the court concluded that the owner was not indispensable. In so doing, the court relied most heavily on the grant given to the licensee to sue for past, future, and present infringements of the patent. *Id.* at 874-75. The court explained that "[t]he policy underlying the requirement to join the owner when an exclusive licensee brings suit is to prevent the possibility of two suits on the same patent against a single infringer. This right is not undercut here because the right to sue rested solely with [the licensee]." *Id.* at 875-76 (emphasis added) (citations omitted).

In the present case, ECPI, a wholly-owned, separately incorporated subsidiary of Exxon, owns the '783 patent. Plaintiff makes much of ECPI's status as a "shell" corporation whose sole purpose is to hold title on Exxon's patents. Although the corporation does have officers and a board of directors, its officers are all employees of Exxon. ECPI has no employees, no offices of its own, no manufacturing or sales facilities, no budget, and no bank accounts. (D.I. 271 at Ex. E; D.I. 205 at B29, B34) As Exxon correctly asserts, however, courts in other contexts have required joinder of holding companies that were "merely a corporate fiction" even where such joinder has destroyed diversity. *Bonar, Inc. v. Schottland*, 631 F.Supp. 990, 997 (E.D.Pa.1986). *See also First State Life Ins. Investors, Inc. v. 20th Century Corp.*, 309 F.Supp. 1390 (D.Del.1969).

More helpful to the determination of whether ECPI is indispensable is an analysis of the relationship between ECPI and Exxon. It is true, as Exxon points out, that ECPI has neither assigned nor exclusively licensed the '783 patent to Exxon. It has, however, granted certain rights in the patent to Exxon Chemical Company ("ECC"), an unincorporated division of Exxon, including the right to sue for infringement on its behalf:

ECPI further grants ECC the right to take such actions as deemed necessary by ECC, in order to establish, perfect, and defend ECPI's title and interest in such patents and patent applications, and to enforce such patents against infringers and settle any claims related thereto, and to enter into and to execute all documents and agreements related thereto.

**\*6** (D.I. 171 at Ex. C) The agreement also grants ECC the right to sublicense without notifying ECPI. John Mahon, who gave deposition testimony on behalf of ECC and ECPI, clarified the practical import of this agreement:Q. Would it be fair to say that by virtue of the rights given in [the licensing agreement] that Exxon Chemical Company controls the '783 patent?

[objection]

Q. Let me just ask a simple question. Is it fair to say that Exxon Chemical Company controls the '783 patent?

[objection]

A. I'm not sure what you mean by the word "control."

Q. The word "control" means having the power to make decisions relating to the '783 patent.

A. It is authorized to make decisions concerning the '783 patent, yes.

....

Q. ... Now, what power is Exxon Chemical Company lacking in respect to the '783 patent?

A. The ability to be a patent applicant in all countries of the world except the United States.

Q. Is there anything else that comes to mind?

A. I can't think of anything right now.

(D.I. 205 at B37-B38) From this testimony, Exxon's active role in defending the patent thus far, and the license agreement itself, it appears that ECPI has not retained substantive rights such that its joinder is necessary.

Even if this court were to construe the agreement between ECC and ECPI as a mere license, the cases Exxon cites in support of joinder were all decided in

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 571541 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

the context of infringement suits. This case, however, is no longer an infringement action. Rather, it concerns Exxon's conduct in obtaining and defending ECPI's patent rights-the very role that was assigned to it under the licensing agreement. The court concludes that, as a practical matter, Exxon has both the duty and the capability of protecting ECPI's interests. Joinder, therefore, is not required.[FN2]

> FN2. The court notes, however, that Exxon has not responded fully to plaintiff's argument concerning the scope of issues to be addressed in Count II. In particular, there is some question as to whether plaintiff may attack the validity of the patent itself on a claim of unfair competition. The court will stay discovery until this issue has been fully briefed and resolved.

C. Plaintiff's Claim for Attorney Fees

The patent laws permit a prevailing party to recover attorney fees in exceptional circumstances. 35 U.S.C. § 285. Dow contends that 1) it is a prevailing party, 2) defendants' inequitable conduct in obtaining their patent constitutes the exceptional circumstance necessary for recovery of attorney fees, and 3) the court has jurisdiction to hear the matter as a collateral issue regardless of whether Count I is dismissed.

Ordinarily, the issue of attorney fees is not decided until the conclusion of the litigation. *See Larchmont Engineering, Inc. v. Toggenburg Ski Center, Inc.,* 444 F.2d 490, 491 (2d Cir.1971). Although the issues dealing directly with the patent will be disposed of with the dismissal of Count I, attorney fees may be awarded on nonpatent issues where they are "so intertwined with the patent issues that the evidence would, in large part, be material to both types of issues." *Stickle v. Heublein, Inc.,* 716 F.2d 1550, 1564 (Fed.Cir.1983). Because, as noted above, the scope of evidence that will be presented on Count II is as yet unclear, the court will reserve decision on whether a hearing on attorney fees is appropriate in this case.

### IV. CONCLUSION

*7 For the reasons stated above, the court will dismiss Count I of plaintiff's second amended complaint. Defendants' motion to dismiss Count II for failure to join an indispensable party will be

denied. Discovery will be stayed while the parties brief the remaining issue of the scope of issues to be tried in Count II.

D.Del.,1996.
Dow Chemical Co. v. Exxon Chemical Patents, Inc.
Not Reported in F.Supp., 1996 WL 571541 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:94cv00572 (Docket) (Oct. 25, 1994)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

COLUMBIA HOUSING/PNC
INSTITUTIONAL FUND IV LIMITED
PARTNERSHIP, COLUMBIA HOUSING
SLP CORPORATION, OCWEN 2000-LLC,          CIVIL ACTION NO. 06-371
PNC BANK, and COLUMBIA
HOUSING/PNC FUND IV, INC.,

                Plaintiffs,

v.

OCWEN FEDERAL BANK FSB,
OCWEN INVESTMENT CORPORATION,
and OCWEN LOAN SERVICING, LLC

                Defendants.

## ORDER

On this date, the Court considered the Defendants' Motion To Dismiss Pursuant to Fed.

R. Civ. P. 12(b)(1) filed by Defendants Ocwen Federal Bank FSB, Ocwen Investment

Corporation and Ocwen Loan Servicing, LLC (the "Defendants").

Having considered the Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) and any

responses thereto, this Court is of the opinion that the Motion should be granted.

It is therefore, ORDERED that the Motion to Dismiss Pursuant to Fed. R. Civ. P.

12(b)(1) is GRANTED.

                                    _____
                                    GREGORY M. SLEET
                                    UNITED STATES DISTRICT COURT JUDGE

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

COLUMBIA HOUSING/PNC INSTITUTIONAL
FUND IV LIMITED PARTNERSHIP,
COLUMBIA HOUSING SLP CORPORATION,
OCWEN 2000-LLC, PNC BANK, and
COLUMBIA HOUSING/PNC FUND IV, INC.,

     Plaintiffs,

v.                Civil Action No. 06-371

OCWEN FEDERAL BANK FSB, OCWEN
INVESTMENT CORPORATION, and OCWEN
LOAN SERVICING, LLC

     Defendants.

## CERTIFICATE OF SERVICE

   I, Domenic E. Pacitti, Esquire, hereby certify that on June 30, 2006, I electronically filed

DEFENDANTS' MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(1) with the

Clerk of Court using CM/ECF which will send notification of such filing. A copy of the

document was served on the following counsel in the manner indicated:

**VIA REGULAR MAIL**

Karen Lee Turner
Michael Busenkell
Eckert Seamans Cherin & Mellott
300 Delaware Avenue, Suite 1360
Wilmington, Delaware 19801

**VIA REGULAR MAIL**

Charles L. Perry
Andrews Kurth LLP
1717 Main Street, Suite 3700
Dallas, TX 75201

         Domenic E. Pacitti (DE Bar No. 3989)
         222 Delaware Avenue, 12th Floor
         Wilmington, DE 19801
         (302) 421-6864
         (302) 421-5881
         dpacitti@saul.com