# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| COLUMBIA HOUSING/PNC INSTITUTIONAL FUND IV LIMITED PARTNERSHIP, COLUMBIA HOUSING SLP CORPORATION, OCWEN 2000-LLC, PNC BANK, and COLUMBIA HOUSING/PNC FUND IV, INC., | § § § § § § § § | NO. 06-371 |
| Plaintiffs, | § § | |
| v. | § § | |
| OCWEN FEDERAL BANK FSB, OCWEN INVESTMENT CORPORATION, and OCWEN LOAN SERVICING, LLC, | § § § § § | |
| Defendants. | § § | |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(1)

**TABLE OF CONTENTS**

NATURE AND STAGE OF PROCEEDINGS ........................................................................ 1

SUMMARY OF ARGUMENT ............................................................................................... 1

FACTUAL BACKGROUND .................................................................................................. 1

DEFENDANTS' HAVE IMPROPERLY ASSERTED A FACTUAL CHALLENGE
   TO SUBJECT MATTER JURISDICTION PRIOR TO FILING AN ANSWER ........................ 2

DEFENDANTS' FACTUAL CHALLENGE IS WITHOUT MERIT ........................................... 3

A "CASE OR CONTROVERSY" EXISTS, AND AN ACTION
   FOR DECLARATORY JUDGMENT IS PROPER ................................................................... 5

# TABLE OF AUTHORITIES

## CASES

*Argos v. Orthotec LLC*, 304 F.Supp.2d 591 (D. Del. 2004) ................................................3

*Bell Atlantic Corp. v. MFS Communications Co.*, 901 F.Supp. 835 (D. Del. 1995) ...........7

*Berardi v. Swanson Mem'l Lodge No. 48 of the Fraternal Order of Police*, 920 F.2d 198 (3d Cir. 1990) ................................................................................................3

*Breitigan v. New Castle County*, 350 F.Supp.2d 571 (D. Del.  2004) ................................7

*Dow Chemical Co. v. Exxon Chemical Patents, Inc.*, 1996 WL 571541(D. Del. 1996) .............................................................................................................................7

*Dwyer v. Lavigne*, 64 N.E.2d 356 (Mass. 1996) .............................................................11

*INA v. Misch*, 1989 WL 73702 3 (E.D. Pa. 1989) ...........................................................7

*Licata v. U.S. Postal Service*, 33 F.3d 259 (3d Cir. 1994) ...............................................3

*Matsko v. U.S.*, 372 F.3d 556 (3d Cir. 2004) ...................................................................3

*Mortensen v. First Federal Sav. & Loan Association*, 549 F.2d 884 (3d Cir. 1977) ..........3

*Motor Terminals, Inc. v. National Car Co.*, 92 F.Supp. 155 (D. Del. 1949) .....................6

*New Jersey Dept. of Treasury v. Visara Int'l, Inc.*, 166 Fed. Appx. 639 (3d Cir. 2006) .........................................................................................................................11

*NutraSweet Co. v. Ajinomoto Co.*, 423 F.Supp.2d 450 (D. Del. 2006) ............................7

*Schwartz v. Centennial Ins. Co.*, 1980 WL 77940  (Del. Ch. 1980) .................................11

*Shamrock Holdings of Ca., Inc. v. Arenson*, 421 F.Supp.2d 800 (D. Del. 2006) ...............7

*Smith v. DCA Food Industrial, Inc.*, 269 F.Supp. 863 (D. Mo. 1967) ...............................8

*Stern & Co. v. State Loan and Finance Corp.*, 205 F.Supp. 702 (D. Del. 1962) ...............7

*Vermeer Manufacturing Co. v. Deere & Co.*, 379 F.Supp.2d 645 (D. Del. 2005) ..............7

## STATUTES AND RULES

26 U.S.C. § 6501 ...............................................................................................................8

Fed. R. Civ. P. 12(b) .........................................................................................................1

**OTHER AUTHORITIES**

Restatement (Second) of Contracts § 253 .......................................................................... 11

12 Moore's Fed. Prac. § 57.80 ....................................................................................... 7

17A Am.Jur.2d *Contracts* § 725 ................................................................................. 11

Plaintiffs Columbia Housing/PNC Institutional Fund IV Limited Partnership ("PNC Fund IV"), Columbia Housing SLP Corporation, Ocwen 2000-LLC, PNC Bank, and Columbia Housing/PNC Fund IV, Inc. ("Fund IV, Inc.") submit this their Response to Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) ("Defendants' Motion"), as follows:

<u>**Nature and Stage of Proceedings**</u>

1.      Plaintiffs filed their Complaint in June 5, 2006.  Defendants have not answered, but have filed their Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(1).  Pursuant to Fed.R.Civ.P. 15(a), Plaintiffs are submitting their Amended Complaint contemporaneously with this response.

<u>**Summary of Argument**</u>

2.      Defendants motion is properly evaluated solely as a factual challenge to subject matter jurisdiction, and the Complaint (and Amended Complaint) establish diversity jurisdiction.

3.      Even if the Court addresses the motion as a factual challenge to subject matter jurisdiction, jurisdiction is established.

4.      An actual case or controversy is presented.

<u>**Factual Background**</u>

5.      This case involves a series of inter-related agreements between the parties:

a.      An Amended and Restated Operating Agreement of Ocwen 2000-LLC (the "Ocwen 2000 Operating Agreement") entered into on October 30, 2001, to be effective as of September 1, 2001, by Ocwen Federal Bank FSB ("Ocwen FSB") as managing member (the "Managing Member") and PNC Fund IV as investor member (the "Investor Member").

b.      A Purchase and Sale Agreement ("PSA") dated as of September 1, 2000, entered into by Ocwen FSB (on its own behalf and on behalf of Selling

1

Partnerships identified in the PSA), Ocwen 2000 LLC ("Ocwen 2000"),

Ocwen Investment, and PNC Fund IV.

c.     An Eighth Amendment to the Purchase and Sale Agreement Including

Capital Contribution Agreement ("Eighth Amendment") entered into

effective September 1, 2001.

d.     A Tax Indemnity Agreement ("Tax Indemnity") dated September 1, 2001,

given by Ocwen FSB to PNC Fund IV, PNC Bank and Fund IV, Inc.

6.     The case involves questions arising out of the voluntary dissolution of Ocwen

FSB, and the impact of such dissolution on the inter-related agreements.

### Defendants' Have Improperly Asserted A Factual Challenge to Subject Matter Jurisdiction Prior to Filing an Answer

7.     Defendants assert only a factual, not a facial, challenge to subject matter

jurisdiction.  *See* Defendants' Motion, at p. 9.   A factual, as distinguished from a facial,

challenge to subject matter jurisdiction is premature prior to the filing of the defendants' answer.

*Mortensen v. First Fed. Sav. & Loan Ass'n*,  549 F.2d 884, 891-92 and n.17 (3rd Cir. 1977).

*Accord, Licata v. U.S. Postal Serv.*, 33 F.3d 259, 260 (3rd Cir. 1994) ("Because the district court

dismissed the complaint under Federal Rules of Civil Procedure 12(b)(1) before the Postal

Service filed an answer, we review only whether the allegations of the complaint, taken as true,

allege facts sufficient to invoke the jurisdiction of the district court."); *Argos v. Orthotec LLC*,

304 F. Supp. 2d 591, 593 (D. Del. 2004).[1]  Defendants have not yet answered.

---

[1]     *But see Berardi v. Swanson Mem'l Lodge No. 48 of the Fraternal Order of Police*, 920 F.2d 198, 200 (3rd Cir. 1990).  The Third Circuit noted the conflict between *Mortensen* and *Berardi*, but found it unnecessary to address the issue, in *Matsko v. U.S.*, 372 F.3d 556, 562 n.12 (3rd Cir. 2004).

Plaintiffs Columbia Housing/PNC Institutional Fund IV Limited Partnership ("PNC Fund IV"), Columbia Housing SLP Corporation, Ocwen 2000-LLC, PNC Bank, and Columbia Housing/PNC Fund IV, Inc. ("Fund IV, Inc.") submit this their Response to Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) ("Defendants' Motion"), as follows:

## Nature and Stage of Proceedings

1.     Plaintiffs filed their Complaint in June 5, 2006.  Defendants have not answered, but have filed their Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(1).  Pursuant to Fed.R.Civ.P. 15(a), Plaintiffs are submitting their Amended Complaint contemporaneously with this response.

## Summary of Argument

2.     Defendants motion is properly evaluated solely as a factual challenge to subject matter jurisdiction, and the Complaint (and Amended Complaint) establish diversity jurisdiction.

3.     Even if the Court addresses the motion as a factual challenge to subject matter jurisdiction, jurisdiction is established.

4.     An actual case or controversy is presented.

## Factual Background

5.     This case involves a series of inter-related agreements between the parties:

    a.     An Amended and Restated Operating Agreement of Ocwen 2000-LLC (the "Ocwen 2000 Operating Agreement") entered into on October 30, 2001, to be effective as of September 1, 2001, by Ocwen Federal Bank FSB ("Ocwen FSB") as managing member (the "Managing Member") and PNC Fund IV as investor member (the "Investor Member").

    b.     A Purchase and Sale Agreement ("PSA") dated as of September 1, 2000, entered into by Ocwen FSB (on its own behalf and on behalf of Selling

Partnerships identified in the PSA), Ocwen 2000 LLC ("Ocwen 2000"), Ocwen Investment, and PNC Fund IV.

c.    An Eighth Amendment to the Purchase and Sale Agreement Including Capital Contribution Agreement ("Eighth Amendment") entered into effective September 1, 2001.

d.    A Tax Indemnity Agreement ("Tax Indemnity") dated September 1, 2001, given by Ocwen FSB to PNC Fund IV, PNC Bank and Fund IV, Inc.

6.    The case involves questions arising out of the voluntary dissolution of Ocwen FSB, and the impact of such dissolution on the inter-related agreements.

### Defendants' Have Improperly Asserted A Factual Challenge to Subject Matter Jurisdiction Prior to Filing an Answer

7.    Defendants assert only a factual, not a facial, challenge to subject matter jurisdiction. *See* Defendants' Motion, at p. 9.   A factual, as distinguished from a facial, challenge to subject matter jurisdiction is premature prior to the filing of the defendants' answer. *Mortensen v. First Fed. Sav. & Loan Ass'n*,  549 F.2d 884, 891-92 and n.17 (3rd Cir. 1977). *Accord, Licata v. U.S. Postal Serv.*, 33 F.3d 259, 260 (3rd Cir. 1994) ("Because the district court dismissed the complaint under Federal Rules of Civil Procedure 12(b)(1) before the Postal Service filed an answer, we review only whether the allegations of the complaint, taken as true, allege facts sufficient to invoke the jurisdiction of the district court."); *Argos v. Orthotec LLC*, 304 F. Supp. 2d 591, 593 (D. Del. 2004).[1]  Defendants have not yet answered.

---

[1]    *But see Berardi v. Swanson Mem'l Lodge No. 48 of the Fraternal Order of Police*, 920 F.2d 198, 200 (3rd Cir. 1990).  The Third Circuit noted the conflict between *Mortensen* and *Berardi*, but found it unnecessary to address the issue, in *Matsko v. U.S.*, 372 F.3d 556, 562 n.12 (3rd Cir. 2004).

### Defendants' Factual Challenge is Without Merit

8.     Even if the Court were to consider Defendants' motion as a factual challenge to subject matter jurisdiction, it should be rejected.

9.     Defendants claim that complete diversity is lacking because Ocwen Loan Servicing, LLC ("Ocwen Servicing") is a Defendant and is also allegedly a member of Plaintiff Ocwen 2000, a limited liability company.[2]   The latter proposition is incorrect, thus negating Defendants' jurisdictional challenge.   (The parties are in agreement that diversity otherwise exists.  Complaint ¶¶ 1-11; Defendants' Motion, at p. 2-3).

10.     Defendants' factual challenge is premised on their disagreement with the allegation in Paragraph 24 of the Complaint that "Fund IV, Inc. was designated as and became Managing Member of Ocwen 2000, and remains the Managing Member of Ocwen 2000." Defendants contention is inaccurate.   Contrary to Defendants argument, Fund IV, Inc. was designated as the new Managing Member, and had been so designated prior to suit being filed and remains as the new Managing Member today.  *See* Declaration of Christopher Bric, attached hereto as Exhibit 1 and Exhibit A thereto.

11.     Defendants claim that Ocwen Servicing has "acted" as the Managing Member of Ocwen 2000 "in conformance with an Assignment and Assumption Agreement." (Defendants' Motion at p. 5).  This argument is also flawed because Ocwen Servicing is not, and could not be, the Managing Member of Ocwen 2000.  Ocwen Servicing could not succeed to Ocwen FSB's membership interest without written consent of Fund IV.  Defendants do not suggest that written consent was received, nor do they attach any document purporting to be written consent.  The

---

[2]       As Defendants implicitly recognize, the Complaint is not subject to a facial challenge under Rule 12(b)(1). As alleged in ¶ 10 of the Complaint, the members of Ocwen 2000 at the time of filing were PNC Fund IV and Fund IV, Inc. *Also see* Complaint ¶ 24.

Declaration of Mr. Bric, on the other hand, affirmatively states that no such consent was given. Defendants attach e-mails *asking* for written consent, but *asking* for written consent is not the same as *receiving* written consent.

12.     Contrary to Defendants' position, the membership interest of Ocwen FSB has been not been transferred to Ocwen Servicing, because any such transfer required prior written consent, which was not obtained.

13.     Section 6.2 of the Ocwen 2000 Operating Agreement provides that the "Managing Member (Ocwen FSB) may transfer its interest in the Company . . . *only with the prior written consent of the Investor Member*." The Investor Member, PNC Fund IV, has not consented to any such transfer in writing (or otherwise).

14.     Defendants rely on an Assignment and Assumption Agreement ("Assignment Agreement") as effecting the purported transfer of the membership interest from Ocwen FSB to Ocwen Servicing. (Mosher Affidavit, Exhibit 5). However, the Assignment Agreement confirms that there has been no effective transfer of the membership interest to Ocwen Servicing. In fact, the Assignment Agreement specifically excludes any assignment to Ocwen Servicing where consents were required and were not obtained prior to closing.

15.     Section 3.3(a) of the Assignment Agreement provides that the transfer of assets from Ocwen FSB to Ocwen Servicing will be pursuant to an Instrument of Assignment (Exhibit E to the Assignment Agreement).

16.     The Instrument of Assignment provides that "as to any lease, contract, agreement, permit or other authorization included in the OLS Assigned Assets *which cannot be* sold, *transferred*, assigned, conveyed or delivered effectively *without the consent of a third party, which consent has not been obtained, this Instrument shall be of no force or effect until such*

4

*requisite consent is obtained*, whereupon this Instrument shall become of full force and effect with respect thereto." (Emphasis added).

17.     Section 6.2 of the Assignment Agreement also provides that "[w]ith respect to any license, certificate, approval, authorization, agreement, contract, lease, easement and other commitment included in the  . . . OLS[3] Assigned Assets that requires the consent of any third Person to the transaction contemplated by the Agreement, if any such consent has not been obtained prior to the Closing, thereafter the Stockholders shall cooperate with OLS at its request in endeavoring to obtain such consent promptly, and if any such consent is unobtainable, to use its reasonable best efforts to secure to OLS the benefits thereof in some other manner."

18.     Thus, the purported transfer from Ocwen FSB to Ocwen Servicing did not occur because the condition contained in the Ocwen 2000 Operating Agreement, the written consent of PNC Fund IV, was not obtained.

19.     Additionally, Defendants' own document, the Instrument of Assignment, on its face confirms that it does not transfer assets where consent has not been obtained.

20.     Since diversity exists, Defendants' Motion should be denied.

### A "Case or Controversy" Exists, and an Action for Declaratory Judgment is Proper

21.     Defendants' next argue that there is no "case or controversy," and that a declaratory judgment action is improper.  By this action, Plaintiffs seek a declaration from this Court regarding various parties' rights and obligations under the inter-related agreements that have been impacted by the dissolution of Ocwen FSB - namely, the Ocwen 2000 Operating Agreement, the PSA, the Eighth Amendment, and the Tax Indemnity.[4]  Defendants argue that no

---

[3]       The Assignment and Assumption Agreement uses "OLS" to refer to Ocwen Servicing.

[4]       Complaint ¶ 14.

"case or controversy" exists with respect to the Purchase and Sale Agreement because, as they contend, "[n]o event under the PSA has occurred that would trigger any right of offset regarding the Payments."[5]  In other words, Defendants' argument assumes that no breach under any of the operative agreements, let alone the PSA, has been committed.  As the Court is aware, however, it is Plaintiffs' position that the dissolution of Ocwen FSB did in fact affect the parties' rights under the agreements, including the Tax Indemnity, the PSA, the Eighth Amendment, and the Ocwen 2000 Operating Agreement; Plaintiffs have set the resolution of these root issues before the Court for determination in this action.[6]  The parties' diametrically-opposed positions on this very issue demonstrates that there indeed exists a "case or controversy" concerning the PSA and payments thereunder.

22.    "A proceeding in the nature of declaratory judgment is a form of remedial procedure which is particularly appropriate where the basic issue underlying the claim of the plaintiff is the interpretation or construction of a contract." *Stern & Co. v. State Loan and Fin. Corp.*, 205 F. Supp. 702, 705 n.6 (D. Del. 1962); *Motor Terminals, Inc. v. National Car Co.*, 92 F. Supp. 155, 161 (D. Del. 1949).  *See also INA v. Misch*, 1989 WL 73702 *3 (E.D. Pa.  1989); 12 MOORE'S FED. PRAC. § 57.80. All unreported cases cited are attached as Exhibit 2.

23.    In support of their argument that no case or controversy exists concerning the PSA, Defendants cite several factually distinguishable cases.  *See, e.g., NutraSweet Co. v. Ajinomoto Co.*, 423 F. Supp. 2d 450 (D. Del. 2006) (granting motion to dismiss where the parties' potential disagreement over patent was insufficient to create a reasonable apprehension of an infringement lawsuit); *Vermeer Mfg. Co. v. Deere & Co.*, 379 F. Supp. 2d 645 (D. Del.

---

[5]     Defendants' Motion at p. 13.

[6]     Complaint ¶¶ 27-29.

2005) (same); *Breitigan v. New Castle County*, 350 F. Supp. 2d 571 (D. Del. 2004) (dismissing declaratory judgment action where the plaintiff did not make "the slightest attempt to show that a controversy exist[ed]"); *Bell Atlantic Corp. v. MFS Communications Co.*, 901 F. Supp. 835 (D. Del. 1995) (potential, and unlikely, anti-trust case was not justiciable). Other cases cited by Defendants actually support Plaintiffs' position on the issue. *See, e.g., Shamrock Holdings of Ca., Inc. v. Arenson*, 421 F. Supp. 2d 800 (D. Del. 2006) (declining to grant one defendant's motion to dismiss where the defendant's role in a decision-making process was a "factual issue currently being addressed in discovery"); *Dow Chem. Co. v. Exxon Chem. Patents, Inc.*, Civ. A. No. 94-572-SLR, 1996 WL 571541 (D. Del. 1996) (denying motion to dismiss in patent infringement case where the plaintiff did not demonstrate the existence of an ongoing controversy in the face of a covenant not to sue which was enforceable against the defendant); *Smith v. DCA Food Indus., Inc.*, 269 F. Supp. 863 (D.Md. 1967) (denying motion to dismiss in labor dispute matter where controversy was actual, not hypothetical). Here, Plaintiffs have demonstrated that an actual controversy exists regarding the parties' rights and obligations under the PSA as well as the other agreements at issue.

24.    The Ocwen 2000 Operating Agreement provides that the representations and warranties of Ocwen FSB "will be true throughout the term of this Amended and Restated Operating Agreement."

25.    The representations and warranties include the following:

(a)    "The Managing Member has and shall maintain until at least five (5) years after the due date of the last Capital Contribution Payment[7] a net worth sufficient to permit it to fulfill all of its obligations under this Agreement." (Section 9.1.3).

---

[7]    Under the Eighth Amendment, the last due date is in 2014. (Mosher Affidavit, Exhibit 2 at p. 12). Thus, Ocwen FSB was required to maintain an adequate net worth until at least 2019.

(b)    "no Event of Withdrawal [which includes voluntary dissolution] has occurred with respect to the Managing Member" (Section 9.1.4).

(c)    "The Managing Member has been duly organized, is validly existing and in good standing . . ." (Section 9.1.6).

26.    Section 6.1 of the PSA includes a representation and warranty by Ocwen FSB (on its own behalf and on behalf of the Selling Partnerships and LLC), Ocwen Investment and Ocwen 2000 that "Ocwen [FSB] is chartered under the laws of the United States as a federal savings bank, and its charter is in full force and effect."

27.    Section 4.6 of the Eighth Amendment states that "[a]ll representations, warranties, covenants and indemnities contained herein and in [the PSA] shall survive the execution and delivery of this Agreement and continue in full force and effect" until events which have not yet occurred, including "the expiration of the statute of limitations for federal income tax purposes with respect to any federal tax return filed by [PNC Fund IV] which is affected by any of the transactions . . . ."[8]

28.    Each of the foregoing representations and warranties was breached by the dissolution of Ocwen FSB.

29.    The PSA, which was entered into in September 2000, related to Fund IV's purchase of interests in a series of Operating Partnerships, each of which owned and operated "apartment complexes or single family home complexes . . . operated under, [and] subject to the requirements of, Section 42 of the Internal Revenue Code." (PSA § 24).

30.    The PSA further stated the "forecasted remaining, unused low income housing tax credits under Section 42 of the Code . . . together with the forecasted material tax benefits . . ." in

---

[8]    As noted above, tax credits are projected to continue until at least 2013. (Mosher Affidavit, Exhibit 2 at p. 13). The general statute of limitations for federal income tax purposes is (at least) three (3) years. 26 U.S.C. § 6501.

Exhibit III to the PSA.  (PSA § 24).  The tax credits and material tax benefits listed in such Exhibit III exceeded $74 million and $108 million, respectively.

31.    Also under the PSA, Fund IV had a "Put Option" which could be exercised in 2001, to require Ocwen FSB to repurchase the interest in one or more of the Operating Partnerships.

32.    As of the date of the Eighth Amendment in 2001, Fund IV had elected to not exercise the Put Option as to many of the Operating Partnerships.  However, it retained its Put Option as to several of the projects.  The Eighth Amendment provided:[9]

> The parties[10] hereto have agreed to extend the payment schedule for the payment of the Remaining Subject Interests Purchase Price from the dates and amounts with respect thereto set forth in the Prior Agreement and the Promissory Notes . . . [to] the dates and in the amounts specified in Section 1.1 below; . . .  The parties hereto acknowledge and agree that such extension and amendment of the payment schedule and the other amendments set forth in this Agreement have been agreed to in consideration for the waiver by the Purchaser of the Put Option with respect to the Remaining Subject Interests and in consideration of the other mutual agreements of the parties set forth herein. . . .

> **Section 3.1.  Ocwen Indemnity.**  The parties hereto acknowledge and agree that this Agreement, including without limitation the termination of the Put Option and the extension and amendment of the payment of the Remaining Interests Purchase Price as Capital Contributions as set forth in Section 1.1 above, were made at the request of Ocwen and agreed to by the Investor as an accommodation to Ocwen and so as to prevent the Investor from exercising the Put Option with respect to the Remaining Subject Interests.  In consideration thereof, Ocwen is executing and delivering to the Investor concurrently with the execution and delivery thereof of this Agreement, a "Tax Indemnity Agreement" dated as of the date of this Agreement, which indemnifies the Investor with respect to any loss of or with respect to Projected Tax Credits by reason of this Agreement and/or the arrangements

---

[9]    The Put Option as to one Operating Partnership was extended for three months and was not terminated.

[10]    The Eighth Amendment used "Ocwen" to refer to "Ocwen FSB" and "Purchaser" or "Investor" to refer to Fund IV.

set forth herein.    However, the foregoing description is for
convenient reference only, and Ocwen's liability under such
indemnity shall be limited to its obligations as set forth in such Tax
Indemnity Agreement.

33.      The Eighth Amendment also created a new Investor Put Option (Section 2.3) that
Fund IV could exercise after all payments related to any particular Operating Partnership.  This
Investor Put Option requires Ocwen FSB to repurchase the Operating Partnership Interest at fair
market value.  Pursuant to the Exhibit A – Payment Schedule to the Eighth Amendment, the
Investor Put Option will arise as to two Operating Partnerships in 2008; as to two Operating
Partnerships in 2010; and as to two Operating Partnerships in 2014.

34.      Pursuant to Section 1.1 of the Eighth Amendment, PNC Fund IV is to make
certain payments to Ocwen 2000 on certain conditions.  Section 1.1 further provides that Ocwen
2000 will, in turn, make certain payments to Ocwen FSB "as agent" for the owner of "remaining
subject interests," such owners being the "remaining operating partnerships."

35.      However, Section 3.3 of the Eighth Amendment provides that the obligation to
make payments is subject to offset, *inter alia*, for "the amount of any 'Indemnity Payment'
which is delinquent" [under the Tax Indemnity], as well as any costs incurred as a consequence
of "any receivership or conservatorship of Ocwen initiated by the [FDIC] or any other
appropriate federal banking agency. . . ."

36.      Pursuant to the Tax Indemnity, Ocwen FSB agreed to indemnify PNC Fund IV,
PNC Bank and Fund IV, Inc., against tax credit shortfalls and other tax liability.

37.      On June 30, 2005, Ocwen FSB was voluntarily dissolved.  The dissolution of
Ocwen FSB has prevented its ability to perform under its agreements, and constitutes a breach
and/or anticipatory breach of same.  "A party who voluntarily becomes unable to perform as
agreed repudiates the contract, giving rise to an immediate right of action."  17A  Am.Jur.2d

*Contracts* § 725; Corbin on Contracts § 984 (Interim Edition 2002). Ocwen FSB could not assign or relieve itself of its contractual obligations without the consent of Plaintiffs. *New Jersey Dept. of Treasury v. Visara Int'l, Inc.*, 166 Fed. Appx. 639, 641 (3rd Cir. 2006); *Schwartz v. Centennial Ins. Co.*, 1980 WL 77940, at *2 (Del. Ch. 1980); *Dwyer v. Lavigne*, 64 N.E.2d 356, 357 (Mass.1946). As stated in Restatement (Second) of Contracts § 253 (62): "Where performances are to be exchanged under an exchange of promises, one party's repudiation of a duty to render performance discharges the other party's remaining duties to render performance."

38.     Defendants argue that no "case or controversy" exists, contending that Plaintiffs "have asserted nothing more than a theoretical risk based upon hypothetical scenarios that have not yet (and likely will never) come to fruition. No event under the PSA has occurred that would trigger any right of offset regarding the payments. Further, in the unlikely circumstance that some event occurs at some hypothetical date in the future, PNC Fund IV simply may offset that amount from a future payment….Ocwen FSB's , and now OLS's, obligations under the PSA and related documents are fully guaranteed by Ocwen Financial." (Defendant's Motion, at p. 13).

39.     Notably, Defendants do not challenge the fact that a "case or controversy" exists with respect to the other contracts that are involved in this case.

40.     Plaintiffs bargained for, and received, the Tax Indemnity from Ocwen FSB, a federally-regulated savings bank. Plaintiffs did not bargain for an indemnity from Ocwen Services or Ocwen Financial, or agree to substitute either Ocwen Servicing or Ocwen Financial in lieu of Ocwen FSB.

41.     Moreover, the substitute Guaranty by Ocwen Financial provides that:

> "*Termination Date*" means the later of (a) the sixth anniversary of the date on which the FSB's federal bank charter is cancelled and (b) the date on which both of the following have been indefeasibly paid in full cash: (i) all Guaranteed Obligations with respect to

> which a Claim has been asserted (whether under this Guaranty or otherwise) on or prior to the sixth anniversary of the date on which the FSB's federal bank charter is cancelled and (ii) all other amounts payable by the Guarantor under this Guaranty (whether in respect of enforcement costs, indemnification payments or otherwise). (Mosher Affidavit, Exhibit 6).

However, the respective obligations of the parties, including payment of tax credits, extend until at least 2014, and receipt of tax credits extends until at least 2013. (Mosher Affidavit, Exhibit 2, at p. 12-13). Under applicable representations and warranties, Ocwen FSB was obligated to maintain an adequate net worth until 2019. For all of these reasons, a substitute guaranty by Ocwen Financial, to which Plaintiffs did not consent, does not eliminate the issues presented by the dissolution of Ocwen FSB.

42.  Ocwen FSB unilaterally chose to dissolve, and, according to ¶ 14 of the Mosher Affidavit, transferred at least the majority of its assets to other entities.[11] Defendants do not suggest that Ocwen FSB retains any ability to perform under its agreements. The dissolution has prevented Ocwen FSB's ability to perform. (Complaint, ¶ 35). It cannot honor its Tax Indemnity, cannot honor the Investor Put Option, and has breached numerous representations and warranties.

43.  Future offset rights are not adequate because the amounts available for offset are less than the liabilities of Ocwen FSB. Defendants would defer liability for the clear breaches until after the payments have been long-dissipated, leaving Plaintiffs with empty promises. A declaratory judgment as to the parties' obligations, including whether Plaintiffs are obligated to make payments to Ocwen FSB, which has been dissolved, notwithstanding Ocwen FSB's prior breaches, is appropriate.

---

[11] Actually, the Assignment Agreement anticipated significant assets, being transferred to Marathon Bank, Rocaille Acquisition and Investors Mortgage Insurance Housing Company, Subsidiary, Inc. (Mosher Affidavit, Exhibit 5). It also ignores the carve-out for assets that required prior consent that had not been obtained. See ¶¶ 10-13).

44.    An actual controversy exists between the parties regarding the effect of the dissolution of Ocwen FSB on the parties' respective rights and obligations pursuant to the PSA, Eighth Amendment, Ocwen 2000 Operating Agreement and/or Tax Indemnity.

Respectfully submitted,

By: _____

Michael G. Busenkell (Bar No. 3933)
**Eckert Seamans Cherin & Mellott, LLC**
300 Delaware Avenue, Suite 1360
Wilmington, DE 19801
(302) 425-0430
(302) 425-0432 (fax)

ATTORNEYS FOR PLAINTIFFS

Of Counsel:

Charles L. Perry, Esquire
ANDREWS KURTH LLP
State Bar No. 15799900
1717 Main Street, Suite 3700
Dallas, TX 75201
Email: cperry@akllp.com
Telephone: (214) 659-4681
Facsimile:  (214) 659-4894
(pro hac vice pending)

Dated: July 17, 2006

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| COLUMBIA HOUSING/PNC | § | |
| INSTITUTIONAL FUND IV LIMITED | § | NO. 06-371 |
| PARTNERSHIP, COLUMBIA | § | |
| HOUSING SLP CORPORATION, | § | |
| OCWEN 2000-LLC, PNC BANK, and | § | |
| COLUMBIA HOUSING/PNC | § | |
| FUND IV, INC., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| OCWEN FEDERAL BANK FSB, | § | |
| OCWEN INVESTMENT | § | |
| CORPORATION, and OCWEN | § | |
| LOAN SERVICING, LLC, | § | |
| | § | |
| Defendants. | § | |

## DECLARATION OF CHRISTOPHER H. BRIC

Christopher H. Bric hereby makes the following declaration under penalty of perjury pursuant to 28 U.S.C. §1746, as follows:

1. My name is Christopher H. Bric. I am a Senior Vice President of Columbia Housing/PNC Fund IV, Inc. and Senior Vice President of Columbia Housing/PNC Institutional Fund IV Limited Partnership. I am over the age of twenty-one (21) years, suffer no legal or mental disabilities, and am fully competent to make this declaration.

2. I have personal knowledge of the facts stated herein, all of which are true and correct.

3. Attached hereto as Exhibit A is a true and correct copy of the Designation of Successor Managing Member and Tax Matters Partner and Agreement Among Members of Ocwen 2000-LLC.

4. Exhibits A was executed by me on June 2, 2006 on behalf of Columbia Housing/PNC Fund IV, Inc. and on behalf of Columbia Housing/PNC Institutional Fund IV Limited Partnership.  Pursuant to PNC Fund IV, Inc., became the Successor Managing Member of Ocwen 2000 LLC, effective as of June 30, 2005.

5. At no time did Columbia Housing/PNC Fund IV, Inc. or Columbia Housing/PNC Institutional Fund IV Limited Partnership consent to the dissolution of Ocwen Federal Bank FSB, or the transfer of any membership interest in Ocwen 2000 LLC from Ocwen Federal Bank FSB to Ocwen Loan Servicing LLC or to any other person or entity.

6. I declare under penalty of perjury that the foregoing is true and correct. Executed on July 17, 2006.

FURTHER DECLARANT SAYETH NOT.

Christopher H. Bric

# EXHIBIT A

## DESIGNATION OF SUCCESSOR MANAGING MEMBER
## AND TAX MATTERS PARTNER
## AND AGREEMENT AMONG MEMBERS OF OCWEN 2000 – LLC

This Designation of Successor Managing Member and Tax Matters Partner and Agreement among Members of Ocwen 2000 – LLC is entered into on June 2, 2006 to be effective as of the Effective Date (as defined herein), by and between COLUMBIA HOUSING/PNC INSTITUTIONAL FUND IV LIMITED PARTNERSHIP, a Massachusetts limited partnership ("*Investor Member*"), and COLUMBIA HOUSING/PNC FUND IV, INC. ("*Successor Managing Member*").

### RECITALS

A.    Ocwen Federal Bank FSB, a United States federal savings bank ("*Ocwen*"), as Managing Member, and Investor Member entered into that certain Amended and Restated Operating Agreement of Ocwen 2000-LLC dated October 30, 2001 to be effective as of September 1, 2001 (collectively with all amendments and modifications thereto, the "*Operating Agreement*"). All capitalized terms used but not defined herein shall have the respective meanings given such terms in the Operating Agreement.

B.    Ocwen voluntarily dissolved as of June 30, 2005 (the "*Effective Date*"). Such dissolution constituted an Event of Withdrawal under the Operating Agreement with respect to Ocwen, and as a result, Ocwen automatically ceased to be a Member of the Company as of the Effective Date.

C.    Investor Member, as the sole remaining Member of the Company, desires to designate Successor Managing Member as the Managing Member and the "tax matters partner" of the Company as successor to Ocwen, and Successor Managing Member desires to accept such designation, on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.    Effective as of the Effective Date, Successor Managing Member is hereby designated as the Managing Member of the Company and as the sole "tax matters partner" of the Company as contemplated by Section 5.3.7 of the Operating Agreement and Treasury Regulation Section 301.6231(a)(7)-1 and any other applicable regulations or provisions of the Code. Successor Managing Member shall promptly execute and deliver to the appropriate filing office of the Internal Revenue Service on behalf of the Company any document or instrument required or otherwise contemplated under the Code or applicable regulations to effectuate Successor Managing Member's designation as the Company's tax matters partner with respect to each tax year of the Company from and after the Effective Date.

2.    Successor Managing Member hereby accepts such designation as the Managing Member together with and subject to all rights, powers, benefits, privileges and obligations of the Managing Member under the Operating Agreement; provided, that Successor Managing Member shall have no obligation or liability to the Company, Investor Member or any other party under Article 9 of the Operating Agreement or with respect to any obligation or liability of Ocwen under the Operating Agreement or otherwise, whenever or however arising.

3.    Effective upon the full execution of this Agreement, and the written consent of the Investor Member pursuant to the applicable provisions of the Operating Agreement as evidenced by its execution of this Agreement, Successor Managing Member shall be deemed admitted to the Company as a Substitute Member.

4.    Each party to this Agreement agrees to take such further action and execute such further agreements and instruments as may be reasonably requested by any other party to give effect to the transactions contemplated by this Agreement or to otherwise comply with any applicable requirement of the Operating Agreement, the Code or other law or regulation.

5.    This Agreement may be executed by facsimile and in any number of counterparts with the same effect as if all signing parties had signed the same document. All counterparts shall be construed together and constitute the same document. In making proof of this Agreement, it shall not be necessary to account for more than one counterpart executed by the party against whom enforcement is sought.

*[Signatures appear on following page]*

**SUCCESSOR MANAGING MEMBER:**

COLUMBIA HOUSING/PNC FUND IV, INC.

By: _____
Name: Christopher H. Bric
Title: Senior Vice President

**INVESTOR MEMBER:**

COLUMBIA HOUSING/PNC INSTITUTIONAL
FUND IV LIMITED PARTNERSHIP,
a Massachusetts limited partnership

By:    Columbia Housing/PNC Fund IV, Inc.,
       its general partner

       By: _____
       Name: Christopher H. Bric
       Title: Senior Vice President

DAL:621681.1

# EXHIBIT 2

Westlaw.

Not Reported in F.Supp.                                                                      Page 1
Not Reported in F.Supp., 1996 WL 571541 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
DOW CHEMICAL COMPANY Plaintiff,
v.
EXXON CHEMICAL PATENTS, INC., and Exxon
Corporation, Defendants.
**Civ. A. No. 94-572-SLR.**

Sept. 20, 1996.

Donald F. Parsons, Esquire, and Lisa B. Baeurle,
Esquire, of Morris, Nichols, Arsht & Tunnell,
Wilmington, Delaware, attorneys for plaintiff. Of
counsel: Harry J. Roper, Esquire, Raymond N.
Nimrod, Esquire, Aaron A. Barlow, Esquire, of
Roper & Quigg, Chicago, Illinois.
William J. Wade, Esquire, and Frederick L. Cottrell,
III, Esquire, of Richards, Layton & Finger,
Wilmington, Delaware, attorneys for defendants. Of
Counsel: Richard C. Levin, Esquire, Scott R. Jacobs,
Esquire, Lisa S. Gallerano, Esquire, and John L.
Hendricks, Esquire, of Akin, Gump, Strauss, Hauer
& Feld, L.L.P., Dallas, Texas; Eric C. Woglom,
Esquire, Glenn A. Ousterhout, Esquire, Denise L.
Loring, Esquire, of Fish & Neave, New York, New
York.

MEMORANDUM OPINION
SUE L. ROBINSON, District Judge.

I. INTRODUCTION

*1 The Dow Chemical Company ("Dow"), filed this
action against Exxon Chemical Patents, Inc.
("ECPI") and Exxon Corporation ("Exxon") on
October 25, 1994. In Count I of its second amended
complaint, plaintiff seeks a declaration that the
manufacture, sale, or use of wire and cable devices
which utilize Dow ENGAGE polymers do not
infringe United States Patent No. 5,246,783 (the "
'783 patent") held by defendants, and that this patent
is invalid by virtue of its obviousness and defendants'
inequitable conduct before the Patent & Trademark
Office ("PTO"). (D.I. 142) In Count II, plaintiff
seeks declaratory, injunctive, and monetary relief
against Exxon for unfair competition. (D.I. 142).
Defendants filed a counterclaim for patent
infringement and several related state law claims.

(D.I. 157)

On August 5, 1996, defendants filed a Statement of
Nonliability which, according to defendants, gives
plaintiff an "unconditional covenant not to sue Dow
for infringement of the '783 patent." (D.I. 171 at 2)
Defendants have moved to dismiss on the basis of the
nonliability covenant. (D.I. 170) The motion has
been thoroughly briefed, and oral argument was held
on September 5, 1996. For the reasons that follow,
the court will grant defendants' motion with respect
to Count I of the complaint and deny the motion with
respect to Count II.

II. BACKGROUND

The patent at issue in this litigation covers certain
wire and cable devices manufactured using a
particular insulating polymer. The '783 patent,
entitled "Electrical Devices Comprising Polymeric
Insulating or Semiconducting Members," was issued
to ECPI on September 21, 1993. (D.I. 9, Ex. 1)
Exxon manufactures the polymer used in the patented
devices under the trade names VISTALON and
EXACT. Roughly contemporaneously to the
issuance of this patent, Dow introduced its first line
of "ITP [FN1]" polymer products under the trademark
name of AFFINITY. By February of 1994, Dow had
introduced a second line of ITP products, the
ENGAGE products, with two polymers (ENGAGE
CL 8001 and ENGAGE CL 8002) specifically for
cable wire use. (D.I. 26 at ¶¶ 9-7) By June, Dow
also developed a third ENGAGE product, ENGAGE
CL 8003, which is also designed for wire and cable
use.

> FN1. ITP products are those which are
> produced using INSIGHT technology. (D.I.
> 26 at ¶ 3)

After several contacts between Exxon and Dow, and
between Exxon and Dow's customers, Dow filed the
present suit. Defendants moved to dismiss,
contending that the court lacked subject matter
jurisdiction due to the absence of an actual case or
controversy. (D.I. 8, 66) This court denied the
motion, finding that Dow had taken concrete steps
toward the production and sale of a potentially
infringing product, and that Exxon had, through its

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 2
Not Reported in F.Supp., 1996 WL 571541 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

contacts with Dow and its customers, created a reasonable apprehension of suit on the part of Dow. (D.I. 76)

Since the resolution of that motion, plaintiff has increased its sales of the ENGAGE polymer, continued its development of new products using ENGAGE, and developed a new line of polymers for use in wire and cable devices, the Nordel IP polymers. (D.I. 204 at 4-7) Like products made with the ENGAGE polymer, Nordel IP products would potentially infringe defendants' patent.

**\*2** Defendants have represented to the court that the license fees from plaintiff on the total amount of ENGAGE polymer used thus far to make infringing products would amount to slightly less than $63,000. Rather than engage in further costly litigation, they have proffered a Statement of Nonliability. The statement has undergone a number of revisions. In its most current form, it reads:
Exxon Chemical Patents, Inc. and Exxon Corporation (collectively "Exxon") hereby unconditionally covenant, promise, and agree on behalf of themselves and their successors-in-interest not to sue The Dow Chemical Company ("Dow") or any wire and cable compounder or manufacturer which Dow indemnifies against infringement of U.S. Patent No. 5,246,783, for infringement of any claim of U.S. Patent No. 5,246,783 based upon (1) any past, current or future polymer composition containing an ENGAGE and/or Nordel IP product, alone or blended with other materials, or (2) any past, current or future wire and cable device that incorporates any polymer composition containing an ENGAGE and/or Nordel IP product, alone or blended with other materials. For purposes of this Statement of Nonliability, ENGAGE is defined as any copolymer of ethylene and octene that is made using INSITE technology, whether sold under the tradename ENGAGE or under some other trade name, and Nordel IP is defined as any terpolymer of thylene, propylene, and ethylidene norbornene that is made using INSITE technology, whether sold under the tradename Nordel IP or under some other trade name.

(D.I. 271 at Ex. C-1) Based on this statement, defendants have moved to dismiss both counts of plaintiff's complaint.

### III. DISCUSSION

#### A. Count I

Jurisdiction by this court over plaintiff's patent claim can only arise from the Declaratory Judgment Act (the "Act"). 28 U.S.C. § § 2201 and 2202. "The existence of an actual controversy is an absolute predicate for declaratory judgment jurisdiction. When there is no actual controversy the court has no jurisdiction to decide the case. When there is an actual controversy and thus jurisdiction, the exercise of that jurisdiction is discretionary." *Spectronics Corp. v. H.B. Fuller Co.,* 940 F.2d 631, 633-634 (Fed.Cir.), *cert. denied,* 502 U.S. 1013 (1991) (citations omitted). No absolute right to a declaratory judgment exists. *Serco Servs. Co. L.P. v. Kelley Co., Inc.,* 34 U.S.P.Q.2d 1217 (Fed.Cir.1995); *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.,* 846 F.2d 731, 733 n. 6 (Fed.Cir.1988). When a defendant files a motion to challenge the court's jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1), the plaintiff has the burden of proof and must establish an actual case or controversy on the totality of the circumstances. *Spectronics,* 940 F.2d at 634 (citing *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 272 (1941)). When a factual dispute exists, it is plaintiff's burden to establish jurisdiction by the preponderance of the evidence. *West Interactive Corp. v. First Data Resources, Inc.,* 972 F.2d 1295, 1297 (Fed.Cir.1992). The Federal Circuit has set forth the following two-prong standard for determining whether "a case of actual controversy" exists in actions seeking a declaratory judgment of patent non-infringement or invalidity:
**\*3** First, the accused infringer must have actually produced or prepared to produce an allegedly infringing product. *Jervis B. Webb Co. v. Southern Sys., Inc.,* 742 F.2d 1388, 1398-99, 222 U.S.P.Q. (BNA) 943, 949 (Fed.Cir.1984). The first prong "looks to the accused infringer's conduct and ensures that the controversy is sufficiently real and substantial." *Lang v. Pacific Marine and Supply Co.,* 895 F.2d 761, 764, 13 U.S.P.Q.2d (BNA) 1820, 1822 (Fed.Cir.1990).... Second, the patent holder's conduct must create an objectively reasonable apprehension on the part of the accused infringer that the patent holder will initiate suit if the allegedly infringing activity continues.

*Spectronics,* 940 F.2d at 634 (citations omitted). Thus, the first prong of the test reviews plaintiff's conduct and the second that of defendant. *Arrowhead,* 846 F.2d at 736; *B.P. Chemicals,* 4 F.3d at 978. These actions are reviewed objectively. *Mobil Oil Corp. v. Advanced Envtl. Recycling Technologies, Inc.,* 26 U.S.P.Q.2d 1238, 1239 (D.Del.1992).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 571541 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

The Federal Circuit has held that when an infringement claim is dismissed, counterclaims of noninfringement or invalidity become moot unless the party seeking declaratory judgment establishes the existence of an ongoing controversy. *Vieau v. Japax, Inc.,* 823 F.2d 1510, 1517-20 (Fed.Cir.1987). In a 1987 speech, Chief Judge Markey of the Federal Circuit offered a helpful insight into the policy underlying this and similar decisions:

Courts have no roving commission to destroy every invalid patent. Assuming the patent would have been proven invalid, a trial required for its destruction, after a finding of no infringement and thus in the absence of a case or controversy, is not justified, by considerations of public policy or otherwise.

H. Markey, *On Simplifying Patent Trials,* 116 F.R.D. 369, 377 n. 15, *cited in* Robert L. Harmon, *Patents and the Federal Circuit* § 14.3(g) (2d ed. 1991).

Defendants contend that their covenant not to sue moots plaintiff's Count I in its entirety. Plaintiff does not dispute the legal premise of this argument, but contends that Count I will be mooted only if defendants agree to a slight change in the wording of the Statement of Nonliability. Specifically, plaintiff wants the covenant to apply to any party indemnified by plaintiff, not just those engaged in wire and cable manufacture. (D.I. 272) In their brief, defendants assert that, in their interpretation, the covenant already applies to any party indemnified by plaintiff. (D.I. 271 at 2 n. 5)

Taking defendants at their word, the court concludes that the Statement of Nonliability is sufficient to protect plaintiff against any reasonable apprehension of suit for any products it currently manufactures or has taken concrete steps to manufacture in the future. Plaintiff has not demonstrated an ongoing controversy. Plaintiff's claims of noninfringement and invalidity, therefore, are not justiciable. Accordingly, Count I of the complaint will be dismissed.

## B. Count II

*\*4* Plaintiff points out that the remaining count of its claim is directed at Exxon only, not ECPI. Because there is complete diversity between the parties, plaintiff argues, its state law claims should survive the dismissal of Count I. Exxon, on the other hand, argues that the claims raised in Count II implicate the validity of the patent itself. Therefore, it contends, ECPI, as the patent owner, must be joined as a party pursuant to Fed.R.Civ.P. 19. Because ECPI is a Delaware corporation, joinder would destroy diversity and require the dismissal of Count II.

Rule 19(a) provides:

A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may [ ] as a practical matter impair or impede the person's ability to protect that interest....

Fed.R.Civ.P. 19(a). If, as in this case, joinder would defeat the court's subject matter jurisdiction, the court must make an additional determination:If a person described in subdivision (a)(1)-(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable.

Fed.R.Civ.P. 19(b). The rule lists several factors for the court to consider in making a determination on indispensability, including potential prejudice to the existing parties, whether such prejudice can be eliminated or mitigated by other measures, whether an adequate judgment can be rendered in the person's absence, and whether an adequate remedy will be available if the action is dismissed. Fed.R.Civ.P. 19(b).

In the case of patent owners, it is well-established that a mere licensee, even an exclusive licensee, may not sue for infringement without joinder of the patent owner. *Minco, Inc. v. Combustion Engineering, Inc.,* No. 96-1005, 96-1033, 1996 WL 511532 (Fed.Cir. Sept. 10, 1996); *Abbott Laboratories v. Diamedix Corp.,* 47 F.3d 1128 (Fed.Cir.1995). As the Federal Circuit explained in *Minco:*

A conveyance of interests in a patent typically constitutes either an assignment or a mere license. An assignment of patent rights operates to transfer title to the patent, while a license leaves title in the patent owner. Thus, an assignee holds title to a patent and may sue for infringement without further permission or clearance. A licensee, however, cannot sue without joinder of the patent owner. To

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 571541 (D.Del.)
(Cite as: Not Reported in F.Supp.)

create an assignment, a contract must transfer: (1) the entire exclusive patent right, (2) an undivided interest in the patent rights, or (3) the entire exclusive right within any geographical region of the United States. An agreement that does not transfer one of these three interests is merely a license.

**\*5** *Minco, Inc. v. Combustion Engineering, Inc.* at \*6. These cases, however, do not stand for the proposition that a patent owner who retains any rights in the patent must be joined in any case affecting the validity of that patent.

In *Vaupel Textilmaschinen v. Meccanica Euro Italia S.P.A.,* 944 F.2d 870 (Fed.Cir.1991), the Federal Circuit addressed the question of whether a patent owner was an indispensable party to an infringement suit brought by an exclusive licensee. In that case, the patent owner retained a veto right on sublicenses, the right to obtain patents on the invention in other countries, the right to receive infringement damages, the right to be notified of infringement suits, and a reversionary interest in the patent in the event of the licensee's bankruptcy. Construing the license agreement as a constructive assignment, the court concluded that the owner was not indispensable. In so doing, the court relied most heavily on the grant given to the licensee to sue for past, future, and present infringements of the patent. *Id.* at 874-75. The court explained that "[t]he policy underlying the requirement to join the owner when an exclusive licensee brings suit is to prevent the possibility of two suits on the same patent against a single infringer. This right is not undercut here because the right to sue rested solely with [the licensee]." *Id.* at 875-76 (emphasis added) (citations omitted).

In the present case, ECPI, a wholly-owned, separately incorporated subsidiary of Exxon, owns the '783 patent. Plaintiff makes much of ECPI's status as a "shell" corporation whose sole purpose is to hold title on Exxon's patents. Although the corporation does have officers and a board of directors, its officers are all employees of Exxon. ECPI has no employees, no offices of its own, no manufacturing or sales facilities, no budget, and no bank accounts. (D.I. 271 at Ex. E; D.I. 205 at B29, B34) As Exxon correctly asserts, however, courts in other contexts have required joinder of holding companies that were "merely a corporate fiction" even where such joinder has destroyed diversity. *Bonar, Inc. v. Schottland,* 631 F.Supp. 990, 997 (E.D.Pa.1986). *See also First State Life Ins. Investors, Inc. v. 20th Century Corp.,* 309 F.Supp. 1390 (D.Del.1969).

More helpful to the determination of whether ECPI is indispensable is an analysis of the relationship between ECPI and Exxon. It is true, as Exxon points out, that ECPI has neither assigned nor exclusively licensed the '783 patent to Exxon. It has, however, granted certain rights in the patent to Exxon Chemical Company ("ECC"), an unincorporated division of Exxon, including the right to sue for infringement on its behalf:
ECPI further grants ECC the right to take such actions as deemed necessary by ECC, in order to establish, perfect, and defend ECPI's title and interest in such patents and patent applications, and to enforce such patents against infringers and settle any claims related thereto, and to enter into and to execute all documents and agreements related thereto.

**\*6** (D.I. 171 at Ex. C) The agreement also grants ECC the right to sublicense without notifying ECPI. John Mahon, who gave deposition testimony on behalf of ECC and ECPI, clarified the practical import of this agreement:Q. Would it be fair to say that by virtue of the rights given in [the licensing agreement] that Exxon Chemical Company controls the '783 patent?
[objection]
Q. Let me just ask a simple question. Is it fair to say that Exxon Chemical Company controls the '783 patent?
[objection]
A. I'm not sure what you mean by the word "control."
Q. The word "control" means having the power to make decisions relating to the '783 patent.
A. It is authorized to make decisions concerning the '783 patent, yes.
....
Q. ... Now, what power is Exxon Chemical Company lacking in respect to the '783 patent?
A. The ability to be a patent applicant in all countries of the world except the United States.
Q. Is there anything else that comes to mind?
A. I can't think of anything right now.

(D.I. 205 at B37-B38) From this testimony, Exxon's active role in defending the patent thus far, and the license agreement itself, it appears that ECPI has not retained substantive rights such that its joinder is necessary.

Even if this court were to construe the agreement between ECC and ECPI as a mere license, the cases Exxon cites in support of joinder were all decided in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                      Page 5
Not Reported in F.Supp., 1996 WL 571541 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

the context of infringement suits. This case, however, is no longer an infringement action. Rather, it concerns Exxon's conduct in obtaining and defending ECPI's patent rights-the very role that was assigned to it under the licensing agreement. The court concludes that, as a practical matter, Exxon has both the duty and the capability of protecting ECPI's interests. Joinder, therefore, is not required.[FN2]

> FN2. The court notes, however, that Exxon has not responded fully to plaintiff's argument concerning the scope of issues to be addressed in Count II. In particular, there is some question as to whether plaintiff may attack the validity of the patent itself on a claim of unfair competition. The court will stay discovery until this issue has been fully briefed and resolved.

### C. Plaintiff's Claim for Attorney Fees

The patent laws permit a prevailing party to recover attorney fees in exceptional circumstances. 35 U.S.C. § 285. Dow contends that 1) it is a prevailing party, 2) defendants' inequitable conduct in obtaining their patent constitutes the exceptional circumstance necessary for recovery of attorney fees, and 3) the court has jurisdiction to hear the matter as a collateral issue regardless of whether Count I is dismissed.

Ordinarily, the issue of attorney fees is not decided until the conclusion of the litigation. *See Larchmont Engineering, Inc. v. Toggenburg Ski Center, Inc.,* 444 F.2d 490, 491 (2d Cir.1971). Although the issues dealing directly with the patent will be disposed of with the dismissal of Count I, attorney fees may be awarded on nonpatent issues where they are "so intertwined with the patent issues that the evidence would, in large part, be material to both types of issues." *Stickle v. Heublein, Inc.,* 716 F.2d 1550, 1564 (Fed.Cir.1983). Because, as noted above, the scope of evidence that will be presented on Count II is as yet unclear, the court will reserve decision on whether a hearing on attorney fees is appropriate in this case.

### IV. CONCLUSION

**\*7** For the reasons stated above, the court will dismiss Count I of plaintiff's second amended complaint. Defendants' motion to dismiss Count II for failure to join an indispensable party will be denied. Discovery will be stayed while the parties brief the remaining issue of the scope of issues to be tried in Count II.

D.Del.,1996.
Dow Chemical Co. v. Exxon Chemical Patents, Inc.
Not Reported in F.Supp., 1996 WL 571541 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:94cv00572 (Docket) (Oct. 25, 1994)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

166 Fed.Appx. 639                                                                                       Page 1
166 Fed.Appx. 639, 2006 WL 335855 (C.A.3 (N.J.))
**(Cite as: 166 Fed.Appx. 639)**

Briefs and Other Related Documents
This case was not selected for publication in the
Federal Reporter.NOT PRECEDENTIAL    Please
use FIND to look at the applicable circuit court rule
before citing this opinion. Third Circuit Local
Appellate Rule 28.3(a) and Internal Operating
Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3
IOP APP I 5.3.)
United States Court of Appeals,Third Circuit.
NEW JERSEY DEPARTMENT OF TREASURY,
Division of Purchase and Property, Appellant,
v.
VISARA INTERNATIONAL, INC.
**No. 05-1196.**

Argued Jan. 17, 2006.
Decided Feb. 15, 2006.

**Background:** State of New Jersey brought suit for
breach of contract, unjust enrichment, fraud, and
breach of implied covenant of good faith and fair
dealing against purchaser of assets of defunct
corporation from which State had purchased
computer equipment and prepaid maintenance
services. The United States District Court for the
District of New Jersey, Stanley R. Chesler, J., granted
summary judgment to successor. State appealed.

**Holdings:** The Court of Appeals, Fuentas, Circuit
Judge, held that:

1(1) State remained company's creditor after
nonconsensual assignment of assets, and

2(2) confirmation of company's Chapter 11
bankruptcy plan presented res judicata bar to attempt
to enforce company's obligations against asset
purchaser.

Affirmed.

West Headnotes

**[1] Assignments 38 ⟲100**

38 Assignments
38V Rights and Liabilities

38k99 Equities and Defenses Between Original
Parties
38k100 k. In General. Most Cited Cases
State did not lose its status as creditor of computer
equipment and services company by virtue of
company's nonconsensual assignment of its
contractual obligations to third party.

**[2] Bankruptcy 51 ⟲3568(2)**

51 Bankruptcy
51XIV Reorganization
51XIV(B) The Plan
51k3566 Confirmation; Objections
51k3568 Effect
51k3568(2) k. Conclusiveness. Most
Cited Cases
Inasmuch as state remained creditor of corporation
after corporation's attempt to assign its contractual
obligations without state's consent, state was creditor
of company during company's subsequent bankruptcy
proceeding, and confirmation of Chapter 11 plan
presented res judicata bar to state's attempt to
subsequently enforce contractual obligations against
assignee.

**[3] Assignments 38 ⟲29**

38 Assignments
38I Property, Estates, and Rights Assignable
38k29 k. Transfer of Liability. Most Cited
Cases
Assignor could not assign its obligations under
contract without consent of other contracting party to
which it was liable.

**[4] Novation 278 ⟲1**

278 Novation
278k1 k. Nature and Requisites in General. Most
Cited Cases
A novation is the act of substituting for an old
obligation a new one that either replaces an existing
obligation with a new obligation or replaces an
original party with a new party.

**\*639** On Appeal from the United States District
Court for the District of New Jersey. (D.C. No. 04-
cv-01776).  District Judge:  Honorable Stanley R.
Chesler.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

166 Fed.Appx. 639
166 Fed.Appx. 639, 2006 WL 335855 (C.A.3 (N.J.))
**(Cite as: 166 Fed.Appx. 639)**

Page 2

Mala S. Narayanan (Argued), Office of the Attorney General of New Jersey, Richard J. HughesJustice Complex, Trenton, New Jersey, for Appellant.
Robert E. Ganz (Argued), Ganz, Wolkenbreit & Friedman, Albany, New York, Hal K. Haveson, Haveson & Otis, Princeton, New Jersey, for Appellee.

Before ROTH, FUENTES, and BECKER, Circuit Judges.

OPINION OF THE COURT

FUENTES, Circuit Judge.

**\*\*1** Appellant, New Jersey Department of Treasury ("New Jersey"), appeals the decision of the U.S. District Court for the District of New Jersey granting summary judgment in favor of appellee Visara International, Inc. ("VI") on New Jersey's claims for breach of contract, unjust enrichment/quantum meruit, bad faith, fraud, and breach of the implied covenant of good faith and fair dealing. We exercise plenary review over these claims on appeal and affirm the District Court's decision.

I. Background

In 1997, and again in 2001, New Jersey awarded contracts (the "New Jersey Contracts") to Visara, Inc., ("Visara") for computer equipment and pre-paid maintenance and warranty services. New Jersey paid Visara a total of $10.1 million for the equipment and maintenance services. Much of the computer equipment proved to be defective almost immediately after being put into service. In April 2002, a service representative informed New Jersey that all of Visara's assets-including its obligations under the New Jersey Contracts-had been sold to VI. In fact, VI had purchased Visara's assets in February 2002 through an Asset Purchase Agreement, which provided, among other things, that VI would "assume" Visara's warranty and maintenance obligations to New Jersey. New Jersey was not a signatory to the Agreement.

In May 2002, shortly after the asset sale, Visara was put into involuntary bankruptcy by a creditor filing in the U.S. Bankruptcy Court for the Northern District of New York. On October 29, 2003, Visara filed its Disclosure Statement and Chapter 11 Proposed Liquidating Plan of Reorganization. The proposed plan included a settlement agreement between Visara and VI that required VI to contribute $200,000 to fund a ten percent payment to Visara's general

unsecured creditors in exchange for a release from the claims of Visara's creditors.

New Jersey filed a $2.8 million claim on December 5, 2003, almost one year after the bar date for filings by governmental units had passed. Visara objected to New Jersey's claim on three grounds: untimeliness, insufficient documentation, and New Jersey's failure to mitigate damages. New Jersey subsequently sought permission of the Bankruptcy Court to withdraw its claim. On February 11, 2004, the Bankruptcy Court issued an "Order Disallowing Claim of the State of New Jersey." The bankruptcy proceedings eventually concluded when the Bankruptcy Court approved the settlement agreement (which was increased to $220,000) and confirmed Visara's Chapter 11 plan. No appeals were filed by the New Jersey Attorney General or any other party.

On March 9, 2004-less than one month after the Bankruptcy Court disallowed New Jersey's claim against Visara-New Jersey filed suit against VI in the Superior Court of New Jersey. New Jersey asserted claims for breach of contract, unjust enrichment/quantum meruit, bad faith, fraud, and breach of the implied covenant of good faith and fair dealing. New Jersey sought to recover the same sum of $2.8 million that it sought in Visara's bankruptcy proceedings. The action was removed to the U.S. District Court for the District of New Jersey. The parties eventually filed cross-summary judgment motions. On December 20, 2004, the District Court granted summary judgment in VI's favor based on *res judicata,* holding that, in view of New Jersey's status as a creditor to **\*641** Visara during Visara's bankruptcy proceedings, the claims in this action were resolved by the confirmation of the Chapter 11 plan. This appeal followed.

II. Discussion

**\*\*2** [1][2] New Jersey argues that the District Court erred in granting VI's motion for summary judgment on *res judicata* grounds. For the reasons stated below, we conclude that the District Court properly granted summary judgment for VI.

The rule of *res judicata,* as applied in the bankruptcy context, has been summarized as follows:
Section 1141(a) of the [Bankruptcy] Code provides that a plan is binding upon all parties once it is confirmed.... [A] confirmed plan of reorganization is binding upon every entity that holds a claim or interest even though a holder of a claim or interest is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

166 Fed.Appx. 639                                                                                      Page 3
166 Fed.Appx. 639, 2006 WL 335855 (C.A.3 (N.J.))
**(Cite as: 166 Fed.Appx. 639)**

not scheduled, has not filed a claim, does not receive a distribution under the plan or is not entitled to retain an interest under such plan. In other words, a confirmed plan precludes parties from raising claims or issues that could have or should have been raised before the confirmation but were not.

8 *Collier on Bankruptcy* ¶ 1141.02 (15 ed. rev.2004) (footnotes omitted).

[3][4] New Jersey contends that *res judicata* does not apply here because it was not a creditor of Visara during Visara's bankruptcy proceedings. First, New Jersey argues that, by the time Visara's bankruptcy proceedings began, VI had expressly "assumed" Visara's contractual obligations to New Jersey; therefore, New Jersey was a creditor of VI and not Visara. However, as the District Court explained, it is a matter of basic contract law that

one who ... is bound to any performance whatsoever cannot by its own act, or by any act in agreement with anyone else, except its creditor, divest itself of the duty and substitute the duty of another. No one can assign his liabilities under a contract without the consent of the party to whom he is liable.

29 *Williston on Contracts* § 74:27 at 412 (4th ed.2003, Supp.2004) (internal quotation marks and footnote omitted); *see also Riley v. New Rapids Carpet Ctr.*, 61 N.J. 218, 294 A.2d 7, 10 (1972) (citing *Williston on Contracts* for same proposition); *Wachovia Realty Invs. v. Hous., Inc.*, 292 N.C. 93, 232 S.E.2d 667, 674 (1977) (discussing same proposition). [FN1] In other words, Visara could not assign its obligations under the New Jersey contracts to VI, without the consent of New Jersey, the party to which it was liable. The District Court concluded that without any evidence that New Jersey expressly or impliedly agreed to a novation [FN2] of its contracts with Visara, New Jersey remained Visara's creditor despite the attempted assignment of Visara's obligations to VI.[FN3] We agree.

FN1. Although there is some question as to whether the Asset Purchase Agreement between Visara and VI is governed by New Jersey or North Carolina law, we need not resolve a choice of law question here because the relevant laws do not conflict. *See Lucker Mfg. v. Home Ins. Co.*, 23 F.3d 808, 813 (3d Cir.1994) ("Before a choice of law question arises, ... there must actually be a conflict between the potentially applicable bodies of law.").

FN2. A novation is "[t]he act of substituting for an old obligation a new one that either replaces an existing obligation with a new obligation or replaces an original party with a new party." *Black's Law Dictionary* 1091 (7th ed.1999).

FN3. We further note that the New Jersey Contracts contained an anti-assignment-without-consent clause. That provision states the following:
3.11    SUBCONTRACTING    OR ASSIGNMENT-The contract may not be subcontracted or assigned by the contractor, in whole or in part, without the prior written consent of the Director of the Division of Purchase and Property. Such consent, if granted, shall not relieve the contractor of any of his responsibilities under the Contract.
This language in the contract suggests that the maintenance obligations were never validly transferred to VI. For example, according to the Second Restatement of Contracts, a term prohibiting the assignment of "the contract" bars delegation of a duty to an assignee. Restatement (Second) of Contracts § 322; *see also* U.C.C. § 2-210(2) ("*Unless otherwise agreed* all rights of either seller or buyer can be assigned except where the assignment would materially change the duty of the other party, or increase materially the burden or risk imposed on him by his contract, or impair materially his chance of obtaining return performance." (emphasis added)); N.J. Stat. § 12A:2-210(2); N.C. Gen.Stat. § 25-2-210(2). Therefore, it appears that New Jersey does not have, and never did have, a valid and independent claim against VI.

**\*642** New Jersey also contends that the circumstances surrounding Visara's bankruptcy proceedings demonstrate that it was not a creditor of Visara. To that end, New Jersey points out that Visara did not list the State of New Jersey in its bankruptcy schedules, Visara never formally notified New Jersey of its bankruptcy filing, and Visara never sought New Jersey's consent to the settlement agreement funded by VI. The District Court properly rejected these arguments, explaining that issues with respect to notice and consent should have been raised in Visara's bankruptcy proceedings. In addition, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

166 Fed.Appx. 639
166 Fed.Appx. 639, 2006 WL 335855 (C.A.3 (N.J.))
**(Cite as: 166 Fed.Appx. 639)**

Page 4

fact that New Jersey accepted computer service from VI for approximately six months after Visara sold its assets to VI is of no moment. As explained above, Visara could not assign its obligations under its contracts with New Jersey without New Jersey's consent, and that consent was never given. Accordingly, for the reasons stated above, we reject New Jersey's arguments that it was not a creditor of Visara during Visara's bankruptcy proceedings and therefore affirm the District Court's dismissal of New Jersey's claims against VI on *res judicata* grounds.


### III. Conclusion

**\*\*3** We have considered all of the arguments advanced by the parties and conclude that no further discussion is necessary. Accordingly, the judgment of the District Court will be affirmed.

C.A.3 (N.J.),2006.
New Jersey Dept. of Treasury v. Visara Intern., Inc.
166 Fed.Appx. 639, 2006 WL 335855 (C.A.3 (N.J.))

Briefs and Other Related Documents (Back to top)

• 05-1196 (Docket) (Jan. 24, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                        Page 1
Not Reported in F.Supp., 1989 WL 73702 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

C
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
INSURANCE COMPANY OF NORTH AMERICA
v.
Paul M. MISCH.
**CIV. A. No. 88-3669.**

July 5, 1989.

Jane Landes Foster, Stradley, Ronon, Stevens &
Young, Philadelphia, Pa., for plaintiff.
Peter F. Marvin, Miller Marvin Dunham Doering &
Schreiber, Philadelphia, Pa., for defendant.

*MEMORANDUM AND ORDER*
HUTTON, District Judge.
**\*1** Plaintiff initiated this action against defendant
seeking to recover certain payments made by plaintiff
under an indemnification agreement and investor
note signed by defendant. Defendant's counsel seeks
reconsideration of this Court's Order dated April 7,
1989, denying leave to withdraw as defense counsel.
Plaintiff moves for summary judgment and sanctions.
Defendant's counsel also moves to stay all motions
pending this Court's adjudication of counsel's petition
to withdraw. Upon due consideration, this Court
finds that plaintiff's motion for summary judgment is
granted. Defendant's motion for reconsideration is
denied. Defendant's motion to stay is denied as
moot.

Plaintiff, Insurance Company of North America
(hereinafter "INA") is a Pennsylvania corporation
with a principal place of business in Philadelphia,
Pennsylvania. Defendant, Paul M. Misch
(hereinafter "Misch"), is an individual residing in the
State of Illinois. Jurisdiction is proper under 28
U.S.C. § 1332, diversity of citizenship.

In 1984, defendant Misch, purchased a limited
partnership interest in a limited partnership known as
Marietta Associates Limited Partnership ("Marietta
Associates"). Marietta Associates was formed for
the purpose of acquiring and owning a Kroger
supermarket located in Marietta, Georgia.
Defendant Misch signed an Investor Note payable to
Marietta Associates in the principal amount of
$158,800, payable in quarterly installments over a
five-year period. The note was assigned by Marietta

to Columbia Savings and Loan Association. In
connection with the assignment, Misch also executed
an Investor Bond Indemnification and Pledge
Agreement with plaintiff Insurance Company of
North America ("INA"). The Investor bond served
to guarantee that defendant would fulfill his payment
obligations to Columbia Savings and Loan
Association in accordance with the terms of the note.
The Investor Bond Indemnification and Pledge
Agreement protected INA in the event Misch
defaulted on the payments to Columbia Savings and
Loan.

Defendant Misch ceased making payments to
Columbia Savings and Loan on May 1, 1985.
Columbia Savings and Loan Association, in
accordance with its rights under the Investor Bond,
advised INA of defendant's default and made demand
on INA for the defendant's delinquent payments.
Pursuant to its agreement with Columbia Savings and
Loan, INA made payment to Columbia Savings and
Loan and then made demand on defendant Misch for
reimbursement. Defendant Misch has not
reimbursed INA for any of these payments. On May
2, 1988, INA filed an action against Misch for
reimbursement of the payments, interest and incurred
expenses.

Defendant claims that subsequent to execution of the
note, bond and indemnification agreement, he
became aware of certain financing irregularities.
Defendant contends that he became aware of certain
misrepresentations made by Marietta Associates and
its broker/agent in connection with his purchase of
the limited partnership interests. Defendant Misch
avers that he then rescinded his purchase of the
limited partnership interests and ceased making
payments under the note. A rescission is a form of
retroactive relief where all rights and all
responsibilities of parties towards each other are
abrogated from the inception of the contract.
*Metropolitan Property & Liability Ins. Co. v.*
*Commwlth.,* 97 Pa.Cmwlth. 219, 509 A.2d 1346
(1986), *affirmed* 517 Pa.Super. 218, 535 A2s 588
(1987). There is no such thing as a partial rescission.
*Sherman v. Medicine Shoppe International, Inc.,* 581
F.Supp. 445 (E.D.Pa.1984). As noted in *Erie*
*Telecommunications, Inc. v. City of Erie, PA,* 853
F2d 1084 (3rd Cir.1988):

**\*2** "Recission of a contract is tantamount to relieving

Not Reported in F.Supp.                                                                                  Page 2
Not Reported in F.Supp., 1989 WL 73702 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

the parties of all obligations under the contract and returning to the status quo ante as it existed prior to the execution of the contract. Thus, rescission must occur in toto."

Consequently, contract law does not permit plaintiff to unilaterally modify the agreement. Both parties to a contract may, of course, agree to rescind the entire contract. See, Corbin on Contracts 1236 n. 60 (1964 and Supp.1981). However, one party may not unilaterally rescind a contract. Defendant's argument is without merit.

Defendant's answer to the complaint avers that plaintiff assisted in a breach of the securities law and that plaintiff's claims are barred by *in pari delicto* and unclean hands. Defendant contends that as a Marietta investor, he was required to execute the investor note, bond and indemnification, and pledge agreement with INA. Plaintiff contends that defendant has not proffered any facts to support allegations that plaintiff INA assisted in any wrongful scheme and plaintiff's motion for summary judgment should be granted. This Court agrees.

Before granting a motion for summary judgment, it must be established that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Federal Rule of Civil Procedure 56(c). The moving party carries the burden of proving that accepting all facts of record and inferences reasonably drawn from the facts in light most favorable to the non-moving party, there is no genuine issue of fact. *Sorba v. Pennsylvania Drilling Co., Inc.,* 821 F2d 200, 203 (3rd Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 730 (1988). Once the moving party has met its burden, the burden then shifts to the non-moving party to show that the evidence is such that a reasonable jury might enter a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

Firstly, defendant fails to raise any genuine issues that would abate his liability to plaintiff under the indemnification agreement. If defendant failed to make proper payments to Columbia Savings, then plaintiff was required to make payment. The indemnity agreement guaranteed that defendant would reimburse plaintiff for any such payments made by plaintiff to Columbia Savings. Under the laws of Pennsylvania, this Court is bound by certain precepts.[FN1] As has been stated:

"[A] court will make no inference or give any construction to the terms of a written contract that may be in conflict with the clearly expressed language of the written agreement. *National Cash Register Co. v. Modern Transfer Co., Inc.,* 224 Pa.Super 139, 142, 302 A2d 486, 488 (1973)."

*Mellon Bank, N.A. v. Aetna Business Credit,* 619 F2d 1009-1010 (3rd Cir.1980). Defendant admits that the contract itself is not suspect. However, defendant argues that "the very existence of the note and the INA documents is proof of INA's substantial assistance in the scheme." [Defendant's Reply to Summary Judgment Motion at 11]. This Court does not agree. The mere issuance of an investor bond does not constitute evidence of wrong-doing. *Landy v. Federal Deposit Insurance Corp.,* 486 F2d 139, 163 (3rd Cir.1973).

*3 Secondly, defendant fails to present any material facts to support the allegations asserted in his affirmative defenses. Defendant states that after execution of the investor note, the bond and the indemnification agreement, he became concerned about alleged unspecified irregularities in the financing of the purchase and ownership of the Kroger store. Defendant Misch ceased making payments on the note May 1, 1985. At the latest, defendant became aware of these alleged illegalities in 1984. [Defendant's Reply Brief at 3]. Defendant initiated no action against plaintiff on these allegations. The applicable statute of limitation has now run. *See, Antinoph, et al. v. Laverell Reynolds Securities,* C.A. No. 88-3664 (E.D.Pa. January 17, 1989); *Ferreri v. Andrew, et al.,* C.A. No. 88-3954 (E.D.Pa. February 6, 1989). In general, one who asserts the existence of a fact material assumes the burden of proof. This rule extends to affirmative defenses. Discovery is completed. Defendant has not proffered any proof that a disputed material fact exists. Thus, the mere assertion of affirmative defenses are insufficient to oppose plaintiff's motion for summary judgment.

Thirdly, defendant argues that summary judgment should not be entered because plaintiff has failed to disprove defendant's affirmative defenses.[FN2] Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2552 (1986). "The existence of a factual dispute between the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 3
Not Reported in F.Supp., 1989 WL 73702 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

parties will defeat an otherwise properly supported motion for summary judgment only if the dispute is 'genuine' and the fact 'material'." *Anderson v. Liberty,* 106 S.Ct. at 2510. Defendant has not provided this Court with any factual support for the affirmative defenses to plaintiff's complaint. Therefore, plaintiff's motion for summary judgment is granted.

Plaintiff also moves for declaratory relief. Plaintiff argues that it is entitled to judgment in the amount of its payments and its costs and expenses incurred in connection with the enforcement of its indemnification rights against defendant Misch. "The construction and interpretation of written instruments, including contracts, is the principal function of a declaratory judgment proceeding." *Lehigh Coal & Navigation Co., v. Central R. of New Jersey,* 33 F.Supp. 362 (E.D.Pa.1933); *Schulzendorf v. Pittsburgh & Lake Erie Railroad Company,* 640 F.Supp. 40, 41 (W.D.Pa.1986); The Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

Pursuant to the investor note, defendant promised to pay the principal sum of $158,800 in quarterly installments.[FN3] Under the indemnification agreement, defendant agreed to reimburse plaintiff for all payments, plus interest, made to Columbia Savings and Loan by INA on defendant's behalf. Defendant also agreed to reimburse plaintiff for all expenses incurred in obtaining reimbursement from defendant. Defendant admits that he ceased making payments to Columbia Savings and Loan on May 1, 1985.

*4 Plaintiff has made payments to Columbia Savings in the amount totalling $136,652.85. Defendant is liable for this amount, plus interest at the rate of 2% over the applicable interest rate of Columbia Savings at the time of each payment. The interest has been calculated for each payment through April 17, 1989, at the total amount of $31,262.55. Interest will continue to accrue at the rate of $41.95 per day. Plaintiff has incurred counsel fees and costs through April 17, 1989 in the amount of $23,730.08. Plaintiff has incurred legal related expenses in the amount of $9,323.83. Plaintiff has been able to collect $5,938.35 in disbursements on Misch's account from Marietta Associates. Thus, this Court finds defendant is liable to plaintiff in the past due amount of $200,969.31. This Court finds that plaintiff is also liable for all present and future payments, and expenses incurred, under the contract.

An Appropriate Order follows.

*FINAL JUDGMENT*

AND NOW, this 5th day of July, 1989, upon consideration of the Motion for Reconsideration of this Court's Order dated April 7, 1989, Plaintiff's Motion for Summary Judgment, Plaintiff's Motion for Sanctions and Attorney Fees, Defendant's Motion for Stay of Plaintiff's Motion for Sanctions, Defendant's Motion for Stay of Plaintiff's Motion for Summary Judgment, Plaintiff's Motion to File a Supplemental Memorandum of Law, Plaintiff and Defendant's Joint Motion for Pre-Trial Conference, and Plaintiff's Motion to Treat Pre-Trial Memorandum *nunc pro tunc,* IT IS HEREBY ORDERED that:

(1) Plaintiff's Motion for Summary Judgment is GRANTED. Judgment is entered in favor of Plaintiff, Insurance Company of North America, and against Defendant, Paul M. Misch, in the amount of $171,300.88, representing reimbursement and expenses incurred by Plaintiff through April 17, 1989. Defendant is hereby ORDERED to reimburse Plaintiff, Insurance Company of North America, for all future payments made on his behalf together with counsel fees and expenses within ten (10) days of demand by Plaintiff. Failure to so reimburse Plaintiff, Insurance Company of North America, will result in the entry of additional judgments upon affidavit by Plaintiff, Insurance Company of North America, in the amount of the demand by Plaintiff, Insurance Company of North America.

Further, Defendant is ORDERED to pay legal fees and legal expenses incurred by Plaintiff on Defendant's behalf through April 17, 1989, and judgment is entered in favor of Plaintiff and against defendant in the amount of $23,730.08.

(2) Motion for Reconsideration of this Court's Order dated April 7, 1989 is DENIED;

(3) Plaintiff's Motion for Sanctions and Attorney Fees is DENIED;

(4) Defendant's Motion for Stay of Plaintiff's Motion for Sanctions is DENIED as Moot;

(5) Defendant's Motion for Stay of Plaintiff's Motion for Summary Judgment is DENIED as Moot;

(6) Plaintiff's Motion to File a Supplemental Memorandum of Law is GRANTED;

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 73702 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

**\*5** (7) Plaintiff and Defendant's Joint Motion for Pretrial Conference is DENIED, as Moot;

(8) Plaintiff's Motion to treat Pre-Trial Memorandum *nunc pro tunc* is DENIED as Moot; and

(9) Defendant's Motion to stay the filing of Defendant's Pre-Trial Memorandum is DENIED, as Moot.

> FN1. In a diversity action a federal court must, under the principles of *Erie v. Tompkins,* apply the substantive law of the state in which it sits. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Lynne Carol Fashions, Inc. v. Cranston Print Works Co.,* 453 F.2d 1177 (3rd Cir.1972).

> FN2. Defendant's first through fifth affirmative defenses alleg that the misrepresentations and omissions of Marietta Associates and its broker/agent violated various state and federal securities laws and constituted common law fraud, that those violations and fraud render the Note void, and that Misch therefore has no obligation to make payments to INA under the Indemnification Agreement. The sixth affirmative defense alleges that Mr. Misch's rescission of his purchase of the limited partnership interests renders the Note of no legal effect and the Indemnification Agreement unenforceable. The seventh affirmative defense alleges that the Indemnification Agreement is illegal and unenforceable as against public policy. The eighth through tenth affirmative defenses allege that the claims of INA are barred by its secondary liability as an aider and abettor under the federal securities laws and the doctrines of *in pari delicto* and unclean hands. [Defendant's Reply to Plaintiff's Motion for Summary Judgment at 4].

> FN3. a. On each of February 1, May 1, August 1 and November 1 of 1985, the sum of $5,740;
> b. On each of February 1, May 1, August 1 and November 1 of 1986, the sum of $5,740;
> c. On each of February 1, May 1, August 1 and November 1 of 1987, the sum of $5,740;
> d. On each of February 1, May 1, August 1 and November 1 of 1988, the sum of $5,740;

> e. On each of February 1, May 1, August 1 and November 1 of 1989, the sum of $5,740;
> f. On each of February 1, May 1, August 1 and November 1 of 1990, the sum of $5,740;

E.D.Pa.,1989.
Insurance Co. of North America v. Misch
Not Reported in F.Supp., 1989 WL 73702 (E.D.Pa.)

END OF DOCUMENT

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1980 WL 77940 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

**H**
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware, New Castle County.
SCHWARTZ et al
v.
CENTENNIAL INSURANCE CO. et al.
**Civ. A. No. 5350 (1977).**

Submitted:  Nov. 30, 1979.
Decided:  Jan. 16, 1980.

Cross Motions for Summary Judgment:  Denied.

Frederick T. Haase, Jr., Roeberg & Associates, P.A.,
Wilmington.
Alfred M. Isaacs, Wilmington.

HARTNETT, Vice-Chancellor.
**\*1** Defendant-Hartford Accident and Indemnity
Company ("Hartford") moved for summary judgment
which is denied herein.    Plaintiffs also moved for
summary judgment.    Their motion for summary
judgment is also denied.

## I. FACTS

In May of 1973 Supermarkets General Corporation
("SGC") trading as Huber Baking Company
("Huber"), a division of SGC, leased an automobile
from Allstate Auto Leasing, Inc. ("Allstate").    The
automobile was to be used in the business of SGC
and Huber by SGC's employees.    The lease required
SGC to maintain the automobile and to carry liability
insurance covering its use.    SGC obtained insurance
on the automobile from Hartford.    By the contract
terms, the lease was assignable by Allstate but not by
SGC.

In December of 1973, SGC sold Huber to Schmidt
Baking Company ("Schmidt").    The terms of the sale
included an assignment of SGC's rights under the
Allstate lease.    At the time of the assignment SGC
still held the insurance policy issued by Hartford
covering liability for use of the automobile.    SGC
did not notify Hartford or Allstate of the assignment,
and Allstate was not removed as an additional
insured from the SGC policy.    After the sale Schmidt

insured the automobile with its carrier:  defendant-
Centennial Insurance Co. ("Centennial") even though
SGC still retained coverage on the automobile with
Hartford.

In June of 1975, Sidney Schwartz ("Mr. Schwartz"),
an employee of Huber, and Ruth Schwartz ("Mrs.
Schwartz"), his wife, were involved in a collision
while using the automobile.    Mr. Schwartz was
killed and Mrs. Schwartz was injured.

Mrs. Schwartz, in her own right and as administratrix
of Mr. Schwartz's estate, filed this action seeking a
reformation of certain insurance policies which
allegedly should have provided coverage for her or
Mr. Schwartz.    Among these policies are the policies
issued by Hartford and Centennial.

## II. HARTFORD'S MOTION

First, Hartford, in its motion for summary judgment,
claims that SGC did not have an insurable interest in
the automobile at the time of the accident.    The basic
policy sought to be served by the requirement that the
insured have an insurable interest in the subject of
insurance is twofold:  to prevent (or refuse to
enforce) wagering contracts, and to prevent
intentional destruction of the property covered or
collusive action intended to defraud the insurer.    As
is clear from the facts of this case, neither of these
dangers is present.    A finding of lack of insurable
interest in this case will not be in conflict with the
policy supporting the doctrine requiring an insurable
interest.

Liability insurance must be distinguished from
property insurance in order to determine the relevant
interest sought to be protected.    Property insurance is
intended to indemnify the policyholder against loss of
the thing insured.    An interest in the property insured
is therefore required in order to effectuate the policy:
it is thought that one put to risk will not intentionally
incur that risk.    The interest required is a potential
pecuniary loss resulting from loss of the chattel.    In
liability insurance, on the other hand, the insurance is
intended to indemnify the holder against claims
asserted against him for certain activity with respect
to the chattel.    The chattel itself is therefore
irrelevant except insofar as it may be used to define
the risks covered.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                          Page 2
Not Reported in A.2d, 1980 WL 77940 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

**\*2** Since the risk sought to be protected against by liability insurance is liability and not property, it is both logical and supportive of the general policy requiring insurable interest, to require that there be some risk of liability to which the insured is put. In this context, the liability need not be tied to any specific interest or property, since such a concept would not further any definable goal.

The great weight of authority supports this proposition. *Ocean Acc. & Guar. Co. v. Bear,* 220 Ala. 491, 125 So. 676 (1929); *Howe v. Howe,* 87 N.H. 338, 179 A. 362 (1935); *Employer's Liab. Assur. Corp. v. Sweatt,* 95 N.H. 31, 57 A.2d 157 (1948); 48 Columbia L.Rev. 1162, 1170-71 (1948); 43 AM. JUR.2d, *Insurance,* § 529; 44 C.J.S., *Insurance,* § 198; 1 ALR.3d 1193. The parties are in agreement that ownership is not necessary to create a sufficient insurable interest. They disagree on whether the risk of liability alone is a sufficient interest to support a policy of insurance. Since the weight of authority and of logic indicates that the policy supported by the insurable interest doctrine requires only that the insured be put to a risk covered by the insurance, there should only be a requirement that pure liability insurance be coupled with a risk of liability. To require more would unnecessarily burden the freedom to contract of both insurers and insureds, without a simultaneous benefit to the considerations which require an insurable interest.

This view is further supported by negative implication from the Delaware Insurance Code, 18 *Del.C.* § § 2704 and 2706. Section 2704(c) defines insurable interest in conjunction with personal insurance, and § 2706(b) and (c) define insurable interest with respect to property insurance. There is no definition of insurable interest with respect to liability insurance, therefore giving rise to an inference that the insurable interest required, if any, is something other than that required by § § 2704(c) and 2706(b) and (c).

In order to determine whether SGC had an insurable interest in the automobile at the time of the accident by using the potential liability test, it is necessary to examine the effect of the assignment on SGC. Hartford contends that SGC was relieved of all liability arising from the lease by virtue of its assignment. Plaintiffs argue that SGC assumed the position of a surety by assuring Schmidt's performance of the assigned lease.

It is clear that a party cannot escape his duties under a

contract by assigning the contract to another. Normally, an assignor remains liable as a surety for performance under an assigned contract: he must indemnify the lessor for the acts or omissions of the assignee. 3 Williston, *Contracts,* § 411 (3d ed. 1960); 4 Corbin, *Contracts,* § 866 (1951); Restatement, Second, *Contracts,* § 150 (Tent.Drafts 1-7, 1973); Restatement, *Contracts,* § 160 (1932); 6 AM. JUR.2d, *Assignments,* § 110; 6A C.J.S., *Assignments,* § 97. In the present case, SGC could not, by its unilateral act of assignment, alter the rights and duties established by contract between itself and Allstate. It is therefore obvious that, absent a finding of novation, SGC remained liable under its contract with Allstate to insure the property and to indemnify Allstate for liability arising from use of the automobile. That this is so can be seen even more clearly from the existence in the contract of a clause forbidding assignment by SGC of the contract. Allstate obviously intended to hold SGC liable and no other.

**\*3** Nor was there a novation. A novation requires four elements: (1) a valid pre-existing obligation; (2) a valid new contract; (3) extinction of the old contract; and (4) the consent of all parties to the novation transaction. 58 AM. JUR.2d, *Novation,* § 10; 66 C.J.S., *Novation,* § 3. While a novation can be implied from the acts of the parties, it must be clear that a novation is intended. In this case there was no formal novation since Allstate was not a party to a new instrument executing a lease in favor of Schmidt and discharging the agreement in favor of SGC. A novation cannot be implied from the circumstances either, since there is no evidence contrary to the presumption that Allstate intended to hold SGC liable as a surety for any default in the performance of Schmidt or for any liability arising from the use of the automobile. As there has been no consent by Allstate to the assignment sufficient to infer a novation, it follows that SGC retained, subsequent to the assignment, certain liability toward Allstate for the automobile.

SGC's assignment of the automobile lease to Schmidt did not create a novation extinguishing SGC's duties to Allstate, nor did Schmidt's performance under the assigned lease release SGC from responsibility with respect to the automobile. SGC therefore retained a potential liability for damages resulting from Schmidt's use of the automobile. Under the proper insurable interest standard, SGC had an insurable interest in the automobile for liability insurance purposes. The insurance policy is consequently not void for lack of an insurable interest.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 3
Not Reported in A.2d, 1980 WL 77940 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

I therefore hold that SGC retained an insurable interest in the automobile by virtue of its potential liability to Allstate with respect to its use. SGC was still liable to Allstate following the assignment. There is no public policy which prohibits insuring against that risk.

Next, Hartford asserts that the policy should be held to be invalid since it was carried only as a result of Hartford's mistake in believing the automobile to have remained with SGC, or because of SGC's failure to notify Hartford of the assignment. Hartford's argument is without merit. Mistake, unless fraudulent and material, is not a defense to a claim on an insurance contract after damage has occurred which the contract was intended to cover. 43 AM. JUR.2d, *Insurance,* § § 447-448; 45 C.J.S., *Insurance,* § § 469, 473(2). Hartford had the opportunity to protect itself from assignment of the lease covering the automobile by inserting a contract term to that effect. Inasmuch as it did not do so, it is Hartford's responsibility to provide the coverage for which it contracted.

Lastly, Hartford cites the recent case of *Morgan v. State Farm Mutual Ins. Co.,* Del.Super., 402 A.2d 1211 (1979) as holding that an insured must retain title to a motor vehicle to retain an insurable interest arising out of the motor vehicle. Hartford reads more into *Morgan* that is there. In *Morgan* the Court held that the transferror did not intend to retain an insurable interest and the intent not to retain title was merely an indication of that intent. There is no showing in this case that SGC did not intend to retain an insurable interest-especially in view of SGC's continuing liability to Allstate. Also, in our present case, title to the automobile has always rested with Allstate.

*4 Hartford's motion for summary judgment, therefore, must be denied. So ordered.


### III. PLAINTIFFS' MOTION

Plaintiffs in their cross motion for summary judgment, seek to have me construe in their favor a provision contained in the policy issued by Centennial. The provision under dispute is contained in the uninsured motorist clause which does not state a specific dollar amount of coverage but instead refers to the coverage mandated by one or more statutes with the term "as per statute", inserted in the policy where a dollar amount would normally appear. Plaintiffs' assertion, syllogistic in form, is that use of the term "as per statute" renders the policy ambiguous; that ambiguities are always construed in favor of the insured; and that therefore the policy of Centennial should be construed to provide the greatest rather than the least amount of coverage for plaintiffs.

Centennial replies this Court should look first to extrinsic evidence of the parties' intent in using the term rather than resort initially to a presumption in favor of the insured. Centennial points to certain facts in the record which might put a different gloss on the meaning of "as per statute" from that urged by plaintiffs. Among the facts to which Centennial points are the trade usage of the term, the lack of an endorsement to the policy providing for coverage above the minimum insured motorist protection required by 18 *Del.C.* § 302, and the existence of a questionnaire indicating that the policyholder was aware that the policy did not provide maximum coverage.

In order to prevail on a motion for summary judgment the moving party must show, at the outset, that there are no genuine issues of material fact pertinent to the subject matter of the motion. Chancery Rule 56(c). The burden is, of course, on the proponent of the motion to establish that no issue of fact exists, *Krajewski v. Blair,* Del. Ch., 297 A.2d 70 (1972), which he may do by showing that although disputed facts exist they would not be admissible at trial, *McGrew v. Vanguard Corp.,* Del.Ch., C.A. No. 5743 (unreported September 25, 1979), since no genuine issue would then exist as to those facts. All reasonable inferences from facts properly considered by the Court must be drawn in favor of the non-moving party. *Dineen v. Suburban Cab Co.,* Del.Super., 175 A.2d 39 (1961). Unless plaintiffs can show that the facts alleged by Centennial cannot be considered in interpreting the alleged ambiguity created by the use of the term "as per statute" they cannot prevail on their motion.

Plaintiffs assert, and Centennial does not deny, that the amount of coverage intended to be provided by the term "as per statute" cannot be determined from that language and therefore that term as used in the policy is ambiguous. This is so even when the contract is read in conjunction with 18 *Del.C.* § 3902, which provides that an insurance carrier must provide certain minimal uninsured motorist protection and must offer additional uninsured motorist protection under certain circumstances. The laws in force at the time of contracting "enter

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 4
Not Reported in A.2d, 1980 WL 77940 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

into, and form a part of [the contract] as if they had been expressly referred to, or incorporated in, its terms." *Trader v. Jester,* Del.Super., 1 A.2d 609 (1938). The question therefore is whether the extrinsic evidence Centennial seeks to introduce may be admitted as evidence at trial to show the meaning of the ambiguous term or whether the term must be construed according to a bare presumption in favor of the insured.

**\*5** It is the duty of a Court to give effect to the intentions of the parties to a contract, the writing being the embodiment of a jural act by the parties. *Radio Corp. of America v. Philadelphia Storage Battery Co.,* Del.Supr., 6 A.2d 329, 340 (1939); *duPont v. Wilmington Trust Co.,* Del. Ch., 45 A.2d 510, 520 (1946); 9 *Wigmore on Evidence* § 2425. In well-drawn and unambiguous contracts, of course, the plain meaning of the words used by the parties will be given full force and effect, and extrinsic evidence will not be admitted. *Radio Corp. of America v. Philadelphia Storage Battery Co.,* supra. But where, as here, the meaning of the contract cannot be determined from its terms, it is ambiguous and the intent of the parties must be determined from evidence extrinsic of the contract. *duPont v. Wilmington Trust Co.,* supra, at 517. In attempting to resolve the ambiguity, the Court may look to the circumstances surrounding the making of the contract, *Gluckman v. Holzman,* Del. Ch., 51 A.2d 487, 489-91 (1947), which would of course embrace the meaning, in trade usage, of the language used at the time the contract was made. The Court may also look to the actions of the parties subsequent to the making of the contract to ascertain their practical interpretation of it, and so to determine what the parties meant by their contract. *Artesian Water Co. v. Dept. of Highways & Transp.,* Del.Supr., 330 A.2d 441, 443 (1974); *Reeve v. Hawke,* Del.Ch., 136 A.2d 196, 200 (1957); *McCabe v. Baltimore Trust Co.,* Del.Super., 180 A. 780, 781 (1935).

The parol evidence rule is unavailable to plaintiffs to bar the admission of Centennial's evidence to show the true meaning of the ambiguous term: "as per statute", since that rule applies only if a party seeks to show by extrinsic evidence a meaning inconsistent with the plain and unambiguous language of the contract itself, or to show an ambiguity in a document unambiguous, but for the parol evidence. The plain meaning rule of *Radio Corp. of America v. Philadelphia Storage Battery Co.,* supra, stands for the proposition that parol evidence may not be used to show an ambiguity in the first place, and does stand for the proposition that such evidence may not

be used to construe an ambiguity ascertainable from the four corners of the instrument. *See generally,* 40 ALR.3d 1384.

In the instant case the existence of a contractual ambiguity is apparent from the face of the document and no extrinsic evidence need be shown to show it. Since the ambiguity cannot be resolved without recourse to extrinsic evidence to effectuate the intent of the parties, such evidence may be received by the Court. The presumption that an insurance contract is to be construed in favor of the insured, which the plaintiffs ask to have applied, should be used only in the event that the ambiguity is otherwise unresolvable after the evidence is adduced, and since Centennial has shown facts which may resolve the ambiguity but which plaintiffs dispute, summary judgment is not appropriate.

**\*6** Plaintiffs' motion for summary judgment is therefore denied. So ordered.

Del.Ch.,1980.
Schwartz v. Centennial Ins. Co.
Not Reported in A.2d, 1980 WL 77940 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| COLUMBIA HOUSING/PNC INSTITUTIONAL FUND IV LIMITED PARTNERSHIP, COLUMBIA HOUSING SLP CORPORATION, OCWEN 2000-LLC, PNC BANK, and COLUMBIA HOUSING/PNC FUND IV, INC., | § § § § § § § § | NO. 06-371 |
| Plaintiffs, | § § | |
| v. | § § | |
| OCWEN FEDERAL BANK FSB, OCWEN INVESTMENT CORPORATION, and OCWEN LOAN SERVICING, LLC, | § § § § § | |
| Defendants. | § | |

### CERTIFICATE OF SERVICE

I, Michael G. Busenkell, certify that on July 17, 2006 I caused a copy of the foregoing Plaintiffs' Response To Defendants' Motion To Dismiss Pursuant To Fed. R. Civ. P. 12(B)(1) to be served in the manner indicated on:

**Hand Delivery**
Domenic E. Pacitti (Bar No. 3989)
Saul Ewing LLP
222 Delaware Ave., Suite 1200
Wilmington, DE  19801

**Facsimile and U.S. Mail**
Joshua C. Krumholz
Holland & Knight LLP
10 St. James Avenue
Boston, MA  02116

_____
Michael G. Busenkell (No. 3933)