IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

COLUMBIA HOUSING/PNC
INSTITUTIONAL FUND IV LIMITED
PARTNERSHIP, COLUMBIA HOUSING
SLP CORPORATION, OCWEN 2000-LLC,
PNC BANK, and COLUMBIA
HOUSING/PNC FUND IV, INC.,

Plaintiffs,

v.

OCWEN FEDERAL BANK FSB,
OCWEN INVESTMENT CORPORATION,
and OCWEN LOAN SERVICING, LLC

Defendants.

CIVIL ACTION NO. 06-371

**DEFENDANTS' REPLY
TO PLAINTIFFS' OPPOSITION TO
MOTION TO DISMISS PURSUANT TO
FED. R. CIV. P. 12(b)(1)**

## INTRODUCTION

The Plaintiffs[1] contest neither the facts detailed in the Motion, nor the law discussed.
Instead, they rely upon a thinly veiled effort to re-write the parties' historical relations through a
heretofore undisclosed document created solely for this litigation. In so arguing, the Plaintiffs
have failed to meet their burden of establishing subject matter jurisdiction.

## ARGUMENT

## I.    THE DEFENDANTS' MOTION HAS NOT BEEN PREMATURELY FILED

The Plaintiffs start with the proposition that the Defendants filed the Motion prematurely
because they were required to file an answer first. *See* Plaintiffs' Response to Defendants'
Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) (the "Response") (Docket No. 16), ¶ 7.
As articulated by the Third Circuit in *Berardi,* however, the defendants have no such obligation.

[1] All capitalized terms are the same as the terms used in Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P.
12(b)(1) (the "Motion") (Docket No. 11).

# 3919035_v1

*See Berardi v. Swanson Memorial Lodge No. 48 of the Fraternal Order of Police,* 920 F.2d 198, 200 (3d Cir. 1990) (holding that a "facially sufficient complaint may be dismissed *before an answer is served* if it can be shown by affidavits that subject matter jurisdiction is lacking") (emphasis supplied). *See also Metallgesellschaft AG v. Foster Wheeler Energy Corp.*, 143 F.R.D. 553, 559 (D. Del. 1992) (same).

Indeed, pre-answer motions asserting factual challenges to subject matter jurisdiction have been repeatedly recognized as appropriate by both the Supreme Court and Third Circuit. *See Berardi,* 920 F.2d at 200 (collecting cases), citing to, e.g., *KVOS, Inc. v. Associated Press,* 299 U.S. 269 (1936) and *Int'l Assoc. of Machinists v. Northwest Airlines,* 673 F.2d 700 (3d Cir. 1982). This approach is also consistent with the Federal Rules of Civil Procedure. *See id.* ("The requirement in Fed.R.Civ.P. 12(b) that a motion to dismiss for lack of subject matter jurisdiction must be made 'before pleading if a further pleading is required' would make little sense if the factual basis for subject matter jurisdiction could not be contested until after an answer is filed.") Accordingly, there is no merit to the Plaintiffs' contention that the Motion is premature.[2]

## II. THE PLAINTIFFS HAVE FAILED TO MEET THEIR BURDEN OF ESTABLISHING SUBJECT MATTER JURISDICTION

The Plaintiffs do not dispute that they have the burden of establishing subject matter jurisdiction. *See Mortensen,* 549 F.2d at 891. Nor do they dispute that, if indeed OLS was the managing member at the time the lawsuit was filed, complete diversity does not exist. *See*

---

[2] The Plaintiffs' reliance on *Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884 (3d Cir. 1977) is particularly puzzling. Although language in that case seemingly supports the Plaintiffs' position, that language was explicitly rejected as dicta by the Third Circuit in a subsequent decision. *See Berardi,* 920 F.2d at 200 (holding that, although dicta in *Mortenson* appears to support the argument that pre-answer factual challenges to subject matter jurisdiction are inappropriate, "we are convinced that the argument is wrong"). Even more bizarrely, the Plaintiffs themselves identify *Berardi* as a case which undermines their position. *See* Response, at ¶ 7 n.1 (citing to *Berardi* as a "*but see*" citation and noting the conflict between *Mortensen* and *Berardi*). Notwithstanding the Plaintiffs' efforts to minimize its impact, *Berardi* ultimately controls over *Mortensen* as the more recent pronouncement - by some thirteen years - from the Third Circuit on this issue.

2

*Grupo Dataflux v. Atlas Global Group, LLP*, 541 U.S. 567, 570 (2004) ("[T]he jurisdiction of the Court depends upon the state of things at the time of the action brought").

The Plaintiffs similarly do not dispute any of the facts set forth in the Motion. Those facts indisputably establish that the Plaintiffs were aware of the possible dissolution of Ocwen FSB and assignment to OLS as early as April 2005, and were aware thereafter that the dissolution and transfer had occurred. *See* Motion, pp.4-5, 13 (Docket No. 11). The Plaintiffs do not contend that they complained about the dissolution or assignment, or asserted that the assignment was invalid. *See generally* Response (Docket No. 16). They do not contest that, for one full year, with the Plaintiffs' knowledge, OSL managed Ocwen 2000 and acted in all material respects as its Managing Member. *See id.* Finally, they do not deny that, as OLS expended time, energy and costs to manage Ocwen 2000 for that year, the Plaintiffs sat silently by and without complaint, even making a payment that they now claim they do not owe. *See id.*

In the face of these undisputed facts, the Plaintiffs instead engage in classic sophistry, claiming that OLS did none of the things claimed because PNC Fund IV first had to consent to that activity, and never did. *See* Response, at ¶11. The Plaintiffs then invent a canard to try to alter the parties' historical relationship. They assert that a document signed only by them, a mere three days before filing the lawsuit, designated Fund IV, Inc. as the managing member of Ocwen 2000 retroactive to July 2005. That document, as implied by the Plaintiffs' silence on the subject, did not surface until the Response was filed. It was neither sent to any of the defendants at any time,[3] nor did the Plaintiffs even mention the document in the Complaint itself.

For three reasons, the Plaintiffs' Response comes nowhere close to meeting the Plaintiffs' burden of establishing subject matter jurisdiction. First, the Plaintiffs' position is barred by a

---

[3] *See* Second Affidavit of Michael Mosher Filed in Support of Defendants' Opposition to Plaintiffs' Motion for Leave to Deposit Funds into the Court Registry and Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) ("Second Mosher Aff."), ¶ 7, filed contemporaneously herewith.

number of equitable principles, among them equitable estoppel, waiver, laches, acquiescence and ratification. *See Chase Manhattan Bank v. Iridium Africa Corp.*, 197 F. Supp. 2d 120, 127-131 (D. Del. 2002); *Coca-Cola Bottling Co. v. Coca-Cola Co.*, 769 F. Supp. 599, 669 (D. Del. 1991), *rev'd on other grounds,* 988 F.2d 386 (3d Cir. 1993) (estoppel); *Aeroglobal Capital Mgmt. v. Cirrus Indus., Inc.*, 871 A.2d 428, 444-445 (Del. 2005) (waiver); *Kallop v. McAllister*, 678 A.2d 526, 532 (Del. 1996) (waiver); *Waggoner v. Laster*, 581 A.2d 1127, 1136 (Del. 1990) (estoppel); *George v. Frank A. Robino, Inc.*, 334 A.2d 223, 224 (Del. 1975) (waiver); *Nevins v. Bryan*, 885 A.2d 233, 246-250 (Del. Ch. 2005).

In *Nevins*, for example, the plaintiff-director alleged that his removal by the board was invalid because the other defendants-directors were never validly appointed to the board. *See Nevins*, 885 A.2d at 237. Specifically, and directly on point to this case, the plaintiff claimed that the defendants never received the necessary written consents. *See id.* at 238. For that reason, according to the plaintiff, their subsequent actions were ineffective. *See id.* at 237.

Invoking "the maxim that he who seeks equity must do equity," the Chancery Court disagreed. *See id.* at 248. It noted that, until the complained-of conduct, the plaintiff never challenged the defendants' status. *See id.* at 246-47. The plaintiff knew of the absence of the necessary consents, yet for months treated the defendants as company directors without complaint. *See id.* Further, during that time, the defendants expended their time, energy and reputation to their tasks as directors. *See id.* Again, the plaintiff never complained. *See id.* For those reasons, the court held that the plaintiff's challenge to the original consent was barred by laches, acquiescence and equitable estoppel. *See id.* at 246-50.

The same principles apply in this instance. Before filing this lawsuit, all of PNC Fund IV's behavior reflected a conscious decision to accept OLS as the managing member. It knew of

the proposed assignment beforehand, and said nothing. It never complained as it made subsequent payments to OLS, and sat quietly as Ocwen FSB and related entities engaged in a large scale de-thrifting and dissolution. It allowed OLS to run the property and assume all the expenses, exposure and liability associated with that activity. *See* Second Mosher Aff., ¶¶ 3-6. For almost a year, PNC Fund IV gave no indication that it was ever concerned about the dissolution and assignment.

Indeed, were Fund IV, Inc. really the managing member as far back as July 2005, as the Plaintiffs now claim, it had and has specific duties under the Operating Agreement. Among those duties are:

- Maintaining adequate books and records.
- Causing the Company's accountants to prepare tax returns.
- Preparing and delivering tax returns.
- Preparing a balance sheet and income statement.

*See* Operating Agreement, Articles 5.3.2, 5.3.3, 5.3.9.1, and 5.3.9.3 . The problem, however, is that OLS, and not Fund IV, Inc., has discharged all of those duties. See Second Mosher Aff., ¶¶ 3-6. Only now, one year later and when they have discovered a formalistic argument to try to unjustly reach funds to which they are not entitled, do the Plaintiffs create a self-servicing document that flouts any semblance of reality. It is simply too late to make such a claim. As such, the Plaintiffs' claim of complete diversity fails.

Second, PNC Fund IV's argument is moot because it could not unreasonably withhold consent. The Operating Agreement defines "consent" as "prior written approval, *which shall not be unreasonably withheld* unless otherwise specified herein." *See* Operating Agreement, p. 5 (emphasis added). The right of a managing member to transfer its interest is governed by Article

6.2, which requires, as the Plaintiffs suggest, prior written consent. The language in that section, however, does not allow PNC Fund IV to unreasonably withhold that consent. *See id.*, at Art. 6.2. Compare *id.,* at Art. 5.5, which sets forth other limitations of the managing member's authority, where PNC Fund IV could withhold consent at its "sole discretion."

Ocwen FSB was replaced by OLS, another subsidiary of Ocwen Financial, but with much greater financial backing. The Plaintiffs benefited from the assignment. While the Plaintiffs point out that PNC Fund IV never formally gave its consent, they fail to note that PNC Fund IV had no good faith basis to withhold that consent. As such, their objection is moot. *See Fitzgerald v. Cantor*, 1999 WL 182571, at 1-2 (Del. Ch. 1999), filed contemporaneously herewith as Tab A (observing that it would be "futile" for general partner to argue that it had not consented to the transfer of corporate shares, because the circumstances of the case demonstrated that any denial of consent would have been unreasonable; general partner had not identified how transfer would harm the partnership, and could only have been motivated to withhold consent by its desire to receive multi-million dollar distributions of cash that would have gone elsewhere if the transfer had occurred); *In re Integrated Health Servs., Inc.*, 2006 WL 1728409, at *14 (Bkrtcy. D. Del. 2006), filed contemporaneously herewith as Tab B (holding that party had unreasonably withheld consent to a settlement agreement whose overall affect was beneficial to that party).

Finally, it is not clear that the purported designation of Fund IV, Inc. as the successor managing partner was mechanically correct. The Operating Agreement provides that the "Company" must name the successor managing member. *See* Operating Agreement, at Art. 5.3.7. The "Company" is defined as Ocwen 2000. *See id.*, p. 5. Ocwen 2000, however, is not a party to the document upon which the Plaintiffs rely to claim managing member status. *See*

Exhibit A to Declaration of Christopher H. Bric. As such, the Plaintiffs' transparent effort to alter reality is itself not a valid document.

As previously noted, it is the Plaintiffs' burden to establish subject matter jurisdiction. It has failed to meet that burden. As such, the action must be dismissed.

## III.   THE PLAINTIFFS HAVE A PROPER FORUM TO BRING THEIR CLAIMS

If this Court were to properly dismiss this matter for lack of subject matter jurisdiction, the Plaintiffs still would have a proper forum to assert their purported claims. The parties expressly agreed to jurisdiction in state court in Delaware. *See* First Amended Compl., ¶ 13. The Delaware Chancery Court is uniquely positioned to determine internal company disputes of this nature. *See* 6 Del. C. § 18-110 (investing Chancery Court with power to determine "the right of any person to become or continue to be a manager of a limited liability company"). As such, the Plaintiffs would not be left remediless.

## IV.   THE PLAINTIFFS HAVE ARTICULATED A DISAGREEMENT, NOT A CASE IN CONTROVERSY, IN BRINGING THEIR CLAIM

The Plaintiffs correctly note that, with regard to that portion of the Motion concerning a case in controversy, the defendants focus only upon the payment claims under the PSA. In the Complaint, the Plaintiffs seek two declarations from the Court regarding this aspect of the case:

- "The Court enter final judgment that the ... PSA [and] Eighth Amendment ... have been breached by Defendants"; and

- "The Court enter an order that Plaintiffs are not obligated to make any further payments under the PSA or the Eighth Amendment."

*See* First Amended Compl., prayers c-d. To a large degree, these prayers overlap, since the only consequence of an alleged breach would be the impact on future payments owed by PNC Fund IV under the PSA and Eighth Amendment.

7

With regard to those issues, while the Plaintiffs identify an area of substantive *disagreement*, they identify nothing that rises to the level of a case in controversy. Specifically, they claim that Ocwen FSB breached a representation and warranty that it is duly chartered as a federal savings bank. *See* Response, at ¶¶ 26, 28. As a consequence, the Plaintiffs allege, Ocwen FSB cannot honor some future potential liability. *See id.*, at ¶ 37.

Even if this allegation were true, however, it bears no relevance to the parties' contractual duties under the PSA. As previously discussed, the Payments are "absolute and unconditional" unless otherwise stated in the PSA.    *See* Eighth Amendment to PSA, § 1.1.  The only qualification in the PSA is a right of *offset*. That right, in turn, is limited to: (1) the amount of any Indemnity Payment that Ocwen FSB has failed to pay; and (2) any costs incurred by PNC Fund IV as a result of the FDIC's placing Ocwen FSB into receivership or conservatorship. *See id.*, § 3.3 and First Amended Compl., ¶ 33.

Thus, the Plaintiffs' rights with regard to the Payments are limited to *offset* only. That offset, meanwhile, can only arise under specific circumstances not alleged in the Complaint. Similarly, whether Ocwen FSB dissolved, properly or improperly, with consent or without, therefore is of no import.  Whether the assignment was proper, and whether OLS is the Managing Member has no relevance to the issues at hand.  Under the Plaintiffs' allegations, even if true, PNC Fund IV must make the Payments. There is, in reality, absolutely nothing for the Court to decide on this topic.

Further, even if the Plaintiffs' rights somehow extend beyond offset, the Plaintiffs do not dispute that they now are more financially secure than ever.[4] That observation further moots any theoretical claim on the Plaintiffs' part.

## CONCLUSION

The defendants, Ocwen Federal Bank FSB, Ocwen Investment Corporation and Ocwen Loan Servicing, LLC, respectfully request that the Court grant their motion to dismiss.

Dated: July 24, 2006

SAUL EWING LLP

By:

Domenic E. Pacitti (DE Bar No. 3989)
Michael F. Bonkowski (DE Bar No. 2219)
222 Delaware Avenue, 12th Floor
Wilmington, DE 19801
(302) 421-6864
(302) 421-5881
dpacitti@saul.com

Attorneys for Defendants
OCWEN FEDERAL BANK FSB, OCWEN
INVESTMENT CORPORATION, and OCWEN
LOAN SERVICING, LLC

OF COUNSEL:

Joshua C. Krumholz *(not yet admitted)*
Elizabeth M. Mitchell *(not yet admitted)*
Benjamin M. McGovern *(not yet admitted)*
HOLLAND & KNIGHT LLP
10 St. James Avenue
Boston, MA 02116
(617) 523-2700 (telephone)
(617) 523-6850 (facsimile)
joshua.krumholz@hklaw.com

---

[4] The Plaintiffs appear to claim that there is some pertinent time limitation to Ocwen Financial's Guaranty. *See* Response, at ¶ 41. On its face, however, the "termination date" does not arise until the Guarantor has paid "all amounts payable" under the Guaranty. *See id.*

# TAB A

# Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1999 WL 182571 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

# H

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
FITZGERALD
v.
CANTOR, et al.
**No. CIV. A. 16297-NC.**

March 23, 1999.

Rodman Ward, Jr., Karen L. Valihura, Joseph M.
Asher, George F. Fraley, III, Skadden, Arps, Slate,
Meagher & Flom, Wilmington.

Richard I.G. Jones, Jr., Ashby & Geddes,
Wilmington.

Martin P. Tully, William M. Lafferty, Morris,
Nichols, Arsht & Tunnell, Wilmington.

STEELE, Vice Chancellor.
\*1 Counsel:

Defendants' CFI and Cantor move for summary
judgment and Plaintiff CFLP moves for cross-
summary judgment on CFLP's Ninth Cause of Action
against the Cantor Fitzgerald Family Trust (the
"Family Trust"), the Iris Cantor Trust, Iris Cantor and
CFI. CFLP's Ninth Cause of Action claims that Iris
Cantor's transfer of the shares of CFI, a corporate
limited partner of CFLP, from the Cantor Family
Trust to the Iris Cantor Trust constitutes a breach of
Section 11.01 of the 1996 Partnership Agreement as a
matter of law. I disagree and grant CFI's and Cantor's
motion for summary judgment.

Section 11.01 states:
*Transfer Restrictions.* Except as otherwise herein
expressly provided, each Partner agrees not to
Transfer (as defined in Section 9.01(a)) any of his,
her, or its Units other than by sale to the Partnership
upon the terms and conditions stated in this
Agreement unless such Partner shall have received
the written consent of the Managing General Partner
which consent may be withheld for any reason (or no
reason whatsoever) in the sole and absolute discretion
of the Managing General Partner. Each shareholder
of any corporate Partner agrees not to Transfer his or
her stock of such corporate Partner and agrees to

execute such documents and take such other actions
as reasonably requested by the Managing General
Partner to effectuate the foregoing. Any Units
transferred in violation of the provisions herein shall
thenceforth lose all voting, distribution, and other
rights appurtenant thereto. Any corporate Partner the
stock of which is transferred in violation of the
provisions of this Section 11.01 shall cease to be
recognized as a Partner and shall thenceforth lose all
voting, distribution, and other rights appurtenant
thereto.

While Cantor and CFI dispute whether the transfer of
the CFI shares from the Cantor Family Trust to the
Iris Cantor Trust actually occurred, this dispute over
an arguably mixed question of law and fact is
irrelevant. Assuming *arguendo* that the transfer did
legally occur, CFI and Cantor are entitled to
summary judgment.

According to CFLP's interpretation of Section 11.01,
a shareholder of a corporate Partner must receive the
written consent of the Managing General Partner,
CFGM, before transferring his or her stock of the
corporate Partner. Consistent with this interpretation,
CFLP maintains that the written consent of the
Managing General Partner can be withheld for any
reason or no reason whatsoever in its sole and
absolute discretion. Section 11.01, as interpreted by
CFLP, provides for a reasonable restraint on the
transfer of shares of a corporate Partner for the
purpose of protecting the interests of CFLP and its
limited partners' partnership common interests. As a
matter of equity, however, a managing general
partner cannot use, adversely to the interests of a
partner or shareholder of a corporate partner seeking
consent to transfer shares, provisions identical or
similar to Section 11.01 for the sole purpose of
protecting or advancing the interests of certain
limited or general partners in matters unrelated to
their partnership interests. Despite the fact that
Section 11.01 states that the managing general
partner may deny consent for any reason whatsoever,
equity through an implied covenant of good faith and
fair dealing demands generally that consent not be
unreasonably withheld. Self-interested invocation of
a provision restraining the transfer of partnership
units or the shares of a corporate partner constitutes a
violation by the managing general partner of the
implied covenant of good faith and fair dealing

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

engrafted upon every partnership agreement. Language suggesting that the general partner does not have to establish a *persuasive reason* to withhold consent over an objecting limited partner's request to transfer is not, *per se,* unreasonable nor does it portend to tolerate a bad faith denial of consent. It simply removes the burden from the general partner of showing good cause when a genuine dispute arises. It is another matter altogether for a general partner to deny consent under Section 11.01 or similar provisions, at the expense of a partner seeking consent, in order to protect or advance the interests of certain other limited partners when those interests are unrelated to the partnership. In the latter instance, the managing general partner is favoring the interests of one partner over another for reasons unrelated to the partnership and contrary to the managing general partner's duty of loyalty to all limited partner's equally and to all partners' and their common interest in the partnership itself.

**\*2** First, CFLP points to no harm to CFLP or its limited or general partners' partnership interests that has or would result from the transfer of the CFI shares from the Cantor Family Trust to the Iris Cantor Trust nor to any reason related to the interests of the Partnership and its partners that would have justified its denial of consent to the transfer of CFI shares if Cantor had requested consent. Identifying any harm to the partnership in this instance would be a difficult task since the CFI shares were transferred from one trust controlled by Iris Cantor to another trust controlled by Iris Cantor.

Second, CFLP has emphasized throughout this litigation that Cantor's transfer of the CFI shares and contemporaneous revocation of the Survivor's Trust would prevent multi-million dollar distributions of cash that otherwise would have been made to Lutnick, the sole owner of CFLP's Managing General Partner, CFGM, and Fraser, a CFLP limited partner. The absence of any reason related to the partnership or the partners' partnership interests for which CFGM would have denied consent *coupled with* the presence of Lutnick's and Fraser's substantial outside self-interest in preventing the transfer lead me to conclude that the only reason CFGM could have denied consent would have been to protect Lutnick's and Fraser's individual interests outside their interests in common with their partners in CFLP. CFGM's denial of consent on this, the only apparent basis, would have raised serious questions about CFLP's independent exercise of its duty of loyalty owed to all partners equally. CFGM and CFLP presumably bargained for a duty to act even-handedly in its

relations with all partners and in the best interest of their common partnership investment and formalized that bargain in a Partnership Agreement. An exercise of power by the CFGM which cannot be reconciled with the interests of the partnership itself and which advances the interests of some partners, including one who controls CFGM, to the detriment of other partners violates the contractual duty of loyalty found in § 303(b) and implicates a breach of an implied covenant of good faith and fair dealing in the way in which CFGM would have interpreted its duty had its consent to the transfer been requested.

Because CFGM would have had to grant consent to the transfer of CFI shares if Cantor had requested CFGM's consent and because Cantor's failure to request CFGM's consent has caused no harm to CFLP, any attempt by CFLP in this instance to enforce Section 11.01 on its terms would be futile.

CFI and Cantor are entitled to summary judgment on this claim because if Cantor had requested CFGM's consent to transfer the CFI shares, CFGM's denial of consent would have been withheld under circumstances equity would deem intolerable and, therefore, unreasonable. The denial, on these facts, would have violated the Managing General Partner's duty of loyalty found in § 303(b) and of the implied covenant of good faith and fair dealing engrafted upon the Partnership Agreement.

**\*3** For the reasons stated above, I grant CFI's and Cantor's motion for summary judgment and deny CFLP's cross motion for summary judgment on Count IX of CFLP's Second Amended Complaint.

IT IS SO ORDERED.

Del.Ch.,1999.
Fitzgerald v. Cantor
Not Reported in A.2d, 1999 WL 182571 (Del.Ch.)

Briefs and Other Related Documents (Back to top)

• 1999 WL 33966778 (Trial Pleading) Answer of Iris Cantor and Cfi to Third Amended Complaint (Jul. 16, 1999) Original Image of this Document (PDF)
• 1999 WL 33966779 (Trial Pleading) Defendant Market Data Corporation's Answer to the Third Amended Complaint (Jul. 16, 1999) Original Image of this Document (PDF)
• 1999 WL 34000972 (Trial Pleading) Answer of Iris Cantor and CFI to Third Amended Complaint (Jul. 10, 1999) Original Image of this Document (PDF)
• 1999 WL 33966777 (Trial Pleading) Third

Amended Complaint (Jul. 7, 1999) Original Image of this Document (PDF)

• 1999 WL 34000971 (Trial Pleading) Third Amended Complaint (Jun. 30, 1999) Original Image of this Document (PDF)

• 1999 WL 33966776 (Trial Motion, Memorandum and Affidavit) Motion for Leave to File Third Amended Complaint (May 3, 1999) Original Image of this Document (PDF)

• 1999 WL 33966775 (Trial Pleading) Answer of Defendant Chicago Board Brokerage, LLC to Plaintiff's Revised Second Amended Complaint (Mar. 16, 1999) Original Image of this Document (PDF)

• 1999 WL 34000970 (Trial Pleading) Answer of Defendant Chicago Board Brokerage, LLC to Plaintiff's Revised Second Amended Complaint (Mar. 16, 1999) Original Image of this Document (PDF)

• 1999 WL 33966774 (Trial Pleading) Defendant Market Data Corporation's Answer to the Revised Amended Complaint (Mar. 11, 1999) Original Image of this Document (PDF)

• 1999 WL 33966773 (Trial Pleading) Answer of Iris Cantor and Cfi to Revised Second Amended Complaint (Mar. 9, 1999) Original Image of this Document (PDF)

• 1999 WL 33748763 (Trial Motion, Memorandum and Affidavit) Issues Presented (Feb. 15, 1999)

• 1999 WL 33966782 (Trial Motion, Memorandum and Affidavit) Motion for Summary Judgment (Feb. 11, 1999) Original Image of this Document (PDF)

• 1999 WL 33966781 (Trial Pleading) Second Amended Complaint (Feb. 2, 1999) Original Image of this Document (PDF)

• 1999 WL 34000973 (Trial Pleading) Second Amended Complaint (Feb. 2, 1999) Original Image of this Document with Appendix (PDF)

• 1999 WL 33966780 (Trial Motion, Memorandum and Affidavit) Plaintiff's Motion for Entry of Final Judgment (Jan. 22, 1999) Original Image of this Document (PDF)

• 1998 WL 34355988 (Trial Motion, Memorandum and Affidavit) Motion for Summary Judgment on CFI's and Mr. Fisher's Books and Records Counterclaims (Dec. 23, 1998) Original Image of this Document (PDF)

• 1998 WL 34355987 (Trial Pleading) CFLP and CF Group Management, Inc.'s Amended Answer and Affirmative Defenses to Iris Cantor and CFI'S Counterclaims and Third Party Complaint (Revised) (Dec. 8, 1998) Original Image of this Document (PDF)

• 1998 WL 34376217 (Trial Pleading) CFLP and CF Group Management, Inc.'s Amended Answer and

Affirmative Defenses to Iris Cantor and CFI's Counterclaims and Third Party Complaint (Revised) (Dec. 8, 1998) Original Image of this Document (PDF)

• 1998 WL 34355986 (Trial Pleading) CFLP and Cf Group Management, Inc.'s Amended Answer and Affirmative Defenses to Iris Cantor and CFI'S Counterclaims and Third Party Complaint (Dec. 2, 1998) Original Image of this Document (PDF)

• 1998 WL 34376216 (Trial Pleading) CFLP and Cf Group Management, Inc.'s Amended Answer and Affirmative Defenses to Iris Cantor and CFI's Counterclaims and Third Party Complaint (Dec. 2, 1998) Original Image of this Document (PDF)

• 1998 WL 34355985 (Trial Pleading) Cflp's Answer and Affirmative Defenses to Rodney Fisher's Counterclaims (Nov. 17, 1998) Original Image of this Document (PDF)

• 1998 WL 34355983 (Trial Pleading) Second Amended Complaint (Nov. 10, 1998) Original Image of this Document (PDF)

• 1998 WL 34376215 (Trial Pleading) Second Amended Complaint (Nov. 10, 1998) Original Image of this Document (PDF)

• 1998 WL 34355982 (Trial Motion, Memorandum and Affidavit) MOTION TO DISMISS (Nov. 9, 1998) Original Image of this Document (PDF)

• 1998 WL 34355981 (Trial Motion, Memorandum and Affidavit) Motion for Leave to File Second Amended Complaint (Nov. 5, 1998) Original Image of this Document (PDF)

• 1998 WL 34355980 (Trial Pleading) Answer of Defendant Chicago Board Brokerage, LLC to Plaintiff'S First Amended Complaint (Nov. 2, 1998) Original Image of this Document (PDF)

• 1998 WL 34355984 (Trial Pleading) First Amended Answer to First Amended Complaint Affirmative Defenses, Counterclaims and Third-Party Complaint (Oct. 16, 1998) Original Image of this Document (PDF)

• 1998 WL 34355979 (Trial Motion, Memorandum and Affidavit) Rodney Fisher's Motion for Leave to File Amended Counterclaims (Oct. 5, 1998) Original Image of this Document (PDF)

• 1998 WL 34355978 (Trial Motion, Memorandum and Affidavit) Motion to Dismiss (Aug. 7, 1998) Original Image of this Document (PDF)

• 1998 WL 34355977 (Trial Pleading) Plaintiff's First Amended Complaint (Jun. 18, 1998) Original Image of this Document (PDF)

• 1998 WL 34355976 (Trial Motion, Memorandum and Affidavit) Motion to Dismiss the Amended Complaint (Jun. 1, 1998) Original Image of this Document (PDF)

• 1998 WL 34355974 (Trial Pleading) First Amended

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                  Page 4
Not Reported in A.2d, 1999 WL 182571 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Complaint (May 20, 1998) Original Image of this
Document (PDF)

• 1998 WL 34355975 (Trial Motion, Memorandum
and Affidavit) Motion for Leave to File Amended
Complaint (May 20, 1998) Original Image of this
Document (PDF)

• 1998 WL 34355973 (Trial Motion, Memorandum
and Affidavit) Motion to Dismiss (May 1, 1998)
Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB B

# Westlaw.

# H

Only the Westlaw citation is currently available.
United States Bankruptcy Court,D. Delaware.
In re INTEGRATED HEALTH SERVICES, INC., et
al., Debtors.
**Nos. 00-389(MFW), 00-825(MFW).**

June 20, 2006.

Robert S. Brady, Esquire, Edmon L. Morton, Esquire,
Young Conaway Stargatt & Taylor, LLP,
Wilmington, DE, for IHS Liquidating L.L.C.

Arthur Steinberg, Esquire, Lester M. Kirshenbaum,
Esquire, Kaye Seholer LLP, New York, NY, for IHS
Liquidating L.L.C.

Abraham Backenroth, Esquire, Backenroth Frankel &
Krinsky LLP, New York, NY, for Abe Briarwood
Corporation.

Frederick B. Rosner, Esquire, Jaspan Schlesinger
Hoffman LLP, Wilmington, DE, for Abe Briarwood
Corporation.

## *OPINION* [FN1]

> FN1. This Opinion constitutes the findings
> of fact and conclusions of law of the Court
> pursuant to Federal Rule of Bankruptcy
> Procedure 7052, which is made applicable to
> contested matters by Federal Rule of
> Bankruptcy Procedure 9014.MARY F.
> WALRATH, Bankruptcy Judge.

\*1 Before the Court are the Motions of Abe
Briarwood Corporation ("Briarwood") to Compel the
Debtors to Comply with the Stock Purchase
Agreement and to Permit it to Release Certain Funds
Held by it in Escrow. The IHS Liquidating LLC (the
"LLC") opposes both Motions and has asserted
counterclaims against Briarwood. After considering
the evidence presented at trial and the briefs of the
parties, the Court will deny Briarwood's Motions and
the majority of the LLC's counterclaims. The Court
will schedule a status hearing on the LLC's remaining
counterclaim.

## I. *BACKGROUND*

Integrated Health Services, Inc. ("IHS") and its
related entities (collectively "the Debtors") filed

voluntary petitions for relief under chapter 11 of the
Bankruptcy Code on February 2, 2000. In late 2002,
the Debtors negotiated a stock purchase agreement to
sell substantially all their businesses and business
assets. That agreement was, however, subject to
higher bids and an auction was held on January 22,
2003, at which time Briarwood was the successful
bidder. On January 28, 2003, the Debtors and
Briarwood executed the Stock Purchase Agreement
(the "SPA"). By Order dated March 13, 2003, the
Court approved Briarwood as the successful bidder
and authorized the Debtors to perform the SPA upon
consummation of the Debtors' Amended Joint Plan of
Reorganization ("the Plan"), which was filed that
same date. The Plan was confirmed by Order entered
on May 12, 2003. Pursuant to the Plan and the SPA,
the Debtors transferred substantially all their assets
and liabilities into two operating subsidiaries and sold
the stock of those subsidiaries to Briarwood. (Ex. B-
1 at § 5.9(b).) Closing occurred on the SPA on
September 2, 2003, effective as of August 29, 2003
(the "Closing").

Subsequent to the Closing, numerous issues arose
regarding various provisions of the SPA. On
December 8, 2004, Briarwood filed its Motion to
compel the Debtors to comply with the SPA. The
LLC, successor to tbe Debtors under the Plan,
opposed the Motion and filed a cross motion for
affirmative relief. Evidence was presented at hearings
held on July 13 and August 10, 2005. The matter was
thereafter continued several times with respect to one
of the LLC's counterclaims and has never been
concluded on that issue. Post-trial briefs on the other
matters were filed on October 21, 2005. The LLC
filed a motion for authority to file a supplemental
brief, which was opposed by Briarwood. The Court
will grant the LLC's motion and consider the
supplemental brief.

On January 20, 2006, Briarwood filed a Motion for
authority to release certain funds which had been
paid by the United States Centers for Medicare and
Medicaid Services ("CMS") to the LLC in late 2005
and placed in escrow pending resolution of the earlier
Motion. The LLC filed a response opposing release
of those funds to Briarwood. A hearing on that
Motion was held on February 7, 2006, at which time
tbe parties requested that the Court decide the two
Motions at this time.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## II. JURISDICTION

\*2 This Court has jurisdiction over this matter as a core proceeding pursuant to 28 U.S.C. § § 1334 & 157(b)(2)(A), (B), (C), (N), & (O).

## III. DISCUSSION

Briarwood's Motions raise five claims for which Briarwood argues the LLC should reimburse it under the terms of the SPA: (1) approximately \$2 million in trust fund taxes for employee wages that accrued pre-Closing and but which Briarwood had to pay after Closing; (2) \$9.1 million in payments due by Georgia Medicaid authorities which were offset against sums owed by the Debtors; (3) \$18.6 million in accounts receivable owed by the United States, of which \$17.1 million was used by the Debtors to offset amounts owed by them and approximately \$1.5 million of which is being held in escrow; (4) \$5 million $^{FN2}$ in trade payables that the Debtors allegedly failed to pay in the ordinary course of business pre-Closing; and (5) a \$350,000 payment made by Briarwood for an administrative claim that the Debtors settled without Briarwood's consent.

> FN2. Although the Motion sought \$9 million, the evidence presented suggests that the trade payables claim is only \$5 million. (Exs. B-26 & B-27.)

The LLC denies that any amounts are due to Briarwood under the SPA. In addition, the LLC asserts that Briarwood owes the estate: (1) the \$19.1 million claim of the United States paid by the Debtors in the event the Court concludes that the LLC must repay the \$18.6 million received from the United States; (2) \$25,000 for obligations under a stipulation with Rotech Medical Corporation ("Rotech") which Briarwood assumed under the SPA; (3) \$7.4 million in cash collateral the Debtors had posted for letters of credit which Briarwood was required under the SPA to replace; and (4) attorneys' fees and costs incurred in this litigation. Alternatively, the LLC seeks rescission of the SPA as a result of Briarwood's alleged breaches.

### A. *Trust Fund Taxes*

Briarwood asserts that the Debtors withheld approximately \$2 million in trust fund taxes from

their employees prior to the Closing which was not subsequently remitted to the taxing authorities. (Ex. B-6.) Briarwood alleges that it has had to pay those sums to the taxing authorities for which it is entitled to be reimbursed by the estate. $^{FN3}$ Briarwood asserts that the Debtors' failure to remit the trust fund taxes created a Material Adverse Effect on the assets it acquired and is a violation of the SPA, in which the Debtors represented that they were operating in the ordinary course of business and in full compliance with all applicable laws. (Ex. B-1 at § § 3.12, 5.1 & 6.15.)

> FN3. The LLC argued that there was no evidence that Briarwood paid these taxes. Evidence was presented, however, that the entities to whom Briarwood sold the facilities did pay these taxes and that Briarwood gave them credit for that payment. (7/13/05 TR. at 16-18, 98; Exs. B-6 & B-7.) The purchaser of the majority of the assets has confirmed that its claim for paying those taxes is against Briarwood only and not the estate. (Ex. B-29; 7/13/05 TR. at 154-55.) Therefore, for purposes of this Opinion, the Court finds that Briarwood has paid those taxes.

#### 1. *Working Capital Adjustment*

The LLC initially argues that, even if the Debtors did undertake to pay the trust fund taxes, the tax liability was an issue resolved by the settlements the parties reached shortly before Closing. The SPA originally provided that Briarwood would pay \$110 million for the assets subject to an adjustment (the "Working Capital Adjustment") if the Working Capital on Closing was different from a baseline of \$62 million. (*Id.* at § 2.4.) Shortly before Closing, however, the parties amended the SPA to reduce the purchase price to approximately \$98 million and to eliminate the Working Capital Adjustment. (Exs. LLC-2 & LLC-3.) $^{FN4}$

> FN4. These modifications were done on July 21, 2003 (the "July 21 Stipulation") and on August 29, 2003 (the "August 29 Stipulation"). The LLC argues that both Stipulations resulted from Briarwood not being able to close as originally agreed and that the ultimate effect of eliminating the Working Capital Adjustment reduced the price by an additional \$4 million. (7/13/05

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TR. at 199; Ex. LLC-6.) Briarwood asserts that the July 21 Stipulation was a result of the Debtors' inability to close.

**\*3** The LLC asserts that the trust fund taxes due by the Debtors prior to Closing were originally included as part of the Working Capital. The formula by which the Working Capital was calculated expressly stated that "[f]or the avoidance of doubt, taxes payable with respect to periods prior to the Closing Date shall be taken into consideration in calculating Working Capital." (Ex. B-1 at Schedule A n. 2.) When the parties agreed to eliminate the Working Capital Adjustment, however, the LLC argues Briarwood waived any remedy for the Debtors' failure to pay those taxes. It argues that Briarwood's request to be reimbursed is an effort to avoid the effect of the modifications to the SPA.

Briarwood argues, however, that the elimination of the Working Capital Adjustment did not eliminate the obligation of the Debtors to pay the trust fund taxes as required by the SPA. Briarwood notes that the July 21 Stipulation contains only a very specific release of claims arising before that date. (Ex. LLC-2 at ¶ 19.) The August 29 Stipulation contains no release language at all. (Ex. LLC-3.) Therefore, Briarwood contends that neither Stipulation absolves the Debtors of their obligations to Briarwood under the SPA. (Exs. LLC-2 & LLC-3.)

The Court agrees with Briarwood. While the July 21 Stipulation released any defaults under the SPA existing as of that date,[FN5] the trust fund taxes at issue arose after that time. (Exs. LLC-2 at ¶ 19 & B-6.) The August 19 Stipulation contained discrete agreements, rather than any release of obligations the Debtors may have that related to the Working Capital Adjustment. In fact, taking the LLC's argument to its logical conclusion would mean that the Debtors were free to collect all the accounts receivable and not pay any of the accounts payable because both were part of the Working Capital Adjustment. The Court rejects any characterization of the SPA that allows such an absurdity.

FN5. The July 21 Stipulation provides in relevant part: IHS and Briarwood hereby waive any defaults, if any, by the other under the Stock Purchase Agreement up to the date of this Stipulation, known or unknown, including, without limitation, those allegedly resulting from actions taken or failed to be taken by the parties on or

prior to the date of this Stipulation. (Ex. LLC-2 at ¶ 19.)

The witnesses testified that the parties had been calculating the Working Capital Adjustment all Summer and were generally aware of the amount at the time they waived that requirement. In fact, the LLC's witnesses testified that they knew (because certain accounts receivable had not been received) that the Working Capital Adjustment would have favored the Debtors. The Debtors and Creditors' Committee agreed to waive that provision, however, in an effort to close and have finality. That waiver, however, was not a waiver of any other provision of the SPA. Therefore, the Court concludes that the Debtors were still bound to perform the SPA in accordance with its terms, as was Briarwood.

### 2. *Liability under the SPA*

The LLC argues, nonetheless, that it owes nothing for the tax claim because it was not an item for which the Debtors were responsible under the SPA. It asserts that under the SPA, Briarwood assumed all liabilities except Excluded Liabilities and that the taxes at issue were not listed as Excluded Liabilities. (Ex. B-3.)

**\*4** Briarwood disagrees, noting that any obligations of the Debtors under the SPA itself are Excluded Liabilities. (*Id.*) It argues that the Debtors' obligation to pay the trust fund taxes is mandated by section 3.17(b), in which the Debtors specifically represented that

Except for Tax claims that will be discharged pursuant to the Plan of Reorganization and Tax claims set forth on Schedule 3.17(a), to the knowledge of the Seller, all material Taxes payable by the Subsidiaries ... have been paid (or shall be paid on or prior to the Closing Date), and each of the Subsidiaries has properly withheld and paid all material Taxes required to have been withheld and paid in connection with amounts paid or owing to any ... employee....

(Ex. B-1 at § 3.17(b).) Further, the Debtors represented in section 3.12 that they were in compliance with all applicable law and in section 6.1 that all representations and warranties made by them in the SPA were correct. As a result, Briarwood argues that it is entitled to a claim for breach of the SPA for the Debtors' failure to pay withholding taxes.

The LLC argues that Briarwood cannot make any claim for breach of representations and warranties

because no representations and warranties survived the Closing. The LLC argues that the only recourse Briarwood had for breach of such warranties was to terminate the SPA and not close. Once Briarwood elected to close, however, the LLC contends that any issue about the representations and warranties is moot.

The Court agrees with the LLC on this point. Briarwood may not make any claim against the estate for the breach of any representations and warranties in Article III of the SPA, because the representations and warranties did not survive the Closing. (Ex. B-1 at Art. VIII.) Further, the provisions in Article VI of the SPA were merely conditions to Briarwood's obligation to close. When Briarwood did close, it waived those conditions.

Briarwood argues, however, that the Debtors were obliged under section 5.1 of the SPA to operate in the ordinary course of business between the execution of the SPA and Closing. (*Id.* at § 5.1.) $^{\underline{FN6}}$ Briarwood asserts that this provision constituted an affirmative obligation, rather than merely a representation, and that any liability arising from the Debtors' failure to perform is an Excluded Liability. (Ex. B-3.) The LLC argues that the Debtors did continue to operate in the ordinary course of business during this period.

> FN6. The SPA defined Ordinary Course of Business as "the ordinary course of business consistent with past custom and practice, including with respect to quantity and frequency ..." (Ex. B-1 at § 1.1.)

Evidence was presented that the taxes at issue relate principally to the payroll that was issued on August 29, 2003. The Debtors' former Vice President of Tax, Mark Fulchino, testified that the Debtors funded only the net payroll from their revolving line of credit on that day, as they normally did. (8/10/05 TR. at 6-8, 14-15.) No funds were actually withheld for the taxes at issue or segregated by the Debtors in a payroll account or any other account. (*Id.*) Fulchino also testified that based on the amount of the payroll tax, the taxes were generally payable the next business day, which was September 2, 2003, after the effective date of the Closing .$^{\underline{FN7}}$ (*Id.* at 6-8.)

> FN7. Some taxes were for earlier payrolls, but were also not required to be paid until after Closing. (Ex. B-6.)

**\*5** The LLC also presented an expert witness, Robert Rosenfeld, a financial consultant and CPA, who testified that this practice was consistent with the practice of most companies and in compliance with federal and state regulations. (*Id.* at 125-27, 137-38.)

Therefore, the Court concludes that in the ordinary course of business, the Debtors would have paid the taxes on the next business day (September 2, 2003), which was after the Closing was effective. (*Id.* at 7-8.) The SPA only required that the Debtors pay the taxes when due in the ordinary course of business prior to the Closing. (Ex. B-1 at § 5.1.) The taxes at issue did not come due in the ordinary course of business until after the Closing. Consequently, the Court concludes that the Debtors did continue to operate in the ordinary course of business with respect to the payment of withholding taxes and, therefore, did not breach section 5.1 of the SPA.

### 3. *Trust Funds*

Briarwood argues alternatively that it should be paid for the taxes because they are "trust fund taxes" on which is impressed a trust. 26 U.S.C. § 7501(a) ("Whenever any person is required to collect or withhold any internal tax from any other person and to pay over such tax to the United States, the amount of tax so collected or withheld shall be held to be a special fund in trust for the United States."). *See also, Gephart v. United States,* 818 F.2d 469, 472 (6th Cir.1987) (holding that trust fund taxes are held for the exclusive use of the United States and the employer may not use them for any other purpose).

The LLC disputes Briarwood's argument that there is a trust fund somewhere holding the taxes in question. As noted above, the LLC presented evidence that there were no funds set aside for these taxes in any bank account.

The Supreme Court has held that, in order to impress a trust fund on cash, there must be some nexus between the withheld taxes and that cash. *See, e.g., Begier v. Internal Revenue Service,* 496 U .S. 53, 66-67 (1990) (finding that debtor's voluntary payment of withholding taxes established the necessary nexus to make them trust funds). In this case there is no nexus between any funds held by the estate and the trust funds Briarwood asserts it is owed. Therefore, the Court concludes that Briarwood's claim on this point must fail.$^{\underline{FN8}}$

> FN8. The LLC further argues that Briarwood is not the proper party to assert that a trust fund was created; only the government can, because the trust is imposed for its benefit, not Briarwood's. The Court finds it unnecessary to address this issue, because it concludes that there was no trust fund.

#### 4. *Related to Cash*

Briarwood also argues that the withholding taxes are Excluded Liabilities because they relate to Excluded Assets, namely Cash. (Exs. B-2 & B-3.) Briarwood asserts specifically that the Debtors' Cash at Closing consisted, in part, of the taxes withheld from their employees on August 29, 2003. Therefore, Briarwood contends that the liability for the taxes is related to Cash, an Excluded Asset, and is an Excluded Liability.

The Court finds this argument unpersuasive. The Debtors' former officers testified that the Debtors did not segregate any cash for the withholding taxes and that the payroll was only funded in the net amount from the Debtors' revolving credit line. Therefore, there was no specific cash to which the withholding tax liability was related. If Briarwood's argument were accepted, any number of liabilities could be "related" to the Debtors' cash, thereby excusing Briarwood from its agreement to assume and pay them. In the extreme, Briarwood could argue that any account for which the Debtors promised payment is an Excluded Liability because it is related to the Excluded Asset, Cash. The Court cannot accept such an expansive reading of the SPA and, therefore, rejects Briarwood's argument.

#### 5. *Prepaid Items and Deposits*

\*6 Briarwood finally argues that although the SPA provided that the Debtors were to retain all Cash, "prepaid items" or "deposits" were expressly excluded from Cash. (Ex. B-2.) It argues that trust fund taxes are deposits because an employer is obligated to deposit withheld funds with the government. 26 C.F.R. § 31.6302-1. As noted, however, the Debtors did not deposit these funds into any account or pay these funds in advance.

The LLC's expert, Rosenfeld, testified that unpaid withholding taxes are not "prepaid expenses" or "deposits" under Generally Accepted Accounting Principles ("GAAP"). (8/10/05 TR. at 139-42.)

Instead, a prepaid item arises where a party has paid in advance for goods or services to be provided. Insurance premiums and subscriptions are prime examples. (*See* Miller GAAP Guide, 3.04 (2002).)

Unlike prepaid items or deposits, the Debtors did not deposit the withholding taxes in any account or prepay them. (8/10/05 TR. at 6-8.) Further, unlike prepaid items or deposits, Rosenfeld testified that withholding taxes are a liability rather than an asset under GAAP. (*Id.* at 139.) The SPA references prepaid items and deposits as an exception to Cash, which is clearly an asset. The obligation to pay the withholding taxes is not an asset at all but is, instead, a liability. Consequently, the Court rejects Briarwood's argument and concludes that it has no claim against the estate for the unpaid withholding taxes.

### B. *Funds Recouped by Georgia*

Briarwood also seeks reimbursement from the LLC of approximately \$9.5 million in Medicaid payments that were recouped by the Georgia Medicaid Authorities after Closing. The recoupment resulted from over-payments Georgia had made to the Debtors pre-Closing (between April and August 2003). Georgia recouped the over-payments post-Closing from payments due to facilities acquired by Briarwood.[FN9]

> FN9. The LLC also asserts that Briarwood failed to establish that it paid this claim. As with the withholding taxes, however, Briarwood did establish that this claim was paid by the operators to whom it sold the facilities and offset against sums they owed to Briarwood. (7/13/05 TR. at 25-26.)

The Georgia over-payments resulted from Georgia switching its claims payment vendor in the Spring of 2003. (Ex. LLC-27 at 19.) During the transition period, Georgia made estimated payments to all nursing home operators based on historical information. (*Id.*) Apparently, many nursing homes were overpaid. Once Georgia realized its mistake, it instituted a temporary policy of recouping the over-payments at the rate of 10% of weekly payments due to the operators until the exact amount could be reconciled. (*Id.* at 20-21, 24.) Once reconciled, Georgia sought the entire amount but often agreed to a repayment schedule. (*Id.* at 26-27.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Debtors were aware of the Georgia over-payments. The Debtors accounted for those over-payments by making a notation ("prospective medicaid payment") in a contra account to the account receivable due from Georgia (resulting in a negative balance for the Georgia receivable). The Georgia over-payments were not segregated, however, but were deposited into the Debtors' bank accounts and swept into a concentration account from which the Debtors' lenders were paid. (8/10/05 TR. at 65.) Sometime prior to the Closing, the Debtors and Georgia apparently reconciled the amount of the Georgia overpayment. (Ex. LLC-27 at 29-30; Ex. B-18; 7/13/05 TR. at 103, 113-14.) A demand was first made by Georgia for repayment of those sums in a letter dated August 28, 2003. (Ex. B-18.) Although it is not clear when that demand letter was received by the Debtors' corporate office, no repayments were, in fact, made prior to Closing.

\*7 Briarwood was also aware of the Georgia over-payments. The Georgia contra account was included in the Working Capital Adjustment calculations done by the Debtors and delivered to Briarwood pre-Closing. (Ex. B-1 at S-3; 8/10/05 TR. at 43-44.) The effect of including that account in the calculation was to reduce Working Capital by the $9.5 million over-payment. (Id.; 7/13/05 TR. at 157.) The Debtors' former Chief Accounting Officer, John Nolan, testified that Briarwood's representative, Mel Feder, inquired about the Georgia account receivable because it had a negative balance. (7/13/05 TR. at 169-70, 172-73, 202-03.) William Johnsen, a consultant and Senior Vice President of the Debtors, testified that he discussed the Georgia over-payments with other Briarwood representatives as well and that he told them the Debtors did not intend to pay Georgia before Closing. (8/10/05 TR. at 42-44 .) He testified that he told the Briarwood representatives that the Georgia over-payments were a liability that would flow through to Briarwood but that Briarwood would get the benefit of it as part of the Working Capital Adjustment. (Id.)

### 1. Liability under the SPA

Briarwood asserts that the estate was responsible for the Georgia over-payments, because the Debtors were obligated under the SPA for any pre-Closing Medicaid recoupments. (B-1 at § 5.16.) Briarwood asserts that the Debtors' obligation under the SPA to make those payments was an Excluded Liability under the SPA. (Ex. B-3.)

The LLC, however, asserts that section 5.16 of the SPA supports its contention that nothing is due to Briarwood for this item. That section originally provided for an escrow account from which "Medicaid recoupments coming due post-Closing but relating to pre-Closing periods shall be paid." (Ex. B-1 at § 5.16.) On July 21, 2003, however, the parties modified the SPA to eliminate the Medicaid escrow. (Ex. LLC-2.) As a result, section 5.16 was modified to require only that the Debtors "pay any Medicaid recoupments prior to the Closing in the Ordinary Course of Business." (Ex. LLC-2 at ¶ 29.)

The LLC presented testimony that the Debtors continued to operate their businesses in the ordinary course at all times prior to Closing. (8/10/05 TR. at 18, 66-67.) The Debtors' former CEO and CFO testified that ordinarily over-payments by Medicaid were repaid over time by recoupment. This practice was confirmed by the testimony of the Georgia representative. (Ex. LLC-27 at 19-27.) In this industry, there are often over-payments by Medicare and Medicaid agencies. (Id.; 7/13/05 TR. at 138-39.) When the accounts are reconciled, the over-payments are recouped by offsetting them against current obligations due to the hospital or nursing home. (Id.) In the case of the Georgia over-payments, however, no agreement or recoupment had occurred pre-Closing. (Ex. LLC-27 at 19-27.)

The Court agrees with the LLC's interpretation of section 5.16 of the SPA. The SPA requires only the payment of Medicaid recoupments in the ordinary course of business. In this case, Georgia and the Debtors had not determined the amount of the over-payment until the day before Closing. Therefore, no recoupment actually occurred pre-Closing.[FN10]

> FN10. Briarwood asserts that the Debtors former Senior Vice President, Johnsen, conceded on cross-examination that the Georgia overpayments were recoupments. (8/10/05 TR. at 82-83.) Johnsen in fact testified that "It would be recoupment when the State of Georgia recouped it." (Id.)

\*8 While the original SPA would have provided for the payment of the Georgia recoupments from the Medicaid escrow, the elimination of that escrow eliminated any right that Briarwood had to be repaid any recoupments that might occur post-Closing. In this case, Georgia did not recoup any of the over-payments pre-Closing. (8/10/05 TR. at 82 .) Thus, the Court concludes that under the express language of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the SPA, as modified, the Debtors were not responsible for the Georgia over-payments. The Georgia over-payments are a liability assumed by Briarwood.

### 2. *Pre-paid Items and Deposits*

Briarwood seeks to recover these sums nonetheless by arguing that the Georgia over-payments to the Debtors were prospective payments (i.e., "prepaid items" or "deposits") and, therefore, assets acquired by Briarwood under the terms of the SPA. (Ex. B-2.) Briarwood notes that the Debtors refer in their records to the payments as "prospective medicaid payments." (Ex. B-8.) Georgia's representative also referred to the over-payments as prospective payments. (Ex. LLC-27 at 19-20.)

Simply calling something a "prospective" payment, however, does not make it a pre-paid item or deposit. The fallacy of Briarwood's argument is that the Georgia over-payments are not assets at all; they are liabilities. The evidence established that there was not a bank account into which the Debtors deposited the Georgia over-payments. (8/10/05 TR. at 65.) Instead, those funds were swept into the Debtors' concentration account and used to pay their secured lenders. (*Id.*) At the time of Closing, therefore, there was no asset but only a liability for the repayment. (*Id.* at 66.)

As explained by Rosenfeld, over-payments by Medicaid authorities are characterized as current liabilities on the books of the nursing homes, rather than assets, because they are owed *by* the nursing home *to* the State. (*Id.* at 139-42.) The over-payments could be recorded as an asset only on the State's records (whether as a pre-paid item or a deposit for future services), because it is owed *to* the State. (*Id.* at 134-35.) In this case, there was no pre-payment or deposit of funds that were assets on the Debtors' records for the Georgia over-payments.

Therefore, the Court concludes that the Georgia overpayments were not pre-paid items or deposits that were excluded from Cash. The Georgia over-payments were not assets at all but instead were liabilities assumed by Briarwood.

### 3. *Trust*

Briarwood asserts nonetheless that the Georgia over-payments do not belong to the Debtors because they

should have been held in trust for Georgia. *See, e.g., In re Visiting Nurse Ass'n of Western Pa.,* 101 B.R. 462, 464 (Bankr.W.D.Pa.1989), *aff'd,* 143 B.R. 633 (W.D.Pa.1992), *aff'd,* 986 F.2d 1410 (3d Cir.1993) (holding that bankrupt provider held over-payments in constructive trust for Medicare). Therefore, Briarwood argues that the Debtors were unjustly enriched by keeping those payments.

**\*9** The Court rejects this argument as well. The *Visiting Nurse* case is distinguishable. In that case the debtor had segregated the funds, placing them in a separate account in a different bank from its operating accounts. 101 B.R. at 463. As noted above, in this case the Georgia over-payments were not segregated. There is no nexus between those over-payments and any cash held by the Debtors at Closing. Therefore, the Court cannot impress any cash of the estate with a trust for the benefit of Georgia or conclude that the Debtors were unjustly enriched by not repaying Georgia. Under the express language of the SPA, as modified by the August 29 Stipulation, Briarwood agreed that there would be no Medicaid escrow from which such over-payments would be repaid and that the Debtors were obligated only to repay those over-payments in the ordinary course of business. Therefore, under the SPA, the Court concludes that the estate received no more than what Briarwood agreed it would.

### 4. *Waiver*

The LLC notes that Briarwood conceded this point earlier in this case when one of the Georgia landlords filed a motion to compel the Debtors to remit the over-payments back to Georgia immediately. At the hearing on the Motion (post-Closing), Briarwood conceded that it was liable and agreed to make the payments in installments. (Ex. LLC-27 at 92-96.) Briarwood asserts that by agreeing to make those payments it did not waive any claim it had against the estate for those claims.

The Court rejects Briarwood's contention. At the hearing, the issue presented was whether the estate or Briarwood was responsible for the repayment of the Georgia over-payments. (*Id.* at 91.) In response, Briarwood conceded its obligation to make the payments. (*Id.* at 92-96.) It did not preserve any right to pursue the estate for payments it agreed to make at that hearing. (*Id.*)

Because the Georgia over-payments are a liability (not an asset) assumed by Briarwood and because

Briarwood has already conceded its obligation to pay that liability, the Court concludes that the estate has no responsibility to reimburse Briarwood for this item.

## C. *Receivables Paid by the United States*

Briarwood also asserts that it is entitled to receive $18.6 million in accounts receivable due from the United States, $17.1 million of which were set off against sums due by the Debtors and $1 .5 million of which is currently held in escrow. Specifically, Briarwood argues that the SPA expressly provides that the Debtors would be responsible for any claims that the United States might have under the False Claims Act (the "False Claims") while all accounts receivable (even those due by the United States) were sold to Briarwood. Briarwood contends that, in contravention of those provisions, the Debtors entered into a settlement with the United States (the "Global Settlement") whereby the Debtors agreed to pay $19.1 million in False Claims to the United States and correspondingly received payment of $18.6 million of accounts receivable owed by the United States.[FN11] Briarwood seeks the $18.6 million, arguing that Excluded Assets (which were kept by the Debtors) do not include the receivables due from the United States.

> FN11. The Debtors received $17.1 million shortly after the Global Settlement was approved. Additional funds were administratively frozen until appeals were concluded in late 2005, at which time the United States set off amounts due it against those funds and remitted the balance (approximately $1.5 million) to the estate. The LLC and Briarwood agreed to place the latter in escrow pending this decision.

**\*10** The LLC responds that Briarwood's arguments are without merit. It notes preliminarily that, if the account receivable is owned by Briarwood simply because it is not on the Excluded Asset list, then the False Claims are owed by Briarwood as well because they are not on the Excluded Liabilities list. Further, the LLC argues that the $17.1 million receivable was created "for settlement purposes only" at the time the Debtors agreed to pay the United States $19.1 million for the False Claims. (Ex. LLC-20 at ¶ III.B.1.b.) The net effect of the agreement was that the Debtors owed the United States $2 million. Two claims were acknowledged and two separate payments were made

because the claims related to two different government agencies: the False Claims handled by the Department of Justice ("DOJ") and the claims for under-payments handled by CMS.

Briarwood asserts that this is not a correct reading of the Global Settlement, because it did not condition the Debtors' payment of the False Claims on the CMS payment being made. The Court finds to the contrary. The Debtors' payment of the False Claims was due only after the Debtors received the CMS payment. (Ex. LLC-20 at ¶ III.C.1.)

The determination of whether the SPA precluded the setoff of the CMS claims against the False Claims requires a close review of the SPA and the Global Settlement. The LLC is correct that the Court cannot determine this issue simply by reference to the Excluded Assets and Excluded Liabilities schedules because neither schedule references the False Claims or the CMS under-payments. Briarwood argues that the False Claims are Excluded Assets because liabilities of the Debtors arising under the SPA itself are Excluded Liabilities and the Debtors had the obligation to pay the False Claims under section 6.17 of the SPA. That section provides:

6.17 *Medicare Settlement.* A comprehensive settlement agreement with the Department of Justice, CMS, OIG and/or any other applieable federal agency or agencies regarding the asserted claims against Seller and the Subsidiaries shall have been executed, providing for a full settlement and compromise of all such asserted claims against Seller and the Subsidiaries arising under governmental health care programs, other than those claims set forth on Schedule 6.17 (the "Medicare Settlement"). Seller shall take reasonable steps to negotiate an agreement under which such asserted claims (i) *are the sole and exclusive obligation of, and will be paid and satisfied solely and exclusively by, the Seller,* (ii) will not be assumed by or become in any manner whatsoever an obligation of the Purchaser or its Subsidiaries, and (iii) do not become the liability of the Purchaser and it Subsidiaries. Regarding the corporate integrity agreement arising from such settlement agreement, the Seller shall take reasonable steps to ensure that such corporate integrity agreement (i) is limited to the facilities of the Seller that are subject to this Agreement, and (ii) is inapplicable to, and does not impose any compliance obligations upon, any facility that is owned or operated by the Purchaser or any of the Purchaser's Affiliates.

**\*11** (Ex. B-1 at § 6.17 (emphasis added).)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

As the Court found above, Article VI of the SPA merely contained conditions to Briarwood's obligation to close on the sale. When Briarwood closed, it waived those conditions. Even if section 6.17 continues to have vitality, as Briarwood argues, the Court concludes that its requirements have been met.

The Court disagrees with Briarwood's assertion that the Debtors are precluded by section 6.17 from using the account receivable due from the United States to offset any False Claims due by the Debtors to the United States. In fact, section 6.17 does not relate only to False Claims; it also requires that a settlement be achieved with CMS, the entity that owed funds to the Debtors for under-payments.

The Global Settlement also provides that the matters being settled are the False Claims and the Debtors' claims against CMS for under-payments allegedly owed for cost reports prior to May 31, 2002. (Ex. LLC-20 at II.C & III.B.2.a.) Included in the latter are claims relating to facilities that had already been transferred to third parties other than Briarwood and claims relating to a rate adjustment. (Id.) As part of a prior settlement, the parties had agreed that CMS could hold certain payments due to the Debtors in administrative freeze. (Id.)i In the Global Settlement the parties agreed that those frozen funds would be used to pay certain post-petition CMS claims until the facilities were transferred. (Id. at III.B.4.d.) If there were insufficient frozen funds to pay those claims, the Debtors agreed to pay the difference; if there were any funds left after that offset, they would be remitted to the Debtors. (Id.)

The Court concludes that, from the language of the Global Settlement as well as the SPA, the funds paid by the United States belong to the Debtors, rather than to Briarwood. The SPA contemplated that all the claims of the United States would be resolved by the Global Settlement between the Debtors and the United States. In fact, they were. The only requirement was that Briarwood would not have to go out of pocket to pay any such claims. It did not. The claims were paid by the Debtors from funds otherwise due to them by the United States that were also encompassed in the Global Settlement. This result was contemplated by the SPA.

Further, Briarwood had knowledge of the terms of the Global Settlement and its effect on the accounts receivable owed to the Debtors by the United States. The SPA was originally negotiated between the

Debtors and another purchaser in late 2002. When Briarwood was the successful bidder at the auction, Briarwood and the Debtors negotiated additional minor revisions. The SPA was signed on or about January 28, 2003. (Ex. B-1.)

In the interim, the Debtors were negotiating with the United States. The terms of the Global Settlement were achieved in late 2002 and early 2003, subject only to a reconciliation of the amounts due by CMS to the Debtors. Though it was not signed until August 28, 2003, the Global Settlement was largely finalized by early March 2003 and was approved as part of the confirmation of the Debtors' Plan on May 12, 2003. (8/10/05 at 47-50; Ex. LLC-5 at 44-45.)

*12 The terms of the Global Settlement were fully vetted with Briarwood. In fact, Briarwood participated in the negotiations of the corporate integrity provisions of the Global Settlement, because those provisions would continue to apply to the facilities that Briarwood was purchasing. Further, the Debtors, in discussing the Working Capital Adjustment with Briarwood's representative, Feder [FN12], explained that Briarwood would not be receiving the CMS under-payments, which were being used to offset the False Claims. (7/13/05 TR. at 174-78.) In memos to Briarwood, Feder noted as early as June 18, 2003, that the receivables due from the United States prior to May 2002 were excluded from the Working Capital Adjustment and covered by the Global Settlement. (Ex. LLC-7; Feder Deposition at 110-13.)

> FN12. Although Briarwood asserts that Feder was not retained by Briarwood to calculate the Working Capital Adjustment, his work papers show that he did work on that matter and that he sent his work to Briarwood.

Finally, the terms of the Global Settlement were disclosed in the Debtors' Plan of Reorganization and Disclosure Statement, which also incorporated the sale to Briarwood.[FN13] In proffered testimony at the confirmation hearing, the Debtors explained the Global Settlement in detail, including the fact that the False Claims ($19.1 million) would be offset by under-payments due to the Debtors ($17.1 million). (Ex. LLC-26 at 81-83.) Therefore, Briarwood was well aware of the terms of the Global Settlement and, specifically, that the claims the Debtors had against CMS were being used to offset the False Claims. Briarwood did not object to the Global Settlement

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and, as it was incorporated in the Plan, Briarwood is bound by it. 11 U.S.C. § 1141(a). *See, e.g., Donaldson v. Bernstein (In re Insulfoams, Inc.),* 104 F.3d 547, 554 (3d Cir.1997) ("A confirmation order is res judicata as to all issues decided or which could have been decided at the hearing on confirmation.") *quoting In re Szostek,* 886 F.2d 1405, 1408 (3d Cir.1989) (holding same with respect to chapter 13 plan).

> FN13. The Disclosure Statement explained the effect of the Global Settlement, including the provision that "the Federal government will receive on the Effective Date a payment of $19,100,000, a portion of which will be set off against certain underpayments due to the Debtors, in full settlement and satisfaction of the United States Claims." (Ex. LLC-5 at 44.)

Therefore, the Court concludes that the sums set off and paid by the United States and/or CMS under the Global Settlement were excluded from the assets sold to Briarwood and are not due to it under the terms of the SPA.

### D. *Trade Payables*

Briarwood also asserts that it is entitled to reimbursement for trade payables it had to pay post-Closing, which the Debtors failed to pay in the ordinary course of business pre-Closing, as required by the SPA. (Ex. B-1 at § 5.1.) Briarwood presented evidence that in the four months prior to the signing of the SPA, the Debtors' total Past Due accounts payable averaged $2.2 million. (Ex. B-27.) During the eight months between the execution of the SPA and the Closing, the total Past Due accounts payable averaged $5.2 million. (Ex. B-26.) As of the Closing, the Past Due accounts payable totaled $7.2 million. (*Id.*) This evidence, Briarwood asserts, proves that the Debtors did not continue to operate in the ordinary course of business pre-Closing but instead allowed accounts payable to increase so that Briarwood would have to pay them.

**\*13** The LLC responds that the SPA clearly provides that Briarwood is responsible for paying the accounts payable, because they are not listed as Excluded Liabilities. (Ex. B-3.) The LLC further disputes Briarwood's assertions that the Debtors did not continue to pay trade payables in the ordinary course of business until Closing.[FN14]

> FN14. The LLC also argues that the trade payables are not due to Briarwood, because any failure to pay them was to be remedied by the Working Capital Adjustment which Briarwood waived. For the reasons stated in Part A1 above, the Court rejects this argument.
>
> The LLC further argues that there is no evidence that Briarwood has been damaged, because Briarwood failed to establish that it paid these claims. Again, the Court finds sufficient evidence that Briarwood compensated the operators to whom it sold the facilities for the accounts payable. (7/13/05 TR. 98, 154-55; Ex. B-29.)

The evidence presented confirms that the LLC is correct. The former officers of the Debtors [FN15] (who had knowledge of the Debtors' operations between the execution of the SPA and Closing) testified that the Debtors did continue to operate in the ordinary course of business during that period. (7/13/05 TR. at 122, 127-28, 201-02; 8/10/05 TR. at 67-68.)

> FN15. Many of the Debtors' former officers are now employed by the entity to whom Briarwood sold the majority of the Debtors' facilities.

Further, the accounts payable summaries show that the *total* accounts payable (as opposed to the past due payables) showed no material increase during the relevant period. (Exs. B-26 & B-27; 7/13/05 TR. at 127-28.) The Debtors' former officers explained that the Debtors had sold Rotech, their most profitable division, in the Spring of 2002. (7/13/05 TR. at 118-20; 8/10/05 TR. at 18-19.) Thereafter, it was important for the Debtors to manage their cash flow by matching payments to vendors with receipts from accounts receivable. (*Id.*) The witnesses testified that during the Summer of 2003 accounts receivable rose by almost $11 million. (7/13/05 TR. at 200.) The Debtors' failure to receive payment of those receivables (all of which went to Briarwood at Closing) affected their cash flow and the timing of the payment of accounts payable. (*Id.*)

Based on this evidence, the Court concludes that the Debtors did continue to operate in the ordinary course of business prior to Closing and that the increase in the accounts payable was a result of the Debtors' using funds received from collection of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

receivables to pay the payables, a practice in place since the sale of Rotech in the Spring of 2002. This conclusion is bolstered by the fact that the Debtors believed until immediately before Closing that the purchase price would be adjusted downward by any build-up of trade payables as a result of the Working Capital Adjustment. The Debtors had no incentive to miss those payments. Consequently, the Court will deny Briarwood's claim on this point.

### E. *IOS Payment*

Finally, Briarwood asserts that it is entitled to $350,000 for an administrative claim owed by Briarwood to IOS Capital, Inc. f/k/a IKON Capital, Inc., and its affiliates ("IOS"). The Claim is the result of a settlement reached by the Debtors and IOS without Briarwood's consent. Briarwood argues that under the SPA the Debtors were not allowed to settle any matter without its consent if it would impose more than $250,000 in liability on Briarwood. (Ex. B-1 at § 5. 1(c), (g), (h) & (k).) Therefore, Briarwood asserts that it is not responsible for the administrative claim of IOS and that the Debtors must reimburse it for having paid IOS. Briarwood also argues that the IOS claim is an Excluded Liability because it is related to an Excluded Asset (the Debtors' preference action against IOS).

#### 1. *Reasonableness of Settlement*

*14 The IOS settlement arose when, in January 2002, the Debtors filed a preference action against IOS seeking recovery of approximately $250,000. IOS had asserted an administrative claim of $2 million, as well as numerous pre-petition claims.[FN16] On August 27, 2003, the Debtors settled with IOS by agreeing to dismiss the preference action and to grant IOS a general unsecured claim in the amount of $1.6 million and an administrative expense in the reduced amount of $350,000. Under the settlement, IOS also agreed to abandon certain property to Briarwood. While Briarwood originally objected to the IOS settlement, it withdrew its objection and conceded the settlement was fair. Briarwood did, however, reserve the right to assert a claim against the Debtors for any payments it made to IOS.

> FN16. Under the SPA, Briarwood is responsible for most administrative claims while the estate is responsible for general unsecured claims. (Ex. B-3.)

The LLC argues that the SPA (which required the Debtors to obtain the consent of Briarwood to any settlement in excess of $250,000) also required that Briarwood not unreasonably withhold its consent. (*Id.*) By stipulating to the reasonableness of the IOS settlement, the LLC argues that Briarwood could not reasonably refuse to consent to that settlement. Furthermore, the LLC notes that the overall effect of the settlement was to give Briarwood the benefit of the IOS preference owned by the Debtors by reducing claims for which Briarwood was liable. The settlement also gave Briarwood miscellaneous IOS property. Therefore, the LLC argues that Briarwood's refusal to consent to the IOS settlement is unreasonable.

The Court agrees. The settlement with IOS gave Briarwood the benefit of the preference claim the estate had against IOS, which reduced the amount due by Briarwood by up to $250,000. The Debtors could have settled the preference action separately from the claims for which Briarwood was responsible. In that event, the Debtors would have recovered their preference of $250,000 and IOS would have asserted an administrative claim of at least $600,000 against Briarwood. Therefore, the Court concludes that the IOS settlement was reasonable from Briarwood's perspective.

#### 2. *Excluded Liability*

Briarwood alternatively argues that it did not assume the IOS liability because Excluded Liabilities included "Liabilities relating to Excluded Assets." Briarwood asserts that, because the IOS preference was an Excluded Asset, the administrative claim of IOS is an Excluded Liability. The LLC responds that the IOS administrative claim was not related to the preference; it was the result of other claims that IOS had against the estate.

The Court agrees with the LLC on this point. To accept Briarwood's argument would be to conclude that any creditor against whom the estate had a preference claim must be excluded from the trade payables assumed by Briarwood. Such a conclusion is not supported by the language of the SPA. The SPA defines Excluded Liabilities to include "Liabilities relating to Excluded Assets." (Ex. B-3.) It clearly requires some relationship between the Excluded Asset and the liability, other than simply the identity of the parties. For example, "Liabilities relating to Excluded Assets" could logically mean the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

costs of bringing preferences or costs incurred in connection with preserving or collecting an Excluded Asset.

**\*15** If instead, as Briarwood asserts, the parties meant to exclude any trade payable because the creditor owed a preference, the definition of Excluded Liabilities would have read "Any liabilities owed to a party owing an Excluded Asset or Preference to the Debtors ." The SPA does not so state, and therefore, the Court rejects Briarwood's argument.

Briarwood argues nonetheless that the IOS administrative claim does have a relationship to the preference: the preference would be a defense to the administrative claim under section 502(d). Further, it asserts that the motion for approval of the IOS settlement stated that IOS had asserted a potential right of setoff to the preference for the administrative claim. The LLC denies that IOS raised its administrative claim in any counterclaim to the preference and asserts that, in substance, the administrative claim is not related to the preference.

The Court agrees with the LLC. A preference defendant cannot raise as a defense to a preference a claim the estate owed to it. In fact, section 502(d) has the opposite effect: disallowing any claim a defendant may have until it satisfies any preference claim the estate has against it. 11 U.S.C. § 502(d). This alone, however, is insufficient to make the Debtors' preference related to the IOS claim. Section 502(d) is applicable to all creditors against whom a preference or other transfer action may be brought. Therefore, to accept Briarwood's argument that the claims are related would mean that all trade payables against whom the Debtors had avoidance actions were Excluded Liabilities. The Court will not read the SPA so expansively.

Finally, Briarwood asserts that IOS's administrative claim arises from the failure of the Debtors to pay the monthly expense due to IOS in the ordinary course of business. The LLC denies this assertion and notes that the IOS administrative claim is the result of 300 equipment leases with numerous operating Debtors.

As noted above, the former officers of the Debtors testified consistently that the Debtors continued to operate their businesses in the ordinary course of business between the execution of the SPA and the Closing. (8/10/05 TR. at 18, 66-67.) Consequently, the Court finds that Briarwood is not entitled to any reimbursement of the IOS administrative claim for

which it is liable under the SPA.

### F. *Limitation on Liability*

Because the Court concludes that the estate owes nothing to Briarwood, it is unnecessary to address the arguments of the LLC that any claim of Briarwood is limited by the terms of the SPA to $2 million [FN17] or was waived pursuant to the July 21 Stipulation.[FN18]

> FN17. Section 11.2 of the SPA provides:
> Section 11.2 Liquidated Damages. Notwithstanding anything to the contrary herein, including without limitation, the provisions of Sections 11.13 and 11.15, the sole and exclusive monetary remedy of the Purchaser for any breach by the Seller of the terms of this Agreement shall be to receive its actual damages in an amount of up to $2,000,000....
> (Ex. B-1 at § 11.2.)

> FN18. The July 21 Stipulation waived all defaults that arose prior to the date of that Stipulation. (Ex. LLC-2 at ¶ 19.) Based on that waiver, the LLC asserts that Briarwood has waived the right to assert the United States claim, the trade payables claim, and the Georgia claim, which are all based on activity occurring prior to July 21, 2003.

### G. *Cross Claims by LLC*

#### 1. *Rescission*

The LLC argues that, in the event the Court finds in favor of Briarwood on any of its claims, the Court should rescind the SPA because the Debtors closed on that agreement under the mistaken belief that Briarwood could not make any of those claims.[FN19] Briarwood argues that the LLC's rescission claim is time-barred under section 1144, Rule 60(b) and applicable state law, that Briarwood's enforcement of its rights under the SPA does not mean it made any misrepresentations, that the LLC cannot seek rescission without rescinding the Plan as well, and that rescission would require that the LLC restore Briarwood to its prior status (by returning the $98 million purchase price, for example).

> FN19. Specifically, the LLC asserts that by

agreeing to the August 29 modifications, Briarwood represented that it would close without seeking a purchase price adjustment based on Working Capital. If Briarwood were able to recover the tax claim, the Georgia claim and the trade payables claim, the LLC contends Briarwood's representation would have been false. Furthermore, the LLC asserts that Briarwood's failure to object at any time during the Plan confirmation process to the Global Settlement was a representation that Briarwood did not own the Debtors' claims against the United States and that they could be set off against the sums the Debtors owed.

**\*16** The Court finds it unnecessary to address the rescission claim of the LLC. The LLC sought rescission only in the event that the Court concluded that Briarwood was entitled to reimbursement for the withholding taxes, Georgia over-payments, and/or the CMS under-payment. Because the Court has concluded that none of Briarwood's claims have merit, the rescission claim is moot.

Briarwood also argued that because the LLC is seeking rescission, it is precluded from also seeking damages from Briarwood for breach of contract. *See, e.g., American Woolen Co. of New York v. Samuelsohn,* 123 N.E. 154, 155 (1919) (concluding that "an action to rescind a contract of sale on the ground of fraud and to recover goods alleged to have been sold in reliance upon fraudulent misrepresentations is inconsistent with an action on the contract of sale.").

The LLC disagrees. It notes that the Federal Rules of Civil Procedure allow pleading in the alternative and that the plaintiff need not elect which remedy it seeks before trial unless the failure to elect would be prejudicial to the defendant. Fed.R.Civ.P. 8(e)(2). *See, e.g., Omega Executive Services, Inc. v. Grant,* No. 78 Civ. 4616, 1980 WL 1432, at \*2 (S.D.N.Y.1980); *E.H. Boly & Son, Inc. v. Schneider,* 525 F.2d 20, 23 n. 3 (9th Cir.1975); *Croce v. Kurnit,* 565 F.Supp. 884, 894 (S.D.N.Y.1982). It distinguishes the cases cited by Briarwood, arguing that in those cases the contract had already been rescinded, thereby precluding a later suit for breach of the contract. *See, e.g., American Woolen Co.,* 123 N.E. at 156 (holding that because plaintiff had elected to rescind and succeeded on its effort to reclaim its goods, it was not entitled to sue for breach of contract).

The Court agrees with the LLC. The LLC was free to argue in the alternative. Simply asserting a claim for rescission (that has not been granted by the Court) does not preclude the LLC from seeking damages for breach of contract.

#### 2. *IHS-Rotech Stipulation*

On March 26, 2002, Rotech emerged from chapter 11 pursuant to a separate plan of reorganization. In connection with the Rotech Plan, the Debtors had stipulated, inter alia, to administer and fund all of Rotech's retained professional and general liabilities through the effective date of the Rotech Plan. The LLC asserts that Briarwood assumed those liabilities under the SPA. The LLC presented evidence that Briarwood has failed to pay a claim of approximately \$25,000 in attorneys' fees incurred in connection with a personal injury claim related to Rotech. (8/10/05 TR. at 155.)

Briarwood contests this claim, asserting first that it is not an obligation it assumed because it relates to professional fees which are Excluded Liabilities. (Ex. B-3.) The Court rejects Briarwood's contention. The attorneys' fees that were Excluded Liabilities under the SPA were "All administrative expenses incurred by [the Debtors] for professional services rendered *in connection with its reorganization.*" (*Id.* (emphasis added).) The claim in question, though professional fees, does not appear to have been incurred in connection with the Debtors' reorganization, but instead was incurred in connection with the administration of professional and general liability claims of Rotech. (8/10/05 TR. at 155-56.) The Court concludes, therefore, that the claim is not an Excluded Liability.

**\*17** Additionally, Briarwood asserts that the LLC failed to establish that the claim is one covered by the Rotech stipulation because there is no evidence that the claim arose before the effective date of the Rotech Plan, that it was related to a professional or general liability claim, or that the claim itself is valid. The Court agrees with Briarwood in part. Although evidence was presented that the claim was for professional fees related to a professional or general liability claim, no evidence was presented as to the validity of the claim itself or when it arose. (*Id.* at 155-56, 160.) Therefore, the LLC has failed to establish that it is covered by the Rotech stipulation or that Briarwood has any obligation to pay it. The Court will deny the LLC's claim on this point.

### 3. *Attorneys' Fees*

Pursuant to the SPA, the prevailing party is entitled to the attorneys' fees and costs associated with any action relating to the SPA. Section 11.11 of the SPA provides that "[s]hould either party institute any arbitration, action, suit or other proceeding arising out of or relating to this Agreement, the prevailing party shall be entitled to receive from the losing party reasonable attorneys' fees and costs incurred in connection therewith." (Ex. B-1 at § 11.11.)

Although the LLC has prevailed on all claims brought by Briarwood in this contested matter, it has not prevailed on all its counterclaims. Therefore, the Court concludes that there is no "prevailing party" and that an award of attorneys' fees and costs is not warranted.

### 4. *Reimbursement of Cash Collateral Securing Bonds*

Prior to the Effective Date, on July 27, 2001, the Debtors had obtained surety bonds from Greenwich Insurance Company which were required for it to operate. According to the LLC, the bonds were secured by irrevocable letters of credit in the amount of $7,420,808 .50. The Debtors were required by their lenders to post cash collateral in that amount to secure the letters of credit obligation.

The LLC asserts that, under section 2.2 of the Plan, Briarwood was to replace the Greenwich letters of credit, among others, and that Briarwood confirmed this obligation in the July 21 Stipulation. (Ex. LLC-2 at ¶ 9(a).) The LLC seeks an order directing Briarwood to replace the letters of credit and to reimburse the estate for the costs of maintaining the cash collateral to support the letters of credit since the Closing (allegedly $185,520.21 per year).

Briarwood contests this claim. It asserts that, under the July 21 Stipulation, the Debtors waived Briarwood's obligation to replace the letters of credit relating to the Florida facilities. It alleges (in a post-trial submission) that approximately 95% of the LLC's claim is related to the Florida facilities.

As noted above, the parties have not concluded the record on this issue and the matter was continued for additional hearing. Consequently, the Court cannot decide this issue at this time.

### IV. *CONCLUSION*

**\*18** For the foregoing reasons, the Court will deny the Motions of Briarwood to compel compliance with the SPA and will deny most of the LLC's counterclaims. The Court will schedule a status hearing on the remaining issue in dispute.

An appropriate order is attached.

### ORDER

**AND NOW,** this **20th** day of **JUNE, 2006,** upon consideration of the Motions of Abe Briarwood Corporation ("Briarwood") to Compel the Debtors to Comply with the Stock Purchase Agreement and to Permit it to Release Certain Funds Held by it in Escrow and the responses of the IHS Liquidating LLC (the "LLC") thereto, and for the reasons stated in the accompanying Opinion, it is hereby

**ORDERED** that the Motion of the LLC for leave to file a supplemental memorandum is hereby **GRANTED;** and it is further

**ORDERED** that Motions of Briarwood are hereby **DENIED;** and it is further

**ORDERED** that the LLC's counterclaims, except with respect to its request that Briarwood be compelled to replace the letters of credit related to the Greenwich Insurance Company bonds, are hereby **DENIED;** and it is further

**ORDERED** that a hearing to consider the LLC's request that Briarwood be compelled to replace the letters of credit or collateral related to the Greenwich Insurance Company bonds is rescheduled for status hearing on June 27, 2006, at 2:00 pm.

Bkrtcy.D.Del.,2006.
In re Integrated Health Services, Inc.
--- B.R. ----, 2006 WL 1728409 (Bkrtcy.D.Del.), 97 A.F.T.R.2d 2006-3105

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

COLUMBIA HOUSING/PNC INSTITUTIONAL
FUND IV LIMITED PARTNERSHIP,
COLUMBIA HOUSING SLP CORPORATION,
OCWEN 2000-LLC, PNC BANK, and
COLUMBIA HOUSING/PNC FUND IV, INC.,

       Plaintiffs,

v.

OCWEN FEDERAL BANK FSB, OCWEN
INVESTMENT CORPORATION, and OCWEN
LOAN SERVICING, LLC

       Defendants.

Civil Action No. 06-371 GMS

## CERTIFICATE OF SERVICE

I, Domenic E. Pacitti, Esquire, hereby certify that on July 24, 2006, I electronically filed **DEFENDANTS' REPLY TO PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(1)** with the Clerk of Court using CM/ECF which will send notification of such filing. A copy of the document was served on the following counsel in the manner indicated:

| **VIA REGULAR MAIL** | **VIA REGULAR MAIL** |
|---|---|
| Karen Lee Turner<br>Michael Busenkell<br>Eckert Seamans Cherin & Mellott<br>300 Delaware Avenue, Suite 1360<br>Wilmington, Delaware 19801 | Charles L. Perry<br>Andrews Kurth LLP<br>1717 Main Street, Suite 3700<br>Dallas, TX 75201 |

Domenic E. Pacitti (DE Bar No. 3989)
222 Delaware Avenue, 12th Floor
Wilmington, DE 19801
(302) 421-6864
(302) 421-5881
dpacitti@saul.com

# 3919035_v1